(b) The Buyer [BWIP-AC, now Flowserve] shall defend, indemnify and hold harmless Borg-Warner and its subsidiaries from, and there shall be excluded from Borg-Warner's obligation to defend, indemnify and hold harmless under the preceding paragraph (a) of this section 9.04, the following Losses (the "Specified Liabilities"):

* * * * *

   (C) any product liability claim asserted after the Effective Date, whether based on theories of negligence, warranty or strict liability, arising from a product manufactured or sold by any of the businesses of the Divisions [including the Byron Jackson Division], whenever manufactured or sold, unless set forth in Schedule 4.15 or required to be disclosed in Schedule 4.15 and not so disclosed, provided, however, that BWIP [Flowserve] or one of its Subsidiaries manufactures or holds out for sale such product or parts therefor as of the Effective Date;

CC at 12.

  The indemnity obligation set forth in Section 9.04(b)(C) of the 1987 Stock Purchase Agreement, that requires BWIP-AC [Flowserve] to indemnify Borg-Warner and Burns for products liability claims asserted after the Effective Date of the Agreement, is consistent with the indemnity obligation set forth in Section 9.04(a)(ii)(C) of the Agreement that requires Borg-Warner or Burns, subject to the provisions of Section 9.04(b) and (c), to indemnify BWIP-AC [Flowserve] for products liability claims asserted prior to the Closing Date under the Agreement. CC at 12. These indemnity provisions reflect the parties' intent to transfer to BWIP-AC [Flowserve] full responsibility for all products liability claims asserted after the Effective Date of the 1987 Stock Sale arising from products manufactured by the businesses being sold. CC at 12.

  On or about May 1, 1987, BWIP-AC sent to Borg-Warner a letter concerning the 1987 Stock Purchase Agreement and specifically BWIP's and its subsidiaries responsibility for "Losses" which are defined in the Agreement as "claims, actions, causes of action, liabilities, losses, damages, and reasonable out-of-pocket expenses and costs." CC at 16. The May 1, 1987 letter provides in part:

120168

5

> The purpose of this letter is to document our mutual agreement that, notwithstanding anything to the contrary contained in the Agreement, neither BWIP nor any of its Subsidiaries shall be responsible for any Losses to the extent that such Losses are covered by insurance carried by Borg-Warner.

CC at 16. The May 1, 1987 letter was acknowledged and agreed to by a representative of Borg-Warner. CC at 16.

### Flowserve's Wrongful Use Of Insurance That Is The Property Of Burns

Since the Closing under the 1987 Stock Purchase Agreement, Flowserve has repeatedly and consistently asserted that the defense and indemnity of the Underlying Asbestos Claims was to be provided by available insurance carried by Borg-Warner pursuant to the terms of the May 1, 1987 letter. CC at 16. Burns, under a reservation of rights, has allowed Flowserve to access and obtain the benefits of this insurance for the defense and indemnity of BWIP/Flowserve's Underlying Asbestos Claims. CC at 16-17. Burns has done so with the express understanding that Flowserve was asserting its rights under the May 1, 1987 letter, because Flowserve recognized and agreed that it was the legal successor to BWIP and was responsible for Losses arising out of the Underlying Asbestos Claims to the extent such Losses were not covered by insurance carried by Borg-Warner. CC at 17.

More recently, however, following purported exhaustion of the primary coverage, when one or more of the insurance carriers providing umbrella coverage under the Borg-Warner policies refused to pay the full amount of defense costs and settlement payments in the Underlying Asbestos Claims, Flowserve disavowed its liability for Losses arising out of such Claims. CC at 17. Instead, Flowserve now contends that it is not responsible for such Losses and that it is entitled to indemnity for such Losses under the indemnity provisions of the 1987 Stock Purchase Agreement. CC at 17.

Had Burns known that Flowserve intended to disavow its responsibility for Losses arising out of the Underlying Asbestos Claims, it would not have allowed Flowserve to obtain the benefit of the available insurance to cover such Claims because the terms of the May 1, 1987 letter apply only to Losses for which Flowserve is responsible in the absence of insurance carried by Borg-Warner. CC at 17. Because Flowserve now contends that the Underlying Asbestos Claims are not "Losses" for which it is liable, it is not entitled to access insurance carried by Borg-Warner. CC at 17-18.

Burns has been tendering the defense of the asbestos claims against Flowserve to the insurers for Borg-Warner, CC at 16-19, based on its understanding that Flowserve was responsible, as between Burns and Flowserve, for such claims, and based on that understanding, could access the insurance coverages. CC 17. The insurers have spent millions of dollars in defense and indemnity for suits filed against BWIP or Flowserve. CC at 18. Because the policies are assets of Burns, which is named in thousands of asbestos claims, and continues to be named in new asbestos claims, Flowserve has wrongfully taken insurance coverage that rightfully belongs to Burns. CC at 16-22. Burns is entitled to repayment of the sums expended for Flowserve's benefit, so that they can be used for Burns' own defense and indemnity. CC at 16-22. For that reason, Burns has properly asserted claims for restitution and unjust enrichment against Flowserve.

### The Allegations of Counts IV and V of Burns' Counterclaims

Burns alleges the following in Count IV (Restitution):

> 30. Burns conferred a substantial benefit on Flowserve by providing it with a defense and indemnity in the Underlying Asbestos Claims through insurance carried by Borg-Warner.
>
> 31. Burns conferred this benefit upon Flowserve because of its mistaken belief that Flowserve, by requesting Burns to provide

such defense and indemnity pursuant to the May 1, 1987 letter, was acknowledging its responsibility for the Underlying Asbestos claims to the extent the Claims were not covered by insurance carried by Borg-Warner.

32. Had Flowserve disavowed its ultimate responsibility for the Underlying Asbestos Claims in the absence of insurance carried by Borg-Warner, Burns never would have tendered the Underlying Asbestos Claims to the available insurance carriers, except in those cases where Burns was named as a defendant, and would have preserved such insurance coverage for itself and any others entitled to the benefits of the insurance coverage.

33. Burn's (sic) mistake caused the conferring of the foregoing benefit upon Flowserve.

34. Burns alleges the following in Count V (Unjust Enrichment):

35. Flowserve has realized in excess of $10,000,000 in insurance benefits by wrongfully seeking insurance coverage under the terms of the May 1, 1987 letter for claims which it now contends it is not responsible.

36. Flowserve's retention of these benefits, to the detriment of Burns, is contrary to fundamental principles of equity and good conscience.

37. By reason of its actions, Flowserve has been unjustly enriched and should be required to disgorge the full value of its ill-gotten gains.