2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)   Page 3

and pay all costs and expenses in connection therewith, which Policy shall provide at least the same coverage, and contain terms and provisions which are no less favorable to the insured parties, as existed under the Occurrence-Based Policy in respect of which such replacement is obtained, provided, however, that no party hereto shall be required to expend more than an amount equal to 350% of the original premium paid with respect to the portion of the limits of liability under such Occurrence-Based Policy (determined on a pro rata basis) exhausted by such party's respective Covered Persons to obtain reinstatement or a replacement Policy as contemplated hereby, it being understood that each party hereto shall nonetheless be required to obtain the maximum amount of reinstatement or replacement coverage available for such 350% premium amount in accordance with the terms and provisions of clauses (i) or (ii) hereof as applicable.

**\*\*3** The Insurance Agreement also imposes ongoing obligations on its signatories following the corporate reorganization. For example, Section 3.2(d) continues with the following notice provision:

If at any time a party (an "Impairing Party") hereto becomes aware (such party being deemed to be aware whenever any of the directors or executive officers of such party or any other member of its respective Group become aware) of a claim or potential claim against any such Impairing Party's respective Covered Persons which claim is reasonably likely to exhaust (but has not yet exhausted) all or any portion of the aggregate limits of liability, if any, under any Occurrence-Based Policy (a "Potential Impairment"), such Impairing Party shall promptly provide notice of such Potential Impairment to the other parties hereto.

The Insurance Agreement goes on to specify the duties of the "Impairing Party" following the giving of such notice:

Such Impairing Party shall have five business days after providing such notice to elect to, at that time, either secure reinstatement of the limits of liability under such Occurrence-Based Policy (to the extent provided for therein) or purchase a Policy in replacement of such limits of liability (in each case in accordance with the terms and provisions of the second preceding sentence) in respect of such Potential Impairment (but shall not be required to so elect at such time). If such Impairing Party does not timely elect to secure reinstatement or replacement coverage, then either or both of the other parties hereto may elect to reinstate the limits of liability under such Occurrence-Based Policy (to the extent provided for therein) and pay all expenses incurred in connection therewith, provided, however, that if such Potential Impairment actually occurs, the Impairing Party shall reimburse the other parties for any fees and expenses incurred by such parties in connection with such reinstatement.

Also, with respect to the ongoing obligations of the parties to the Insurance Agreement to each other, the provisions of Section 8.3 may be instructive:

*Cooperation.* The parties hereto agree to use their reasonable best efforts to cooperate with respect to the various insurance matters contemplated by this Agreement. Each party hereto shall not (and shall not permit any of its respective Covered Persons over which it has legal or effective direct or indirect control to) take any action or permit any inaction that could reasonably be expected to jeopardize or otherwise interfere with the rights of any other party (or any of such other party's respective Covered Persons) hereunder or the ability of any other party (or any of such other party's respective Covered Persons) to collect any proceeds which might be available under any of the Policies addressed herein in accordance with the terms of this Agreement.

Old Tenneco, which was facing substantial liability claims, commenced negotiations with the London Insurers in order to resolve coverage issues regarding those claims. As a result of these negotiations, Old Tenneco and the London Insurers reached an agreement, which resulted in a significant payment to Old Tenneco, but that payment came at a price. (FN7) Old Tenneco agreed to release the London Insurers from any further liability under the policies, a release that purports not only to protect the London Insurers from other claims of Old Tenneco, but also to protect them from any claims by the Plaintiffs. Thus, the Plaintiffs allege that, as provided in the Settlement Agreement, Old Tenneco and the London Insurers sought to terminate all of their rights to coverage under the London Insurers' policies as well. The Settlement Agreement, Plaintiffs allege, resulted in the loss of coverage under the Exhaustible Limits policies even though the policy

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)    Page 4

limits had not been reached. In essence, Plaintiffs assert that Old Tenneco compromised coverage disputes by agreeing with the London Insurers that disputed claims would be paid but that the London Insurers' liability would be less than that specified by the policy limits of the Exhaustible Limits policies. Perhaps more troubling to Plaintiffs is their allegation that Old Tenneco's release deprived them of the opportunity to seek coverage under policies with the Non-Exhaustible Limits because the Settlement Agreement purports to release policies that have no aggregate limits and, thus, no limit on the number of claims, which, at least theoretically, could have been brought under the Occurrence-Based Policies for events that happened during the term of the policies.

**4 In addition, Plaintiffs allege that El Paso failed to provide any notice of the Settlement Agreement or of El Paso's efforts that led up to the Settlement Agreement until February 12, 2001, even though the Settlement Agreement was executed in December of 2000. That notice informed Automotive and Shipbuilding that the Settlement Agreement would result in the exhaustion and release of pre-1993 excess insurance coverage issued to Old Tenneco by the London Insurers.

El Paso has not provided replacement coverage or achieved a reinstatement of the subject coverage. It also has not offered to pay to Plaintiffs any percentage of the original policy premiums to acquire new insurance, although it has offered a lump-sum cash payment to Automotive and Shipbuilding, which Plaintiffs contend does not approach Old Tenneco's liability under the Insurance Agreement. Plaintiffs also assert that the London Insurers knew or should have known that El Paso, including Old Tenneco, had no authority to release Plaintiffs' historical coverage rights under the policies with the London Insurers without Plaintiffs' consent, which was not given.

This action, in essence, requires the application of the Insurance Agreement to the subsequent efforts of Old Tenneco to secure the protection of the London Insurers' policies against the liabilities which it carried forward when it merged with an El Paso entity.

### III. CONTENTIONS OF THE PARTIES

Plaintiffs' claims for relief take several forms. They seek (i) a declaration that the Settlement Agreement did not effectively release the London Insurers from their obligations to Plaintiffs under the various policies; (ii) an order requiring replacement or reinstatement of any coverage that may have been lost or to expend an amount equal to 350% of the original premiums for the exhausted coverage to obtain the best replacement or reinstatement coverage available; (iii) an injunction precluding El Paso from releasing their rights under any other insurance policies that may be subject to the Insurance Agreement; (iv) an injunction requiring that El Paso give notice to Automotive and Shipbuilding whenever it becomes aware of a claim that might exhaust a coverage limit, or whenever El Paso takes action with respect to administration of Old Tenneco's insurance claims; and (v) an order imposing a constructive trust on the sums received by El Paso from the London Insurers under the Settlement Agreement in order to ensure that these funds may be applied in accordance with the Insurance Agreement.

Defendants offer three principal arguments in support of their motion to dismiss the Complaint. First, they argue that this Court lacks subject matter jurisdiction because no justiciable controversy exists since the Plaintiffs have failed to identify any insured claim brought against them which has been compromised or adversely affected by the Settlement Agreement by and among the Defendants. Plaintiffs contend that this case is, in fact, ripe for judicial review because their Complaint alleges that the Defendants' Settlement Agreement and their actions in reaching that agreement contravened Old Tenneco's duties under the Insurance Agreement thereby resulting in several ripe controversies "including breach of contract, breach of fiduciary duty, conversion, and tortious interference with contract." (FN8)

**5 Defendants next argue that Old Tenneco could, in a manner consistent with the Insurance Agreement, seek coverage under, and settle its insurance claims pursuant to, the historical policies issued by the London Insurers, without the consent or approval of Plaintiffs. Defendants rely heavily on Old Tenneco's status as the named insured under the policies. Plaintiffs respond by citing Section 3.2(d) of the Insurance Agreement which provides that any entity covered by the policies has an equal right to pursue claims under the governing policies and further cites Section 8.3 of the Insurance

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Agreement which states that no Covered Person under the Insurance Agreement may "take any action ... that could reasonably be expected to jeopardize or otherwise interfere with the rights of any other party." Plaintiffs also assert that the Insurance Agreement does not authorize Old Tenneco to release their rights to the policies with Non-Exhaustible Limits.

The third argument offered by Defendants in support of their motion to dismiss is that El Paso complied with the notice and reinstatement provisions of the Insurance Agreement. Defendants cite El Paso's February 12, 2001 letter to New Tenneco in which El Paso purported to give notice of its anticipated exhaustion and release of the relevant insurance policies. That letter also offered Plaintiffs a cash payment in satisfaction of El Paso's obligations under the Insurance Agreement to secure replacement coverage for Plaintiffs. Plaintiffs allege that the "notice" given by El Paso did not comply with the Insurance Agreement because it was not "promptly provide[d]" to Plaintiffs. Plaintiffs argue that the underlying coverage was subject to diminution by El Paso as early as November of 1997, some three years before El Paso's transmittal of the "notice" letter. Plaintiffs further contend that their Complaint states a claim that El Paso breached the Insurance Agreement's replacement provisions by limiting its proposed payment to the offered sum instead of the appropriate sum of 350% of the original premiums as required by the Insurance Agreement.

## IV. APPLICABLE STANDARD

Defendants' motion to dismiss requires this Court to accept all well-pled facts as true and to draw all inferences from the facts alleged in the Complaint in the light most favorable to the Plaintiffs. The motion to dismiss under Coiurt of Chancery Rule 12(b)(6) will be denied unless " 'it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." ' (FN9) In this setting, Plaintiffs must also demonstrate the existence of a "ripe" or justiciable controversy. (FN10) With this in mind, I turn first to the ripeness issue, and then to Defendants' various challenges to the sufficiency of the Complaint under Court of Chancery Rule 12(b)(6).

## V. ANALYSIS

### A. *Ripeness*.

Defendants' challenge to this Court's power to hear this matter is premised upon their contention that Plaintiffs' claims are not ripe for judicial determination and, thus, may not be addressed under Delaware's Declaratory Judgment Act (FN11) because this Court will not render advisory opinions and because an "actual controversy" must exist in order to invoke this Court's jurisdiction. The standards for determining whether an "actual controversy" exists have been framed:

**\*6** (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief;

(2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim;

(3) the controversy must be between parties whose interests are real and adverse;

(4) the issue involved in the controversy must be ripe for judicial determination. (FN12)

The first three of these requirements are satisfied by Plaintiffs, and Defendants do not contend otherwise. Defendants do, however, assert that this action is not yet ripe for judicial consideration.

The ripeness doctrine reflects two goals: first, to conserve judicial resources by not allocating them to resolution of disputes that are not ready for judicial disposition, and, second, to avoid the development of the law in the absence of concrete facts and adversary positions upon which case law is premised. (FN13)

In examining [the ripeness] question, a court must consider that legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may impose. All that is required, therefore, is that the court make a common sense determination that the plaintiff's interest in a swift resolution of the case outweighs the court's interest in postponing review until the question arises in some more concrete and final form. (FN14)

The Defendants have latched onto the absence of

© 2005 Thomson/West. No claim to original U.S. Govt. works.