# EXHIBIT B

00071306.DOC

2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)                                    Page 1

**\*1641744**   Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

TENNECO AUTOMOTIVE INC., a Delaware corporation, Newport News Shipbuilding Inc., a Delaware corporation, and Pactiv Corporation, a Delaware corporation, Plaintiffs,
v.
EL PASO CORPORATION, a Delaware corporation El Paso Natural Gas Company, a Delaware corporation, El Paso Tennessee Pipeline Co., a Delaware corporation, and Certain Underwriters at Lloyd's, London and London Market Insurance Companies, foreign corporations, Defendants.

No. Civ.A. 18810-NC.
Submitted Sept. 9, 2001.

Decided Nov. 29, 2001.

Allen M. Terrell, Jr., and Dominick T. Gattuso, of Richards, Layton & Finger, P.A., Wilmington, Delaware, and Steven R. Gilford, and Michael J. Gill, of Mayer, Brown & Platt, Chicago, Illinois, for Plaintiffs Tenneco Automotive Inc. and Pactiv Corporation.

William M. Lafferty, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, and Edward A. Friedman, Robert S. Loigman, and Michael A. Berg, of Friedman, Kaplan, Seiler and Adelman LLP, New York, New York, for Plaintiff Newport News Shipbuilding Inc.

Robert K. Payson, Gregory A. Inskip, and Stephen C. Norman, of Potter, Anderson & Corroon, Wilmington, Delaware; Zevnik Horton LLP, Washington, D.C., for Defendants El Paso Corporation, El Paso Natural Gas Company and El Paso Tennessee Pipeline Co., of counsel.

Francis J. Murphy, Jr., of Murphy, Spadaro & Landon, Wilmington, Delaware, for Defendants Certain Underwriters at Lloyd's, London and London Market Insurance Companies.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

I. INTRODUCTION

**\*\*1** The restructuring of a diversified industrial company into independent business entities can present thorny issues regarding historical insurance coverage. The former Tenneco Inc. spun off its shipbuilding business in the form of Plaintiff Newport News Shipbuilding, Inc. ("Shipbuilding") and its automotive and packaging operations in the form of New Tenneco, Inc., now Plaintiff Tenneco Automotive Inc. ("Automotive"), which thereafter spun off the packaging business in the form of Plaintiff Pactiv Corporation ("Pactiv"). The surviving and remaining business of the former Tenneco Inc., essentially its natural gas production and transmission business, was acquired by Defendant El Paso Corporation when a subsidiary of its subsidiary, Defendant El Paso Natural Gas Company ("EPNG"), merged with the former Tenneco Inc. leaving El Paso Tennessee Gas Pipeline Co. ("Old Tenneco") as the surviving entity. (FN1)

The allocation of rights among Automotive, Shipbuilding and Old Tenneco as to the historical insurance coverage acquired by the former Tenneco Inc. and its operating subsidiaries was accomplished through the Insurance Agreement. (FN2) Among Old Tenneco's insurers were Defendants Certain Underwriters at Lloyd's, London and London Market Insurance Companies (collectively, the "London Insurers"). Old Tenneco sought to resolve certain insurance coverage disputes with the London Insurers by releasing not only its rights under certain policies issued by the London Insurers to Old Tenneco or its various entities, but also by purporting to release the rights of the Plaintiffs to coverage under the same policies.

Plaintiffs now pursue this action to obtain a determination, *inter alia,* (1) that Old Tenneco lacked the authority to release any of their rights under the policies, (2) that Old Tenneco failed to satisfy certain notice requirements imposed by the Insurance Agreement, (3) that Old Tenneco otherwise breached the Insurance Agreement when it failed to reinstate or replace the insurance coverage and when it failed, if such coverage was not available, to purchase such insurance coverage as

© 2005 Thomson/West. No claim to original U.S. Govt. works.

could be obtained with the expenditure of 350% of the original premiums for the lost coverage, and (4) that they continue to enjoy coverage rights under the policies issued by the London Insurers. The Defendants have moved to dismiss. In this memorandum opinion, I conclude, contrary to the arguments of the Defendants, that the Complaint presents issues that are "ripe" for judicial consideration and that, with the exception of one claim, I cannot dismiss the Complaint for failure to state a claim upon which relief can be granted.

## II. BACKGROUND (FN3)

Tenneco Inc., until 1996, engaged in several businesses: natural gas exploration and distribution; shipbuilding; automotive products; and packaging. It then entered into a merger agreement which provided for the acquisition of its natural gas business by a subsidiary of Defendant El Paso Corporation. In order to consummate the merger, Tenneco Inc. first had to divest itself of its other lines of business. Thus, in December 1996, it spun off to its shareholders Shipbuilding and New Tenneco, which, at the time, included both the automotive and packaging enterprises. Tenneco Inc. then merged with a subsidiary of Defendant EPNG and the surviving corporate entity ("Old Tenneco") is now known as Defendant Tennessee Old Paso Pipeline Company. (FN4)

**2 Old Tenneco, New Tenneco and Shipbuilding addressed the complex questions of entitlement to coverage under Old Tenneco's historical insurance policies through the Insurance Agreement which they entered on December 11, 1996.

Among the policies covered by the Insurance Agreement were policies issued between 1965 and 1993 to Old Tenneco or its constituent entities by the London Insurers. These policies provided excess (i.e., not primary) coverage on an occurrence (i.e., not claims made) basis.

For present purposes, the London Insurers' policies fall into two categories: (i) those with per occurrence and aggregate limits ("Exhaustible Limits"), typically for products liability coverage; and (ii) those with only per occurrence limits and no aggregate limits or limits as to the number of claims that could be asserted during the specific policy term ("Non-Exhaustible Limits"), typically for general liability coverage. (FN5)

Although the Insurance Agreement recognizes that Old Tenneco is the named insured on the London Insurers' historical policies, Old Tenneco, New Tenneco and Shipbuilding, by Section 3.2(c) of the Insurance Agreement, are accorded:

... the right to coverage and to make or pursue a claim for coverage under such Occurrence-Based Policy with respect to all claims, suits, actions, proceedings, injuries, losses, liabilities, occurrences, damages and expenses incurred or claimed to have been incurred prior to such Termination Time by such Covered Person in or in connection with the operation of, or otherwise related to, [their respective lines of business]. (FN6)

The drafters of the Insurance Agreement recognized that the parties to the Insurance Agreement might compete for coverage under the same policy. Thus, the parties agreed to Section 3.2(d), which provides in pertinent part:

*Policy Limits.* [Old Tenneco, New Tenneco, or Shipbuilding as any of them may be] entitled hereunder to make or pursue a claim for insurance coverage under an Occurrence-Based Policy may claim for such insurance as and to the extent that such insurance is available up to the full extent of the applicable limits of liability under such Occurrence-Based Policy. Notwithstanding the foregoing, each of [Old Tenneco, New Tenneco, and Shipbuilding] shall, to the extent any of its respective Covered Persons shall have exhausted all or any portion of the limits of liability, if any, under any Occurrence-Based Policy, use its best efforts to either (i) obtain and comply in full with the conditions required to effect the reinstatement of the full limits of liability under such Occurrence-Based Policy for all claims which would be covered thereby absent such exhaustion (including any pending or known claims) and be responsible for and pay all costs and expenses, including the amount of any resultant increase in the premium charged in respect of such Occurrence-Based Policy or any renewal thereof, in connection therewith, or (ii) obtain and maintain in full force and effect a Policy in replacement of the limits of liability exhausted under such Occurrence-Based Policy for all claims which would be covered thereby absent such exhaustion (including any pending or known claims), and be responsible for

© 2005 Thomson/West. No claim to original U.S. Govt. works.

and pay all costs and expenses in connection therewith, which Policy shall provide at least the same coverage, and contain terms and provisions which are no less favorable to the insured parties, as existed under the Occurrence-Based Policy in respect of which such replacement is obtained, provided, however, that no party hereto shall be required to expend more than an amount equal to 350% of the original premium paid with respect to the portion of the limits of liability under such Occurrence-Based Policy (determined on a pro rata basis) exhausted by such party's respective Covered Persons to obtain reinstatement or a replacement Policy as contemplated hereby, it being understood that each party hereto shall nonetheless be required to obtain the maximum amount of reinstatement or replacement coverage available for such 350% premium amount in accordance with the terms and provisions of clauses (i) or (ii) hereof as applicable.

**\*\*3** The Insurance Agreement also imposes ongoing obligations on its signatories following the corporate reorganization. For example, Section 3.2(d) continues with the following notice provision:

If at any time a party (an "Impairing Party") hereto becomes aware (such party being deemed to be aware whenever any of the directors or executive officers of such party or any other member of its respective Group become aware) of a claim or potential claim against any such Impairing Party's respective Covered Persons which claim is reasonably likely to exhaust (but has not yet exhausted) all or any portion of the aggregate limits of liability, if any, under any Occurrence-Based Policy (a "Potential Impairment"), such Impairing Party shall promptly provide notice of such Potential Impairment to the other parties hereto.

The Insurance Agreement goes on to specify the duties of the "Impairing Party" following the giving of such notice:

Such Impairing Party shall have five business days after providing such notice to elect to, at that time, either secure reinstatement of the limits of liability under such Occurrence-Based Policy (to the extent provided for therein) or purchase a Policy in replacement of such limits of liability (in each case in accordance with the terms and provisions of the second preceding sentence) in respect of such Potential Impairment (but shall not be required to so elect at such time). If such Impairing Party does not timely elect to secure reinstatement or replacement coverage, then either or both of the other parties hereto may elect to reinstate the limits of liability under such Occurrence-Based Policy (to the extent provided for therein) and pay all expenses incurred in connection therewith, provided, however, that if such Potential Impairment actually occurs, the Impairing Party shall reimburse the other parties for any fees and expenses incurred by such parties in connection with such reinstatement.

Also, with respect to the ongoing obligations of the parties to the Insurance Agreement to each other, the provisions of Section 8.3 may be instructive:

*Cooperation.* The parties hereto agree to use their reasonable best efforts to cooperate with respect to the various insurance matters contemplated by this Agreement. Each party hereto shall not (and shall not permit any of its respective Covered Persons over which it has legal or effective direct or indirect control to) take any action or permit any inaction that could reasonably be expected to jeopardize or otherwise interfere with the rights of any other party (or any of such other party's respective Covered Persons) hereunder or the ability of any other party (or any of such other party's respective Covered Persons) to collect any proceeds which might be available under any of the Policies addressed herein in accordance with the terms of this Agreement.

Old Tenneco, which was facing substantial liability claims, commenced negotiations with the London Insurers in order to resolve coverage issues regarding those claims. As a result of these negotiations, Old Tenneco and the London Insurers reached an agreement, which resulted in a significant payment to Old Tenneco, but that payment came at a price. (FN7) Old Tenneco agreed to release the London Insurers from any further liability under the policies, a release that purports not only to protect the London Insurers from other claims of Old Tenneco, but also to protect them from any claims by the Plaintiffs. Thus, the Plaintiffs allege that, as provided in the Settlement Agreement, Old Tenneco and the London Insurers sought to terminate all of their rights to coverage under the London Insurers' policies as well. The Settlement Agreement, Plaintiffs allege, resulted in the loss of coverage under the Exhaustible Limits policies even though the policy

© 2005 Thomson/West. No claim to original U.S. Govt. works.

limits had not been reached. In essence, Plaintiffs assert that Old Tenneco compromised coverage disputes by agreeing with the London Insurers that disputed claims would be paid but that the London Insurers' liability would be less than that specified by the policy limits of the Exhaustible Limits policies. Perhaps more troubling to Plaintiffs is their allegation that Old Tenneco's release deprived them of the opportunity to seek coverage under policies with the Non-Exhaustible Limits because the Settlement Agreement purports to release policies that have no aggregate limits and, thus, no limit on the number of claims, which, at least theoretically, could have been brought under the Occurrence-Based Policies for events that happened during the term of the policies.

**\*\*4** In addition, Plaintiffs allege that El Paso failed to provide any notice of the Settlement Agreement or of El Paso's efforts that led up to the Settlement Agreement until February 12, 2001, even though the Settlement Agreement was executed in December of 2000. That notice informed Automotive and Shipbuilding that the Settlement Agreement would result in the exhaustion and release of pre-1993 excess insurance coverage issued to Old Tenneco by the London Insurers.

El Paso has not provided replacement coverage or achieved a reinstatement of the subject coverage. It also has not offered to pay to Plaintiffs any percentage of the original policy premiums to acquire new insurance, although it has offered a lump-sum cash payment to Automotive and Shipbuilding, which Plaintiffs contend does not approach Old Tenneco's liability under the Insurance Agreement. Plaintiffs also assert that the London Insurers knew or should have known that El Paso, including Old Tenneco, had no authority to release Plaintiffs' historical coverage rights under the policies with the London Insurers without Plaintiffs' consent, which was not given.

This action, in essence, requires the application of the Insurance Agreement to the subsequent efforts of Old Tenneco to secure the protection of the London Insurers' policies against the liabilities which it carried forward when it merged with an El Paso entity.

### III. CONTENTIONS OF THE PARTIES

Plaintiffs' claims for relief take several forms. They seek (i) a declaration that the Settlement Agreement did not effectively release the London Insurers from their obligations to Plaintiffs under the various policies; (ii) an order requiring replacement or reinstatement of any coverage that may have been lost or to expend an amount equal to 350% of the original premiums for the exhausted coverage to obtain the best replacement or reinstatement coverage available; (iii) an injunction precluding El Paso from releasing their rights under any other insurance policies that may be subject to the Insurance Agreement; (iv) an injunction requiring that El Paso give notice to Automotive and Shipbuilding whenever it becomes aware of a claim that might exhaust a coverage limit, or whenever El Paso takes action with respect to administration of Old Tenneco's insurance claims; and (v) an order imposing a constructive trust on the sums received by El Paso from the London Insurers under the Settlement Agreement in order to ensure that these funds may be applied in accordance with the Insurance Agreement.

Defendants offer three principal arguments in support of their motion to dismiss the Complaint. First, they argue that this Court lacks subject matter jurisdiction because no justiciable controversy exists since the Plaintiffs have failed to identify any insured claim brought against them which has been compromised or adversely affected by the Settlement Agreement by and among the Defendants. Plaintiffs contend that this case is, in fact, ripe for judicial review because their Complaint alleges that the Defendants' Settlement Agreement and their actions in reaching that agreement contravened Old Tenneco's duties under the Insurance Agreement thereby resulting in several ripe controversies "including breach of contract, breach of fiduciary duty, conversion, and tortious interference with contract." (FN8)

**\*\*5** Defendants next argue that Old Tenneco could, in a manner consistent with the Insurance Agreement, seek coverage under, and settle its insurance claims pursuant to, the historical policies issued by the London Insurers, without the consent or approval of Plaintiffs. Defendants rely heavily on Old Tenneco's status as the named insured under the policies. Plaintiffs respond by citing Section 3.2(d) of the Insurance Agreement which provides that any entity covered by the policies has an equal right to pursue claims under the governing policies and further cites Section 8.3 of the Insurance

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Agreement which states that no Covered Person under the Insurance Agreement may "take any action ... that could reasonably be expected to jeopardize or otherwise interfere with the rights of any other party." Plaintiffs also assert that the Insurance Agreement does not authorize Old Tenneco to release their rights to the policies with Non-Exhaustible Limits.

The third argument offered by Defendants in support of their motion to dismiss is that El Paso complied with the notice and reinstatement provisions of the Insurance Agreement. Defendants cite El Paso's February 12, 2001 letter to New Tenneco in which El Paso purported to give notice of its anticipated exhaustion and release of the relevant insurance policies. That letter also offered Plaintiffs a cash payment in satisfaction of El Paso's obligations under the Insurance Agreement to secure replacement coverage for Plaintiffs. Plaintiffs allege that the "notice" given by El Paso did not comply with the Insurance Agreement because it was not "promptly provide[d]" to Plaintiffs. Plaintiffs argue that the underlying coverage was subject to diminution by El Paso as early as November of 1997, some three years before El Paso's transmittal of the "notice" letter. Plaintiffs further contend that their Complaint states a claim that El Paso breached the Insurance Agreement's replacement provisions by limiting its proposed payment to the offered sum instead of the appropriate sum of 350% of the original premiums as required by the Insurance Agreement.

## IV. APPLICABLE STANDARD

Defendants' motion to dismiss requires this Court to accept all well-pled facts as true and to draw all inferences from the facts alleged in the Complaint in the light most favorable to the Plaintiffs. The motion to dismiss under Coiurt of Chancery Rule 12(b)(6) will be denied unless " 'it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief." ' (FN9) In this setting, Plaintiffs must also demonstrate the existence of a "ripe" or justiciable controversy. (FN10) With this in mind, I turn first to the ripeness issue, and then to Defendants' various challenges to the sufficiency of the Complaint under Court of Chancery Rule 12(b)(6).

## V. ANALYSIS

### A. Ripeness.

Defendants' challenge to this Court's power to hear this matter is premised upon their contention that Plaintiffs' claims are not ripe for judicial determination and, thus, may not be addressed under Delaware's Declaratory Judgment Act (FN11) because this Court will not render advisory opinions and because an "actual controversy" must exist in order to invoke this Court's jurisdiction. The standards for determining whether an "actual controversy" exists have been framed:

**\*6** (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief;

(2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim;

(3) the controversy must be between parties whose interests are real and adverse;

(4) the issue involved in the controversy must be ripe for judicial determination. (FN12)

The first three of these requirements are satisfied by Plaintiffs, and Defendants do not contend otherwise. Defendants do, however, assert that this action is not yet ripe for judicial consideration.

The ripeness doctrine reflects two goals: first, to conserve judicial resources by not allocating them to resolution of disputes that are not ready for judicial disposition, and, second, to avoid the development of the law in the absence of concrete facts and adversary positions upon which case law is premised. (FN13)

In examining [the ripeness] question, a court must consider that legitimate interest of the plaintiff in a prompt resolution of the question presented and the hardship that further delay may impose. All that is required, therefore, is that the court make a common sense determination that the plaintiff's interest in a swift resolution of the case outweighs the court's interest in postponing review until the question arises in some more concrete and final form. (FN14)

The Defendants have latched onto the absence of

© 2005 Thomson/West. No claim to original U.S. Govt. works.

any allegation in the Complaint to the effect that Plaintiffs have any pending claims for coverage under the policies that may have been released by the Settlement Agreement. According to Defendants, the policies are for excess coverage and, thus, Plaintiffs may never seek to invoke this coverage. Defendants, accordingly, argue that, because there is no current dispute as to coverage, judicial consideration of the rights and actions of El Paso and Plaintiffs under the Insurance Agreement and the rights and duties of El Paso, the London Insurers and Plaintiffs under the policies and under or as a result of the Settlement Agreement should all await a concrete, fact specific coverage dispute regarding a well-defined coverage claim from Plaintiffs.

Any inquiry into whether Plaintiffs claims are ripe must begin with *Union Texas Petroleum Holdings, Inc. v. The Travelers Indemnity Company.* (FN15) Union Texas (including its affiliates) had been a subsidiary of Allied-Signal, Inc. ("Allied-Signal") which had been insured by The Travelers Indemnity Company ("Travelers"). Allied-Signal and Union Texas had entered into an agreement regarding their rights under certain of the Travelers' policies at the time Allied-Signal divested part of its interest in Union Texas. Several years later, Allied-Signal and Travelers entered into a Settlement Agreement that resolved a lengthy coverage dispute over environmental claims and that exhausted the Travelers' policies to which Union Texas claimed rights. While the background allegations in *Union Texas* are very similar to the assertions made here by Plaintiffs, the Defendants point out several differences. First, the Plaintiffs in *Union Texas* alleged that they had already incurred costs; second, that they had asked Travelers to pay those costs; and third, that Travelers had refused to pay the costs based on its Settlement Agreement with Allied-Signal.

**7 Here, there are no allegations that costs have been incurred on any claim by any of the Plaintiffs that may have arisen under the policies issued by the London Insurers and that have been rejected by the London Insurers. I concur with Defendants that the plaintiffs in *Union Texas* made a more compelling showing of the ripeness of their claims than have the Plaintiffs. That observation, however, does not compel the conclusion that *Union Texas* requires dismissal of Plaintiffs claims because of the absence of a justiciable controversy. Plaintiffs seek, *inter alia*, a determination of their risk position: in essence, an answer to the question of whether they have any coverage under the polices subject to the Insurance Agreement and issued by the London Insurers. They allege that the Settlement Agreement between El Paso and the London Insurers deprived them of the rights existing under both the policies and the Insurance Agreement. As the Chancellor observed in *Union Texas:*

Plaintiffs have a very real and obvious interest in knowing whether the Settlement Agreement has altered or terminated altogether their pre-1985 coverage under the Travelers policies. In their current position, plaintiffs remain exposed to the risk of additional defense costs and damages, both with respect to this action and other potential actions. Thus I find that plaintiffs' claims are ripe for adjudication and decline to dismiss them on this ground. (FN16)

Defendants also support their contention by citing *Allstate Ins. Co. v. Spinelli* (FN17) and *Harper v. State Farm Mutual Automobile Ins. Co.*, (FN18) which generally stand for the proposition that an allegation of a breach of an insurance policy, such as a refusal by the carrier to pay for a covered loss, is a necessary predicate for a suit on an insurance policy. Something more than the failure of an insurance company to pay a claim, however, is at work in this case. By the allegations of the Complaint, the insurance companies and a third party (El Paso) with rights under the same policies have agreed that no coverage will be available to Plaintiffs in the future under the policies. Moreover, rights under the Insurance Agreement, such as entitlement to replacement coverage, are also alleged. Thus, the Plaintiffs have brought an action which seeks more than an academic analysis of whether some hypothetical claim might be entitled to coverage in the future. Instead, they are seeking a determination as to whether they have any rights under the London Insurers' policies, what, in this context, rights they may have under the Insurance Agreement, and the effect, if any, of the Settlement Agreement on their rights to coverage by the London Insurers.

In sum, I am satisfied that the Plaintiffs' need for a timely resolution of the claims which they seek to assert in this action outweighs considerations of judicial economy and restraint. (FN19) Thus, when a practical and common sense view is taken of the

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)                               Page 7

allegations in the Complaint, the Plaintiffs have tendered claims which are ready for judicial consideration and, thus, are ripe. Accordingly, I deny Defendants' motion to dismiss the Complaint on ripeness grounds.

B. *El Paso's Right to Settle Claims Arising under the London Insurers' Policies.*

**\*\*8** El Paso is the named insured on the London Insurers' policies. (FN20) The Insurance Agreement authorizes El Paso to make claims under the policies. El Paso argues that its right to seek coverage under the policies necessarily includes the right to settle, exhaust and release the policies regardless of Plaintiffs' rights, as "Covered Persons" under the Insurance Agreement, to seek coverage under the policies. In essence, El Paso has contended that whoever wins the race to coverage from, and settlement with, the London Insurers must prevail. (FN21) Thus, according to El Paso, the Complaint must be dismissed under Court of Chancery Rule 12(b)(6), at least in part, because El Paso did nothing more than what was contemplated and allowed by the Insurance Agreement.

The broad question, accordingly, is whether El Paso, under the policies and the Insurance Agreement, had the right to release the London Insurers of their duties under the policies--duties owed not only to El Paso, but also to Plaintiffs. Two subordinate questions also arise. First, can El Paso release or "exhaust" the Exhaustible Limits policies (or as to specific occurrences under the Non-Exhaustible Limits policies for which a claim has been tendered) by agreeing to accept less than full policy limits? Second, can El Paso release or "exhaust" the Non-Exhaustible Limit policies as to occurrences, known or unknown, but for which no claim has been asserted or covered?

The answers to these questions must first be sought in the terms of the Insurance Agreement. The construction of a contract, in this case, the Insurance Agreement, initially presents a question of law. (FN22) Absent ambiguity in the terms of an agreement, the Court may proceed to interpret and construe the agreement without consideration of extrinsic evidence. (FN23) Thus, I now turn to the Insurance Agreement.

Under the Insurance Agreement, any "Covered Person," a term that included Old Tenneco and Plaintiffs, (FN24) "may claim for such insurance as and to the extent that such insurance is available up to the full extent of the applicable limits of liability under such [policies]." (FN25) Accordingly, El Paso had the right, as did Plaintiffs, to assert claims against the London Insurers "up to the full extent" of the available coverage. If it obtained the "full extent" of the coverage, then the London Insurers' obligation under the policy would be "exhausted," the London Insurers could reasonably extract a release from El Paso, and the Plaintiffs, as envisioned by the Insurance Agreement, would, because El Paso won the race, be left with no further rights under the subject policy.

The crux of the Complaint, however, is that El Paso purported to release the London Insurers without having obtained the "full extent" of the available coverage and, thus, in order to obtain the payment from the London Insurers that it did receive, El Paso necessarily bargained away Plaintiffs' rights under the policies to the remaining or additional coverage. For the Exhaustible Limits policies, that difference between the amount paid and the policy limits would have been sacrificed. For the Non-Exhaustible Limit policies, either the difference between the amount paid and the limits for the particular occurrence or the occurrence-based limits for occurrences not yet subject to claim would have been sacrificed.

**\*\*9** Plaintiffs view El Paso's efforts to compromise El Paso's claims against the London Insurers by offering up rights that might otherwise have accrued to Plaintiffs as conduct by El Paso that impaired their rights under the Insurance Agreement. Plaintiffs find support for their position in Section 8.3 of the Insurance Agreement, which provides that no party to the Insurance Agreement shall "take any action or permit any inaction that could reasonably be expected to jeopardize or otherwise interfere with the rights of any other party [under the Insurance Agreement] or the ability of any other party ... to collect any proceeds which might be available under any of the Policies addressed [in the Insurance Agreement]." Plaintiffs also, in substance, contend that even without considering the terms of Section 8.3, the Insurance Agreement precludes or does not authorize the efforts of El Paso to release the London Insurers. I will consider the parties' arguments as they apply, first, to the policies Plaintiffs have characterized as Exhaustible Limits policies and, second, to the

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)                                                Page 8

policies referred to as Non-Exhaustible Limit policies.

Plaintiffs argue that El Paso could not release or exhaust an Exhaustible Limits policy unless it collected all funds that could have been paid up to the limits of the subject policy. I disagree. Plaintiffs' position would preclude any compromise of disputes between the insured and the insurer over coverage. The right to assert and pursue a claim necessarily includes the right to undertake reasonable efforts to settle the claim. I do not read Section 8.3 of the Insurance Agreement as requiring a contrary view. By compromising a claim under an Exhaustible Limits policy, El Paso has denied itself and the Plaintiffs the opportunity to collect on the balance of the limits of the particular policy. That is not, however, an act that "jeopardize[d] or otherwise interfere[d] with the rights of [Plaintiffs]" because those rights were subject to the express and specific terms of Section 3.2 of the Insurance Agreement which allowed El Paso to pursue its claims to coverage. In some sense, any collection by El Paso against a policy limit could be deemed to have "interfered" with the rights of Plaintiffs. Such an interpretation cannot be justified under the terms of language of the Insurance Agreement.

I also note that Plaintiffs' contention that El Paso could not compromise its claims under an Exhaustible Limits policy is inconsistent with our general policies favoring and encouraging settlement. (FN26) In *Stargatt v. Fidelity & Casualty Co. of New York,* (FN27) the Court rejected an argument that "exhaustion" can only occur when "policy limits have been actually paid" because "[t]o require an absolute collection of the primary insurance to its full limits would in many, if not most, cases involve delay, promote litigation, and prevent an adjustment of disputes which is both convenient and commendable." (FN28)

**\*\*10** Accordingly, I conclude that, under the policies and the Insurance Agreement, El Paso had the authority to exhaust and, thus, to release the London Insurers from liability on specific policies under which claims were paid without having received payment of the policy limits set forth in the specific policy. (FN29) Defendants are, thus, entitled to dismissal of this portion of Plaintiffs' claim.

In contrast, El Paso's rights to release or settle the Non-Exhaustible Limits policies cannot be determined through a construction of the Insurance Agreement on a motion to dismiss. The Insurance Agreement authorizes El Paso (and, for that matter, Plaintiffs) to make claims "to the full extent of the *applicable limits.*" (FN30) With respect to the Non-Exhaustible Limits policies, which may have limits as to specific occurrences but have no limits as to the number of separate occurrences, the Insurance Agreement does not unambiguously resolve how to address those aspects of coverage to which the concept of "applicable limits" may have no immediate application. Perhaps the Insurance Agreement can be read as silent on the issue with the determining factor being simply who is the named insured. That view, however, may be inconsistent with Plaintiffs' status as "Covered Persons" under the Insurance Agreement and the Insurance Agreement's intended broad coverage. The analysis is further confused by the Insurance Agreement's treatment of replacement obligations which are imposed "with respect to the portions of *limits of liability* [under the policy exhausted by a Covered Person]." (FN31) Perhaps this suggests that, if there were no applicable limits, the rights under a policy could be adversely affected in the absence of a limit controlling the specific claim. Or, it might suggest that there is no duty to obtain replacement coverage except for coverage governed by specific limits. Again, that might be perceived as inconsistent with the broad intent of the Insurance Agreement. Other, and perhaps better, constructions of Section 3.2(d) may be possible. For present purposes, however, the critical language is ambiguous and the facts as alleged by the Plaintiffs in their Complaint do not allow me to construe the Insurance Agreement against them. Accordingly, Defendants are not entitled to dismissal on these grounds. (FN32)

C. *Plaintiffs' Right to Prompt Notice of Potential Impairment.*

Defendants next contest the sufficiency under Court of Chancery Rule 12(b)(6) of Plaintiffs' allegations that El Paso breached its duties under the notice provision of the Insurance Agreement. Defendants rely on their February 12, 2001 letter for the assertion that their actions comported with the relevant requirements of Section 3.2(d).

Section 3.2(d) of the Insurance Agreement provides that in the event an "Impairing Party," here El Paso,

© 2005 Thomson/West. No claim to original U.S. Govt. works.

learns of:

> a claim or potential claim against any of such Impairing Party's respective Covered Persons which claim is reasonably likely to exhaust (but has not yet exhausted) all or any portion of the aggregate limits of liability ... such Impairing Party shall promptly provide notice of such Potential Impairment to the other parties hereto.

**\*\*11.** Plaintiffs assert that El Paso filed suit against the London Insurers and other insurance companies in November of 1997 and El Paso and the London Insurers entered into the Settlement Agreement in December of 2000. Plaintiffs were first given notice of the potential impairment in the February 12, 2001 letter. Plaintiffs' contend that the February letter constituted insufficient notice under Section 3.2(d) because by the time it was received, the impairment was no longer potential and, therefore, was necessarily not provided promptly. These allegations more than suffice for meeting Plaintiffs' burden of going forward. Accordingly, Defendants' motion to dismiss on this ground is denied.

D. *Plaintiffs' Rights to Replacement Coverage and/or Compensation under the Insurance Agreement.*

I similarly find that Plaintiffs' allegations that El Paso breached the Agreement's reimbursement and replacement provisions are adequate at this stage to withstand Defendants' motion to dismiss. Defendants urge this Court to find that their offer of a cash payment exceeds the Agreement's cap of 350% of the original premiums paid with respect to the limits of liability being exhausted. Plaintiffs' argue that Defendants' offer is "substantially less" than the 350% requirement mandated by the terms of the Agreement. Moreover, Plaintiffs' allege in their complaint that the payment proffered by El Paso in its February 12, 2001 letter was not calculated based on the original premiums and was therefore a "straightforward breach" of its obligations under the Agreement. Plaintiffs have alleged, in a manner sufficient to withstand a motion to dismiss, that El Paso's duties under the Insurance Agreement to replace or reinstate coverage or to compensate Plaintiffs otherwise has been triggered by El Paso's actions, and that El Paso's offer as set forth in its February 12, 2001 letter does not satisfy the requirements of the Insurance Agreement. Perhaps El Paso's offer was, in fact, generous or, as may be the case, replacement is not possible, but these issues cannot be resolved on a motion to dismiss. Accordingly, El Paso's motion to dismiss Plaintiffs' claims under the replacement or reinstatement provision of the Insurance Agreement must be denied.

VI. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted as to Plaintiffs' claim that El Paso could not exhaust, and release the London Insurers from liability under, specific policies for which claims were paid. Otherwise, the motion to dismiss is denied.

IT IS SO ORDERED.

(FN1.) Defendants El Paso Corporation, EPNG and Old Tenneco are collectively referred to as "El Paso."

(FN2.) The Insurance Agreement ("Ins.Agr."), dated December 11, 1996, is attached to the Verified Complaint ("Complaint") as Ex. A.

(FN3.) The facts are taken from the well-pled allegations of the Complaint.

(FN4.) In November 1999, New Tenneco, now known as Tenneco Automotive Inc., spun off its packaging business through the corporate entity known as Pactiv.

(FN5.) For convenience, I use the labels "Exhaustible Limits" and "Non-Exhaustible Limits," as first proposed by Plaintiffs, with the understanding that they have a "rabbit in the hat" quality about them.

(FN6.) Section 3.2 carries the heading "Coverage Under Occurrence-Based Policies," which, of course, is only for convenience and "do[es] not constitute a part of [the Insurance] Agreement." Ins. Agr. § 8.9. "Termination Time" is defined as the time when the subject policy is cancelled with respect to a particular Covered Person and is based essentially upon the status of the corporate reorganization. *Id.* § 1.1. The net effect of the definition of "Covered Persons" is that the term includes Old Tenneco, New Tenneco and Shipbuilding, and their respective historical affiliates.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

2001 WL 1641744, Tenneco Automotive Inc. v. El Paso Corp.,, (Del.Ch. 2001)     Page 10

(FN7.) This agreement (the "Settlement Agreement") is described generally in the Complaint, but it was neither attached to, nor incorporated into, the Complaint, apparently because the Plaintiffs had not then received a copy.

(FN8.) Plaintiffs' Br. in Opposition at 12.

(FN9.) *McMullin v. Beran*, Del.Supr., 765 A.2d 913, 916 (2000) (quoting *In re Tri-Star Pictures, Inc. Litig.*, Del.Supr., 634 A .2d 319, 326 (1993)).

(FN10.) *See Anonymous v. State*, Del. Ch., C.A. No. 17453, mem. op. at 18, Strine, V.C. (May 10, 2000); *Scattered Corp. v. Chicago Stock Exch., Inc.*, Del. Ch., 671 A.2d 874, 877 (1994); *see also Shevock v. Orchard Homeowners' Ass'n, Inc.*, Del.Supr., 621 A.2d 346, 349 n. 1 (1993).

(FN11.) 10 *Del. C.* Ch. 65. "Any person interested under a ... written contract ... may have determined any question of construction or validity arising under the ... contract ... and obtain a declaration of rights, status or other legal relations thereunder." 10 *Del. C.* § 6502. The Declaratory Judgment Act, of course, does not expand this Court's subject matter jurisdiction. *Heathergreen Commons Condo. Ass'n v. Paul*, Del. Ch., 503 A.2d 636, 642 (1985). It should also be noted that the Defendants do not dispute that this action, if properly brought at all, is appropriately brought in a court of equity.

(FN12.) *Stroud v. Milliken Enters., Inc.*, Del.Supr., 552 A.2d 476, 479-80 (1989) (quoting *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, Del.Supr., 303 A.2d 660, 662-63 (1973)).

(FN13.) *Schick Inc. v. Amalgamated Clothing and Textile Workers Union*, Del. Ch., 533 A.2d 1235, 1239 (1987)

(FN14.) *Shevock v. Orchard Homeowners Ass'n, Inc.*, 621 A.2d at 349.

\*\*11 (FN15.) Del. Ch., C.A. No. 15448, mem. op., Chandler, C. (Feb. 19, 1998).

(FN16.) *Id.* at 12-13.

(FN17.) Del.Supr., 443 A.2d 1286 (1982).

(FN18.) Del.Supr., 703 A.2d 136 (1997).

(FN19.) *See Hoechst-Celanese Corp. v. Nat'l Union Ins. Co.*, Del.Super., 623 A.2d 1133, 1137 (1992); *Union Texas*, mem. op. at 10.

(FN20.) Defendant El Paso Tennessee Pipeline Co., or Old Tenneco, is the surviving corporate entity from the 1996 corporate reorganization.

(FN21.) Tr. of Oral Arg. at 37-38.

(FN22.) *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, Del.Supr., 616 A.2d 1192, 1195 (1992).

(FN23.) *Eon Labs. Mfg., Inc. v. Reliance Ins. Co.*, Del.Supr., 756 A.2d 889, 894 n. 25 (2000).

(FN24.) Defendants argue that Pactiv's claims should be dismissed because it did not exist when the Insurance Agreement was executed and, thus, has no standing to assert claims under the Insurance Agreement. For purposes of this motion to dismiss, I deny that application. The rights to coverage under the Insurance Agreement were for the benefit of Old Tenneco, New Tenneco and Shipbuilding, "as well as their respective "Covered Persons." Ins. Agr. § 8.12. *See supra*, note 6. When the Insurance Agreement was executed, Pactiv was a subsidiary of New Tenneco, and, thus, as a "Covered Person" has standing to enforce whatever coverage rights it may have. *See also* Ins. Agr. § 1.1. The terms of the Insurance Agreement may be considered on a motion under Court of Chancery Rule 12(b)(6) because the agreement was attached to and incorporated into the Complaint. *See Malpiede v. Townson*, Del.Supr., 780 A.2d 1075, 1083 (2001).

(FN25.) Ins. Agr. § 3.2(d).

(FN26.) *See, e.g., Nationwide Mut. Ins. Co. v. Nacchia*, Del.Supr., 628 A.2d 48, 53 n. 5 (1993).

(FN27.) 67 F.R.D. 689 (D.Del.1975), *aff'd*, 578 F.2d 1375 (3d Cir.1978).

(FN28.) *Id.* at 690.

(FN29.) This does not resolve the question, if this proceeding poses such question, of El Paso's right to release Exhaustible Limits polices which were not compromised as the result of specific claims.

© 2005 Thomson/West. No claim to original U.S. Govt. works.

Whether there are such policies is not clear from the Complaint, but I note the possibility because of the broad definition of covered policies alleged in the Complaint. If there are such policies, I would view them as governed by the principles of my analysis of El Paso's rights with respect to the Non-Exclusive limits policies.

(FN30.) Ins. Agr. § 3.2(d) (emphasis added).

(FN31.) *Id.* (emphasis added).

(FN32.) Defendants also contend that the Plaintiffs' fiduciary duty claims (Complaint, ¶ ¶ 75-79) should be dismissed because El Paso owed no fiduciary duty to Plaintiffs. I consider Plaintiffs' breach of fiduciary duty claims as tendered in anticipation of an argument, such as the one asserted in *Union Texas,* that El Paso had authority to act on behalf of Plaintiffs. *See Union Texas,* mem. op. at 7. If El Paso does not assert, as it has indicated that it will not, that its actions were authorized under an agency (or comparable) relationship, then it would seem that there is no basis for Plaintiffs' anticipatory allegations. However, that resolution must await the presentation of El Paso's formal position.

© 2005 Thomson/West. No claim to original U.S. Govt. works.