UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FLOWSERVE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-1294-JJF |
| | ) | |
| BURNS INTERNATIONAL SERVICES | ) | |
| CORPORATION and BORG-WARNER | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF/COUNTER-DEFENDANT FLOWSERVE CORPORATION'S MOTION TO DISMISS BURNS INTERNATIONAL SERVICE CORPORATION'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff/Counter-Defendant Flowserve Corporation ("Flowserve" ) has moved to dismiss Defendant/Counter-Plaintiff Burns International Services' ("Burns") Motion for Temporary Restraining Order and Preliminary Injunction (the "TRO Motion").  This memorandum is submitted in further support of Flowserve's Motion to Dismiss.

## INTRODUCTION

Burns brought the instant TRO Motion to enjoin Flowserve from, *inter alia*, hiring non-conflicted counsel to represent Flowserve in thousands of underlying asbestos actions nationwide involving Byron Jackson pumps (the "underlying cases").  As Flowserve demonstrated in its Motion, its decision to terminate outgoing counsel and retain new counsel was precipitated not by any intention to "harass" or "burden" Burns, as the TRO Motion suggests, but by the inherent conflict created by one network of counsel, chosen by CNA  and supervised by Burns, continuing to represent both

Flowserve and Burns in the underlying cases.

The need to remedy the conflict reached a crisis point when Flowserve acquired compelling new information of the severity of outgoing counsels' conflicts-of-interest. To wit, certain counsel hired to represent both Flowserve and Burns has systematically filed answers for Flowserve in cases where Flowserve was either not named or not served with process. (See Affidavit of Lawrence Henke, ¶9) (hereafter "Henke Aff. at ¶__") In some of these cases, Flowserve was brought in as a result of specific direction from Burns' counsel. (Henke Aff. at ¶9, Exhs. A, B, C). This conduct raised the specter – if not the presumption – that outgoing counsel had engaged in the same or similar course of conflicted representation in an unknown number of the thousands of pending underlying actions. Based on the unauthorized and non-approved actions of outgoing counsel to the detriment of Flowserve's interests, Flowserve had no choice but to terminate prior counsel and hire new, non-conflicted counsel to properly protect its interests. Flowserve has nearly completed the transition of underlying cases to a new, experienced network of non-conflicted counsel and, thus, the first prong of Burns' injunction is effectively moot.

The TRO Motion, however, seeks to obfuscate the real issues before this Court, namely the respective rights and obligations of Flowserve and Burns with respect to indemnification for the underlying cases pursuant to the 1987 Stock Purchase and Letter Agreements (the "1987 Agreements"). In a misguided effort to preclude Flowserve from protecting itself from manifest conflicted and arguably unethical dual representation, Burns raises an issue not before this Court: the putative rights of various insureds under Borg Warner Corporation's insurance policies (the "Borg Warner Policies").

This Court has never been asked to decide the future rights of the parties under the

terms of the Borg Warner Policies, despite Burns' assertions to the contrary. Although insurance may or may not be available in the future to pay for the liabilities related to the underlying cases, the continued existence of and circumstances related to the Borg Warner Policies will not affect this Court's jurisdiction and ability to resolve the narrow contractual dispute before it. Accordingly, the Court should not be dissuaded from denying Burns' request for a preliminary injunction based on Burns' erroneous argument that the Borg Warner Policies comprise a "res" that must be protected. The case before this Court is a contract dispute, not an insurance coverage dispute.

Moreover, even assuming *arguendo* that the parties' respective future rights under the insurance policies was an issue properly before this Court (which Flowserve argues it is not), any hypothetical future depletion of insurance proceeds – regardless of who causes the depletion – constitutes purely "economic harm" remediable through an award of money damages, and thus clearly outside the scope of "irreparable harm" necessary for the granting of the preliminary injunction sought here.

Under ordinary preliminary injunction standards of revue, Flowserve's transfer of counsel and subsequent "potential" future use of available litigation strategies should not be enjoined because: (1) Burns has not, and will not, suffer irreparable harm; (2) Flowserve would suffer irreparable harm were the "status quo" of dual representation maintained, or rather, if Flowserve were ordered to undo the transfer which has already *been substantially completed*; (3) Burns has not demonstrated a likelihood of success on the merits of the dispute before this Court; and (4) public policy weighs heavily in favor of Flowserve's right to transfer its defense of the underlying cases from conflicted counsel to new non-conflicted counsel and to retain all reasonable litigation strategies

available under the law.

## ARGUMENT

For approximately the last two years Flowserve has consistently expressed its concerns to Burns and Burns' chosen and controlled NCC, that as a result of the joint representation of Burns and Flowserve – which was exacerbated by the filing of the contractual dispute before this Court – the inherent conflict created by the dual representation needed to be addressed and remedied. Henke Aff., ¶¶ 7-9. As discussed, *supra*, Flowserve recently learned that several conflicted counsel had been filing answers on behalf of Flowserve in cases where Flowserve had never been served with process or named in the complaint. Henke Aff., ¶¶ 7-9. Clearly, from any reasonable perspective, counsel then-in-place could no longer adequately, fairly or ethically represent Flowserve's interests in the underlying cases, and therefore, needed to be replaced.

Burns now seeks to enjoin Flowserve from hiring non-conflicted counsel of Flowserve's choosing, but Flowserve has already taken the necessary remedial steps and moved its defense of the underlying cases to its own well-established network of nationwide counsel. Burns provides no legitimate basis for the extraordinary measure of injunctive relief, the first prong of which Flowserve's swift and efficient transition of counsel has rendered moot.

Under the now *former* status quo, far from the idyllic situation characterized in the TRO Motion, Flowserve found itself represented by counsel either unable to defend, indifferent to, or directly adverse to its interests. In the TRO Motion, Burns conveniently ignores the inherent conflicts present with the dual representation and the examples of problematic practices on the part of outgoing counsel that compelled Flowserve to move

those cases to Flowserve's chosen network of nationwide counsel. Under these troublesome circumstances, it is Flowserve who would suffer irreparable harm were it required to return to the "status quo" sought and preferred by Burns. Burns, on the other hand, can provide no evidence of irreparable harm it would suffer should the Court deny its requested injunctive relief.

Flowserve also represented to Burns that it would reasonably protect its interests once the transition from dual representation was completed. In a letter to Burns dated February 17, 2006 (the "February 17 Letter"), Flowserve stated that, with respect to the underlying cases it would "assert all defenses necessary to protect its interests, including third-party complaints against Burns" and that Flowserve also intended "to meet with plaintiffs counsel . . . to explore common ground with respect to a global resolution of the asbestos lawsuits brought against Flowserve." (Burns' Motion, Exh. D at ¶¶ 4, 6).

Flowserve did not suggest to Burns that it intended to engage in an "Armageddon" strategy intended to harass Burns, as the TRO Motion alleges, but merely that Flowserve would take all "reasonable actions" to protect its interests in the underlying cases once the conflicted dual representation was remedied. (Burns' Motion, Exh. D at ¶¶ 4, 6). Flowserve's communication was intended solely to inform Burns that after Flowserve moved the cases to new counsel, it would assert all available defenses and treat Burns as a separate third-party – which it then was – with respect to the underlying cases. Burns characterizes Flowserve's actions as "harassing," but based on the parties' contractual dispute before this Court, Burns must have expected that Flowserve would take reasonable steps to protect its interests in the underlying cases just as any similarly situated party would.

In sum, there is no basis to enjoin Flowserve from asserting legal defenses or
engaging in legal strategies when Burns cannot demonstrate any associated non-
economic, irreparable harm.

## I.    BURNS WILL NOT SUFFER IRREPARABLE HARM IF THE REQUESTED INJUCTIVE RELIEF IS DENIED

### A.    Flowserve Has Already Appointed New Counsel And Has Nearly Completed The Transfer Of Representation Which Has Not And Will Not Cause Irreparable Harm To Burns.

In order to demonstrate "irreparable harm" warranting injunctive relief, Burns
must demonstrate something beyond mere economic harm which may be redressed
through normal legal remedies. *Loveridge v. Pendleton Woolen Mills, Inc.* 788 F.2d 914,
918 (2nd Cir. 1986) ("It is well-established that irreparable injury means injury for which
a monetary award cannot be adequate compensation"). "Mere litigation expense, even
substantial and unrecoupable cost, does not constitute irreparable injury." *Renegotiation
Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24 (1974).

Flowserve has substantially completed the transfer of the underlying cases to new
non-conflicted counsel and, therefore, the first prong of Burns' requested injunctive relief
(*i.e.* a requested order to enjoin Flowserve from transferring cases to Flowserve's chosen
counsel) is, in effect, moot. *A.P Boyd v. Newark Public Schools,* 44 Fed.Appx 569, 570
(3d.Cir., 2002) As Burns concedes in its Response in Opposition to Flowserve's Motion
for Leave to File, "Flowserve has already fully implemented" its stated intention to
remove existing counsel (Burns' Response, p. 2) and has replaced them with new, non-
conflicted counsel.

Indeed, despite Burns' protestations to the contrary, Flowserve has overseen a
near seamless transition from outgoing counsel to new counsel without disruption, undue

burden or confusion to the parties.  Flowserve, as is its right, has retained a complete network of new counsel to represent its interests in the underlying cases throughout the country, and  thereby has already successfully remedied the inherent ethical conflict of dual representation under Burns' preferred "status quo."  Moreover, Burns has retained its own chosen network of counsel to represent Burns' interests in the underlying cases and has not suffered any demonstrable harm in the process.  Thus, Burns has no basis to argue it will suffer irreparable harm that would require an injunction to prevent Flowserve from defending its interests.

### B.  Burns Will Not Suffer Irreparable Harm If Flowserve Were To File Third- Party Claims Against Burns In The Underlying Cases

Burns' Memo of Law argues extensively and cites many cases about the potential harm that would ensue if Flowserve were not estopped from some perceived attempt to divest this Court of jurisdiction to decide the issues before it by filing third-party claims against Burns in the underlying cases.  (Burns' Memorandum, pp. 11-20).  None of these cases are on point, since Flowserve intends neither (1) to file third-party claims on the *same issues* before this Court, nor (2) to divest this Court of jurisdiction ultimately to decide the issues related to the 1987 Agreements.

Flowserve has not yet filed third-party complaints against Burns in any of the underlying cases, although it indeed may do so in the future to protect its interests as it is entitled by law.  Despite the allegations in the TRO Motion, Flowserve does not seek to implead Burns in each and every one of the cases as an additional means of litigating the construction of the 1987 Stock Purchase and Letter Agreements.  On the contrary, Flowserve readily agrees that the parties' dispute with respect to the meaning and interpretation of these Agreements is squarely before this Court.  Flowserve does not seek

to divest this Court of jurisdiction to decide the meaning and import of the Agreements, nor confuse the issues before this Court by filing needless third-party complaints on the same or similar issues.

Flowserve, however, may implead Burns into the underlying cases for two entirely separate reasons. First, as noted *supra*, Flowserve has discovered that it has been wrongly inserted as a defendant by outgoing counsel in a large number of cases in which it never was served and/or named. In those cases, Flowserve may implead Burns in order to resolve vexing legal and ethical issues related to outgoing counsel's filing of improper answers.

Furthermore, outgoing counsel's conduct with respect to certain cases raises the presumption that Flowserve was wrongfully made a party to other underlying cases. Flowserve should retain the ability to implead Burns to resolve these legal and ethical questions before the various State courts where those cases are pending. Equity and fairness dictate that since outgoing counsel may have wrongfully placed Flowserve before the jurisdiction of certain State courts in numerous other cases, Flowserve should be able to determine when, where and how often this wrongful conduct occurred. The State courts are eminently capable of resolving these ethical and procedural questions without interfering whatsoever with this Court's jurisdiction to resolve the parties' contractual dispute related to the 1987 Agreements.

Second, Flowserve may seek to implead Burns to avoid the prospect of future costly and unnecessary litigation with Burns regarding products liability for the underlying cases. If Burns is not made a party to the underlying cases, Burns could well argue in the future that settlements reached between Flowserve and plaintiffs in the

underlying cases are not *res judicata* and have no binding effect as to Burns. *Epstein v. Chatham Park, Inc.*, 52 Del. 56, 63, 153 A.2d. 180, 184 (Del. Super. Ct. 1959). In other words, even if Flowserve prevails in its declaratory action before this Court, Burns could later argue that it has no duty to indemnify Flowserve for previously resolved underlying cases, because Burns: 1) was not a party to those cases, and 2) did not have an opportunity to participate in the trial or resolution of those cases.

Flowserve can avoid that prospective future quandary – and prevent protracted litigation with Burns over the identical issues of liability in the underlying cases – and ultimately conserve judicial resources simply by impleading Burns into the pending underlying cases. In any event, should Flowserve decide to file third-party complaints against Burns, the State courts would not have to consider any issues pertaining to the 1987 Agreements. Flowserve, of course, would not and has no intention to request that those State courts decide any of the issues presently before this Court.

Accordingly, the putative irreparable harm from hypothetical third-party actions by Flowserve alleged by the TRO Motion is illusory. Flowserve's potential third-party actions would not divest, nor would Flowserve seek to divest, this Court of jurisdiction over the ultimate issues in dispute related to the 1987 Agreements (i.e., the ultimate obligations and responsibilities of the parties under these Agreements with respect to pre-1987 Byron Jackson asbestos liabilities).

### C. Burns Will Not Suffer Irreparable Harm From Flowserve's Potential Negotiations With Plaintiff's Counsel For Group or "Global" Settlements

Flowserve's potential discussions with plaintiffs to pursue a group or global settlement strategy will not cause irreparable harm to Burns, despite Burns' protestations

to the contrary.  To establish the right to the extraordinary relief provided by a
preliminary injunction, Burns must demonstrate a likelihood that irreparable harm will
occur.  *Drabbant Enterprises Inc. v. Great Atlantic & Pacific Tea* Co., 688 F.Supp. 1567,
1573 (D. Del., 1988).  Speculative injury based on the unfounded fears of the applicant is
insufficient to support the issuance of an injunction.  *Id.*  The harm must be real and
imminent.  *Id.* at 1574.

Here, Burns has failed to demonstrate any imminent, irreparable harm should
Flowserve seek to enter global resolutions of underlying cases.  The hypothetical
reduction in insurance available for other parties is purely economic harm, and does not
constitute irreparable harm for purposes of a preliminary injunction.  *See Renegotiation*
*Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 24.  Furthermore, Burns ignores the fact that
global settlements can, and often do, create economies of scale, which, in this instance,
could result in the availability of more insurance assets than if each case is settled or tried
individually.  A putative group settlement of a large number of cases would likely lessen
the burden on the limited insurance assets and certainly reduce the burden on scarce
judicial resources.

Burns also argues, incorrectly, that it is entitled to injunctive relief because
litigation strategies that involve potential global resolutions "may cause the Borg-Warner
insurers to claim a breach of the cooperation clause contained in each policy and deny all
coverage whatsoever." (Burns' Response to Motion for Leave, p. 4).  First, Burns'
argument is entirely speculative:  Burns provides no evidence or facts to support the
likelihood of such an outcome.  Moreover, Burns provides no legal analysis as to what
basis the carriers would invoke cooperation clauses in Borg Warner policies merely if

Flowserve should decide to enter "discussions" with plaintiffs' counsel aimed at potential global resolutions. In addition, the insurance carriers provide all coverage with a reservation of rights. Accordingly, the carriers are not likely to deny coverage without strong legal justification. In sum, Burns allegations fail to show the imminent likelihood that Flowserve's efforts to seek group resolutions will cause Burns any harm, much less harm that is irreparable.

Moreover, strong public policy considerations support the pursuit of this approach to settlement. Public policy favors negotiated settlements that avoid the costs and uncertainties associated with protracted litigation. *Liberate Technologies LLC v. Worldgate Communications, Inc.*, 133 F. Supp. 2d 357, 358 (D. Del. 2001). Actions taken in consideration of public policy or the public interest weigh against a finding of irreparable harm under a preliminary injunction analysis. *Liveware Publishing Inc., v. Best Software, Inc.*, 252 F. Supp.2d 74, 77(D. Del., 2003). The settlement of lawsuits "is in the best interest of all concerned and should be encouraged." *Tabas, et. al. v. Crosby et. al*, 1982 WL 17835 (Del. Ch.). (attached)

### D. The Hypothetical Depletion of Borg-Warner Insurance Coverage Does Not Constitute Irreparable Harm And Is Irrelevant To Burns' Request For Injunctive Relief

The TRO Motion makes numerous references to the potential "irreparable" harm Burns would suffer were Flowserve to seek access to the Borg Warner insurance coverage to fund settlements and recoup defense costs. These arguments are irrelevant to the present relief sought by Burns.

First, the Borg Warner insurance policies are presently the subject of a coverage lawsuit in the Circuit Court of Cook County, Illinois, before the Honorable Judge Peter

Flynn. (the "CNA Coverage Action"). Various rights and obligations of the insureds under the policies are currently before the jurisdiction of the Cook County court and not properly the subject of the dispute before this Court.

Burns' focus on insurance coverage issues before this Court is misplaced, and ultimately incorrect. Burns argues that this Court somehow has original *in rem* jurisdiction over the hypothetical *"res"* of the Borg Warner policies, yet the same policies are the precise subject of the CNA Coverage Action brought in January of 2004, nearly nine months before this case. Burns cannot reasonably argue that this Court has somehow seized "exclusive jurisdiction" over the "res" when the Cook County court has previously undertaken to resolve the insurers' and insureds' rights and obligations under those policies. (Burns' Memorandum, 12, 13)

The issues in this case are limited solely to whether Flowserve is entitled to indemnity for certain asbestos claims pursuant to the 1987 Agreements. Burns' effort to inject irrelevant questions regarding the continuation or exhaustion of the Borg Warner insurance is simply a red herring with no bearing on the resolution of the central issues of this case, particularly when Burns' has failed to provide this Court with any evidence of the Borg Warner Policy limits, clearly a prerequisite to demonstrating any realistic risk of exhaustion.

Second, Burns' argument that the hypothetical depletion of insurance proceeds from the Borg Warner Corporation policies would cause "irreparable harm" is belied by the fact that Burns has brought counterclaims in the present action seeking, *inter alia*, restitution for monies allegedly paid on behalf of Flowserve under the same policies in the past. This highlights the fact that such putative "irreparable harm" is nothing more

than potential economic harm for which Burns believes it may be entitled to *legal redress* if necessary, rather than the extraordinary injunctive relief sought here.

## II.    Flowserve Would Suffer Irreparable Harm If The Requested Injunctive Relief Is Granted

Before Flowserve transferred the underlying cases to its new network of counsel, it was represented by counsel either unable to defend, indifferent to, or arguably adverse to its interests.  Flowserve took the necessary remedial steps and moved the underlying cases to its chosen network of counsel.  In the TRO Motion, Burns conveniently ignores the inherent conflicts present with dual representation, and the practices on the part of outgoing counsel accruing to the direct detriment of Flowserve.  Incredibly, Burns argues that Flowserve would suffer "no harm under the status quo."  In truth, however, Flowserve would certainly be irreparably harmed if it were compelled to retain the same counsel who, because of inherent conflicts due to the dual representation, had failed to adequately represent its interests.

Flowserve has consistently represented to Burns that it would protect its interests once the transition from dual representation was completed.  In Flowserve's February 17 Letter, it stated that with respect to the underlying cases, Flowserve would "assert all defenses necessary to protect its interests, including third-party complaints against Burns" and that Flowserve also intended "to meet with plaintiffs counsel . . . to explore common ground with respect to a global resolution of the asbestos lawsuits brought against Flowserve."  (Burns' Motion, Exh. D at ¶¶ 4, 6).

Flowserve would be irreparably harmed were it precluded from even considering all available legal defense strategies, including third-party claims and potential global settlement negotiations with plaintiffs.  Fundamental fairness and substantial justice

require that Flowserve retain the right to implement legal strategies that would be available to other similarly situated litigants. Flowserve has moved the underlying cases to its chosen network of new counsel; it may now seek to file third-party complaints against Burns and/or engage in settlement negotiations with plaintiffs counsel. Defendants routinely rely on both legal strategies in mass tort litigation, and Flowserve should not be precluded from doing so based on the minimal evidence of potential economic – not irreparable – harm claimed in the TRO Motion.

## III.    Burns Has Not Demonstrated A Likelihood Of Success On The Merits

The heart of the litigation between Burns and Flowserve is the interpretation of the 1987 Stock Purchase and Letter Agreements. Under §§9.04 (a)(ii)(E)(1)(2)(3) of the Stock Purchase Agreement, Burns agreed to retain complete liability and further agreed to indemnify Flowserve for any unknown product, environmental, and disease-related claims – including asbestos related claims – for Borg-Warner Industrial Corporation, Inc. ("BWIC") and Borg-Warner Corporation.

Section 9.04(a)(ii)(E) states, in relevant part, that Burns would indemnify and hold Flowserve harmless for, *inter alia*:

(E)    any occurrence, conduct or condition existing on or prior to the Effective date [of the 1987 Agreement]with respect to the businesses of [BWIC] that:

(1)    violated, is alleged to violate or gives rise to a claim under any law, rule, or ordinance in effect as of the Effective Date, or any judgment, order or decree in any case relating to conduct prior to the Effective Date with respect to handling or disposal of toxic or hazardous materials, air or water pollution or otherwise relating to protection of or damage to the environment;

(2)      is the basis for any common law tort, nuisance or similar claim by a party (other than the Buyer or an affiliate of Buyer) in connection with which Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions is alleged to have released harmful, toxic or hazardous substances into the environment; or

(3)      is the basis for a claim that the claimant contracted a disease as a result of exposure prior to the Effective date to any product of or raw material used by Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions, except to the extent that such a claim is made after the Effective Date and arises out of third party use of a product after sale.

Each of three subdivisions of §9.04(a)(ii)(E) of the 1987 Agreement established the parties' intent that Burns would retain liability for environmental and/or disease-related liabilities, including such liabilities that were either: 1) related to the improper "handling or disposal of toxic substances" such as asbestos (See 1987 Agreement §9.04 (a)(ii)(E)(1)); 2) related to the "release of toxic or hazardous substances" such as asbestos (See 1987 Agreement §9.04(a)(ii)(E)(2)); or, (3) related to a claim that the "claimant contracted a disease from exposure to a product or material" such as asbestos. See 1987 Agreement §9.04(a)(ii)(E)(3).

Burns argues that Flowserve assumed the liabilities for the underlying cases based on §9.04(b)(C) of the Agreement, which refers to product liability claims. The more specific provisions of the Agreement – §9.04(a)(ii)(E)(1)(2)(3) – carved out certain environmental and/or "disease-related" liabilities, however, and under standard principles of contract interpretation, these contractual provisions would supersede the more general provisions cited by Burns.

Furthermore, Burns' misinterprets the meaning of the Letter Agreement. Burns argues that under the Letter Agreement, Burns must indemnify Flowserve for Losses "*only* 'to the extent such losses are covered by such insurance.'" (Burns' Memorandum, p.22). Burns, however, has erroneously added the word "only" into the provision where it does not exist. The Letter Agreement can be more reasonably interpreted to mean that all Losses, whether retained by Burns or assumed by Flowserve, would be paid for to the extent of Borg Warner's available insurance. In the absence of such insurance, however, Burns would retain the obligation to indemnify Flowserve for Losses under §9.04(a), and Flowserve would assume the obligation to indemnify Burns for Losses under §9.04(b) pursuant to the 1987 Stock Purchase Agreement. (Burns' Motion, Exh. B)

In light of these contract provisions, Burns has not demonstrated that it is likely to succeed on the merits of this case.

**IV.    Public Policy Interests Weigh Heavily In Favor Of Denying The Injunctive Relief Requested**

**A. Public policy favors separate representation in situations where parties have adverse interests as now exists between Flowserve and Burns.**

As stated, *supra*, the inherent conflict posed by dual representation that existed in the "status quo" has caused Flowserve untold harm to its legal and economic interests. Outgoing counsel has, in a significant number of the cases, wrongly inserted Flowserve as a defendant despite the fact that plaintiffs in those cases had never sued and/or served Flowserve.

An attorney may not represent two clients when representation of one would be directly adverse to or would materially limit representation of the other. *Lease, et. al. v. Rubacky M.D.,* 987 F.Supp. 406, 407 (D.Pa.1997). Even in cases where the parties'

interests are not directly adverse, a conflict exists if there is a significant risk that a

lawyer's ability to recommend or advocate all possible positions is limited because of the

lawyer's duty of loyalty to others. DEL. RULES OF PROF'L CONDUCT, R. 1.7 cmt. at

8 (amended effective July 1, 2003)  At stake in cases of simultaneous or dual

representation is the attorney's duty and the clients legitimate expectation of loyalty.

*Certain Underwriters at Lloyd's London v. Argonaut Insurance Co.,* 264 F.Supp.2d 914,

919 (N.D. Ca. 2003).  Violation of this duty of undivided loyalty undermines public

confidence in the legal profession and the judicial process.  *Id.*

Public policy strongly weighs in favor of separate representation in situations

where parties – like Flowserve and Burns – have substantially adverse interests.  But here,

where the evidence demonstrates that outgoing counsel has engaged in a pattern of

dubious, and arguably unethical conduct to the detriment of Flowserve, public policy and

fundamental concepts of fairness and equity demand that Flowserve retain the right to

choose non-conflicted counsel to protect its interests.

### B.  Flowserve's right to bring third party suits against Burns and/or engage in discussions with Plaintiffs' counsel about possible global resolutions of underlying cases is supported by public policy

Third party impleader is designed to reduce redundant litigation on the same

underlying legal issues and, thus, to promote judicial economy.  *Salisbury Township*

*School District v. Jared M. et. al. v. Hickock,* 1999 WL 346237 (E.D. Pa.).   The

impleader rule does not have the effect of enlarging any substantive rights; it merely

accelerates the determination of liability among the joint tortfeasors who are or may be

liable to defendant for contribution, exoneration, or indemnification.  *Goldsberry v.*

*Frank Clendaniel, Inc.,* 109 A.2d 405, 407 (Del. Super. Ct. 1954).

Flowserve's ability to bring third party suits against Burns will prevent future protracted litigation over identical issues of liability in the underlying cases. Public policy is served by quick and efficient resolution of these claims.

In addition, as noted *supra* (Flowserve's Memorandum, §I(C)) public policy strongly favors resolving disputes through compromise and settlement rather than through litigation, and any attempts by Flowserve to enter into group or global settlements with plaintiffs likely would have a commensurate reduction in both the costs associated with defending each claim and the burden placed on judicial resources.

## CONCLUSION

For all of the above and foregoing reasons, plaintiff Flowserve respectfully submits that this Court should dismiss Burns' request for a temporary restraining order and a preliminary injunction restraining Flowserve from (1) terminating and replacing national and local counsel who had been representing Flowserve in the underlying cases, and which already has been substantially completed by Flowserve; (2) filing third-party claims against Burns in actions where outgoing counsel has or may have wrongfully answered for Flowserve in cases for which Flowserve was never named in and/or served in a complaint; and (3) meeting with plaintiffs counsel to discuss possible global resolution strategies.

**Segal McCambridge Singer & Mahoney, Ltd.**

Gregory E. Rogus, Esq.
Erich Gleber, Esq.
330 N. Wabash Drive, Suite 200
Chicago, IL  60611
312-645-7800
Attorneys for Flowserve

**TYBOUT, REDFEARN & PELL**

/s/   Danielle K. Yearick
Danielle K. Yearick, I.D. No. 3668
750 South Madison Street, Suite 400
P.O. Box 2092
Wilmington, DE 19899-2092
(302) 658-6901
Local counsel for Plaintiff Flowserve

Dated:  March 13, 2006

Attachment A

Not Reported in A.2d, 1982 WL 17835 (Del.Ch.)
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

1. Court of Chancery of Delaware.

TABAS et al.

v.

CROSBY et al. ON APPLICATION TO APPROVE A SUIT SETTLEMENT: APPROVED

CIVIL ACTION No. 6619.

Submitted: May 7, 1982.

Decided: June 24, 1982.

William Prickett, Vernon R. Proctor, Prickett, Jones, Elliott, Kristol and Schnee, Wilmington.
Januar D. Bove, Jr., Connolly, Bove & Lodge, Wilmington.
Michael D. Goldman, Donald J. Wolfe, Jr., Potter, Anderson & Corroon, Wilmington.
Charles C. Shaefer, C.C. Shaefer, Jr., APC, Kansas City, Mo.
David R. Simon, Simon & Allen, Newark, N.J.

HARTNETT, Vice-Chancellor.

*1 For the reasons set forth, I approve the settlement of this stockholders' derivative and class action suit despite the objections of three shareholders after permitting the three objectors to opt-out of the class.

I

On March 18, 1982, this Court entered an Order of Settlement which, for purposes of settlement only, certified this stockholders' derivative suit as a class action. The members of the class were all the stockholders of Resorts International, Inc. who held shares between June 1, 1980, and March 18, 1982, except the named defendants.

In conformity with Rules 23 and 23.1, Notice of the proposed settlement and of a Hearing to consider whether the settlement should be approved was sent to all the shareholders of Resorts International, Inc.

The Order provided in part:

"7. Any stockholder of Resorts or any member of the Class who objects to the Stipulation, the Settlement or the judgment to be entered herein, or who wishes to be heard with reference to the plaintiffs' application for attorneys' fees or expenses or any other matter, may appear in person or by his attorney at the Settlement Hearing and present any evidence or argument that may be proper and relevant; ..."

While the Order and Notice does not state, as it should, that a member of the class may request to

be excluded from the class, this is implied from the provision of Rule 23(c)(2) which states in part: "The Notice shall advise each member that: (A) The Court will exclude from the class if he so requests by a specific date." WRIGHT & MILLER, *Procedure,* Civil § 1787.

Shareholders-James and Bonnie Geller, of New Jersey, and Rolf Stanford, of California, appeared, through counsel, at the Hearing on May 7, 1982, and requested to be excluded from the Class. Their request is therefore granted and they are excluded from the Class.

II

The settlement seeks to end six actions--now consolidated--which were commenced in this Court as stockholder derivative actions on behalf of all the stockholders of Resorts International, Inc. ("Resorts") who have owned shares of common stock since June 1, 1980.

The basic allegation of all the suits is that the individual defendants, the directors of Resorts, committed a breach of the fiduciary duty they owed to Resorts because they caused or permitted Resorts to make reckless or imprudent investments in that the corporation purchased silver future contracts and U.S. Treasury bond futures contracts. Plaintiffs, in effect, termed these purchases as being speculative.

Defendants, on the other hand, asserted that the decisions to purchase the futures contracts were protected against judicial scrutiny by the business judgment rule and were, in any case, a wise investment considering Resorts' commitment to construction projects which would require sizeable sums of cash in the future and upon the expectation that the unusually high interest rates prevalent in 1981 would fall.

Resorts, in effect, decided in 1981 that interest rates would soon fall and therefore it would make a profit on its futures contracts. Actually, the interest rates rose and Resorts suffered losses. However, in the last quarter of 1981, interest rates began to fall and Resorts made a handsome profit on the futures during that period.

*2 Whether the futures contract purchases ultimately turn out to be profitable or unprofitable to Resorts therefore will depend, to a large extent, on whether interest rates rise or fall in the future. From the above facts it is obvious that in order for the plaintiffs to prevail in the suits filed, they would have to overcome the usual presumption of propriety as to the decision to purchase futures afforded to the defendants by the business judgment rule. *Maldonado v. Flynn,* Del.Ch., **413 A.2d 1251 (1980)**; *rev'd., Zapata v. Maldonado,* Del.Supr., **430 A.2d 779 (1981)**. There has been no allegation that any of the directors directly profited from any of the transactions or that there is any other disabling factor present.

It is also obvious that plaintiffs' burden was difficult. Indeed, from my experience in reviewing these types of cases, the plaintiffs' claim was among the most tenuous I have ever encountered. It is therefore easy to see why plaintiffs, after protracted discovery, concluded that an effort should be made to settle this case.

III

This Court must judge a proposed settlement of a stockholders' class action by exercising its own business judgment as to the reasonableness of the settlement after considering the nature of the claims and the possible defenses. It is not the function of the Court to try the issues of the case. *Krinsky v. Hefland,* Del.Supr., **156 A.2d 90 (1959)**; *Neponsit Investment Co. v. Abramson,* Del.Supr., **405 A.2d 97 (1979)**.

Under the terms of the settlement the corporation has agreed to retain a recognized expert on futures investments to advise the corporation as to this type of investment in the future and made other concessions. The corporation has also agreed to pay plaintiffs' counsel fees and expenses not to exceed $300,000.

Considering the difficult burden plaintiffs would have in overcoming the presumptions of propriety afforded defendants by the business judgment rule, I conclude that, in my business judgment, the settlement is fair and reasonable and in the best interests of the corporation and its stockholders.

## IV

Although objectors cite numerous reasons for their objection to the settlement, their primary reason seems to be that they have commenced suits themselves elsewhere.

The Gellers commenced suit--after the Delaware action was commenced--in the Superior Court of New Jersey. The complaint in that Court is practically a copy of the complaint filed in this Court. After suit was filed in New Jersey, little was done in that Court until the settlement of the Delaware action was arrived at.

Mr. Stanford brought suit in the U.S. District Court for the Western District of Missouri on September 29, 1981--before the Delaware action was filed. From a reading of that complaint I am unsure that it properly states a claim for relief. In any event, service of process was not effectuated until recently and nothing has been done to move the case.

To the contrary, plaintiffs in this Delaware case vigorously pursued discovery. Because I had to hold several conferences with counsel and rule on various discovery problems, I am well aware (perhaps too well aware) of the vigor with which plaintiffs pursued the Delaware action until it became obvious to plaintiffs, as a result of their discovery, that their chance of prevailing was not the best.

*3 Plaintiffs also briefed the issue in the reported opinion which I entered in this case on March 8, 1982, *Tabas v. Crosby*, Del.Ch., **444 A.2d** **250 (1982)**.

The settlement of law suits is in the best interests of all concerned and should be encouraged. ***Neponsit Investment Co. v. Abramson*, supra**. Indeed, if most law suits were not settled the entire judicial system would be overwhelmed. To hold up a settlement of this action, which has been vigorously pursued in Delaware, just because three stockholders choose to file suits elsewhere and then not to vigorously pursue them, would jeopardize the whole settlement process to the detriment of the over 14,000 other shareholders of Resorts International, Inc. who do not object to the settlement.

## V

The objectors assert that the form of Stipulation of Settlement is misleading. A careful reading of the Stipulation and the Notice sent to the stockholders reveals that not to be so. A stipulation of settlement need not recite all the facts but only those required to give the shareholders fair notice. Nor is the scope of the settlement overly broad. The settlement, despite the objectors' claim, does provide a benefit to the corporation and its stockholders.

The objectors also seek the opportunity to engage in additional discovery. This request must be denied. Plaintiffs permitted the objectors access to their files and the objectors had ample opportunity to seek discovery if they desired. An objector to a settlement has a burden to move

promptly. To delay settlements is to jeopardize their vitality.

Lastly, the objectors object to the attorney fees. Because no fund was created by the litigation, plaintiffs have sought only reimbursement for the billable hours of their counsel.

The objectors object to the payment of any attorney fees on the grounds that no benefit was produced, and they also object as to the amount sought. It is clear that a benefit was produced and an award of attorney fees is justified.

The amount of the award is, however, somewhat troublesome because of the limited record. The objectors have sought the opportunity to conduct discovery as to the propriety of the fees and considering all the circumstances, I find that they should be given that opportunity if they act promptly. The objectors, therefore, shall be given two weeks to conduct limited discovery as to the justification for the attorney fees sought by plaintiffs' counsel.

Plaintiffs may submit an order.

Del.Ch.,1982.

Tabas v. Crosby

Not Reported in A.2d, 1982 WL 17835 (Del.Ch.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Attachment B

Not Reported in F.Supp.2d, 1999 WL 346237 (E.D.Pa.)

**1. Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

SALISBURY TOWNSHIP SCHOOL DISTRICT, Plaintiff,

v.

JARED M., by and through his parents and natural guardians GLENN M. and JAN M.,

Defendants and Third-Party Plaintiffs,

v.

EUGENE W. HICKOK, individually and in his capacity as Secretary of the

Commonwealth of Pennsylvania, Department of Education, et al. Third-Party

Defendants.

No. CIV. A. 98-6396.

CIVIL ACTION NO. 98-6396

June 1, 1999.

*MEMORANDUM*

**BUCKWALTER.**
*1 Plaintiff Salisbury Township School District filed an action under the Individuals with Disabilities Education Act ("IDEA"), **20 U.S.C. § 1415(e)(2)**, seeking judicial review of two decisions of the Special Education Due Process Appeals Review Panel. The panel ordered Plaintiff to provide compensatory education to Jared M., who is now being sued by Plaintiff in this civil action through his parents and natural guardians, Defendants Glenn M. and Jan M. Within ten days of answering the complaint and asserting various counterclaims against the school district, Defendants served a separate summons and complaint against Eugene W. Hickok (Secretary of the Commonwealth of Pennsylvania, Department of Education), the Department of Education, and ten other individuals related to the school district and alleged to have been involved in the evaluation and provision of compensatory education to Jared. This third-party complaint appears to have been initiated under the aegis of **Fed.R.Civ.P. 14** as an action for

impleader, although it is not specifically delineated as such. Moreover, while the allegations and claims for relief go far beyond the adjudication conducted in the state administrative proceedings, they appear to relate to the counterclaims asserted by the parents and generally encompass the same set of operative facts and transactions concerning disputes over Jared's special education program. Presently before the Court is a motion to dismiss the third-party complaint by Third-Party Defendants Eugene W. Hickok and the Department of Education (collectively, "the Commonwealth Defendants"). The other ten named third-party defendants have not similarly moved for any relief. The Commonwealth Defendants principally contend that the controversy presented by the third-party complaint is not susceptible to **Rule 14** treatment because, if the school district were to prevail on its original claim against Jared and his parents, that finding of liability (that is, a reversal of the panel's orders) could not be shifted or shared with the Commonwealth Defendants or, for that matter, with any of the other third-party defendants, as these parties are not similarly liable to the school district. Claiming that the parents are impermissibly expanding the scope of what is essentially an action for limited judicial review to include the entirety of the dispute over Jared's special education program, the Commonwealth Defendants maintain that the impleader action is improper and warrants dismissal. In addition, they also argue that the **42 U.S.C. § 1983** claim to enforce various constitutional and statutory rights lacks legal sufficiency. However, as will become clear shortly, the Court declines to address the merits of this latter argument.

In response, Third-Party Plaintiffs essentially argue equity and policy. They initially contend that the Commonwealth Defendants should have no cause to object to the impleading, since the third-party complaint could have been instituted as a separate civil action and then consolidated with the present action, thereby promoting judicial economy. Additionally, they argue that the purpose behind **Rule 14** of avoiding multiple lawsuits and promoting judicial economy would nevertheless be served by adjudicating all the claims together, even though they tacitly admit that the parties may be debating over semantics as to whether the underlying action should be restricted by the traditional "A v. B" structure mandated by the IDEA or construed liberally as one seeking judicial review.

*2 It is apparent that the third-party complaint utterly fails to satisfy the strictures of **Rule 14**, which states, in pertinent part, that "a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." **Fed.R.Civ.P. 14(a)**. Here, none of the third-party defendants are or may be liable to Jared or his parents for any of claims brought by the school district against them. Thus, dismissal for improper impleading is warranted here. Moreover, as the procedural flaw applies with equal force to the non-moving third-party defendants, the entire third-party complaint ought to be dismissed *sua sponte,* notwithstanding the other third-party defendants' acquiescence to the suit. While Jared and his parents have raised the issue of inequity, the Court notes that they have failed to recognize the seemingly unfair result perpetuated by **Rule 14** had the outcome of the state administrative proceedings been unfavorable to them. That is, had the parents brought an action under the IDEA seeking review of an unfavorable panel decision, the school district would most likely have been able to implead the currently named third-party defendants, thus allowing the parents to assert their claims against them *in toto. See* **Fed.R.Civ.P. 14** ("The plaintiff may assert any claim against the third-party defendant arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim against the third-party plaintiff ..."); *see, e.g.,*

*Fritschle v. Andes*, 25 F.Supp.2d 699 (D.Md.1998). Moreover, in the absence of an impleading, they might have been able to allege claims against the currently named third-party defendants as part of their original action. It is the curious posture of this case--one in which relief for the school district would actually result in it being no longer liable to the parents-- that creates the bar to using **Rule 14** by the parents.

The Court agrees that **Rule 14** ought to be interpreted liberally so as to advance the goals of federal practice. *See, e.g., Stiber v. United States*, 60 F.R.D. 668, 670 (E.D.Pa.1973) (Troutman, J.). But while it is tempting to pierce through the inconsistency presented by the rule in favor of the parents in this case, **Rule 14** may not be interpreted to read the text right out of the rule. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 905, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (Blackmun, J., dissenting) ("an appeal to the 'spirit' of the Federal Rules is an insufficient basis for ignoring the import of their text"); *Healy v. Pennsylvania R.R. Co.*, 181 F.2d 934, 937 (3d Cir.1950) ("Howsoever liberal we may wish to be, it cannot be gainsaid that certain formalities are indispensable to 'just, speedy, and inexpensive' litigation, and these attributes of our federal judicial system are forthcoming only upon adherence to, rather than upon rejection of, the Rules.") (footnote omitted); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.*, 43 F.R.D. 452, 460 (E.D.Pa.1968) (Fullam, J.) ("The strong presumption of validity of these rules ... requires this court to apply the rule as written; but it neither requires nor permits a strained interpretation of the rule in a manner likely to rebut the presumption.") (citation omitted). And, in any event, federal practice is replete with examples of imperfect symmetry between the parties. For example, a plaintiff who initially alleges only state law claims in a state court action, but subsequently amends the complaint to include federal claims cannot then remove the action to federal court; only the defendant has that option. *See* 28 U.S.C. § 1446 (expressly allowing only defendants to remove actions from state to federal court).

*3 Here, the plain terms of the rule proscribe the procedural mechanism initiated by the parents. However, the Court notes that the parents could potentially have moved pursuant to **Fed.R.Civ.P. 13(h)** to join the third-party defendants as additional parties. Under that rule, "[p]ersons other than those made parties to the original action may be made parties to a counterclaim ... in accordance with the provisions of Rules 19 and 20." Rule 20(a), in turn, allows joinder of all persons "in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Thus, although the Court expresses no opinion on its propriety at this time, the improper use of the impleader mechanism may have been avoided had counsel moved for leave to add the named third-party defendants under **Rules 13(h)** and **20** and to have the Court align them as party-plaintiffs.

Because the Court is cognizant of the needless waste of judicial and legal resources, the granting of the Commonwealth Defendants' motion for dismissal will be conditioned on providing the parents with an opportunity to recharacterize the instant procedural quagmire as one requesting leave to add the various third-party defendants pursuant to **Rules 13(h)** and **20**. *See* **Fed.R.Civ.P. 1** (stating that the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action"). Should the parents wish to proceed in this manner, all parties will be given an opportunity for full briefing on any and all the issues raised therein. Absent such an indication, the Commonwealth Defendants' motion will be GRANTED and the third-party complaint DISMISSED in its entirety without prejudice for

improper impleading.

An appropriate order follows.

## ORDER

AND NOW, this 1st day of June, 1999, upon consideration of the Motion to Dismiss the Third-Party Complaint of Third-Party Defendants Eugene W. Hickok and the Commonwealth of Pennsylvania, Department of Education (Docket No. 5) and Third-Party Plaintiffs' response thereto (Docket No. 9), it is hereby ORDERED that:

(1) Should Third-Party Plaintiffs wish to proceed in accordance with the accompanying memorandum and have this Court recharacterize the posture of the litigation as a request for leave to add the various third-party defendants pursuant to **Fed.R.Civ.P. 13(h)** and **20**, Third-Party Plaintiffs shall file a brief in support of that request within seven (7) days of the date of this order. Any opposition to such a joinder by any of the named third-party defendants, if any, shall be filed seven (7) days thereafter.

(2) Should Third-Party Plaintiffs choose not to exercise this option within seven (7) days of the date of this order by filing their brief, the instant motion will be GRANTED and the third-party complaint DISMISSED in its entirety without prejudice for improper impleading through operation of this order.

E.D.Pa.,1999.

Salisbury Tp. School Dist. v. Jared M. ex rel. Glenn M.

Not Reported in F.Supp.2d, 1999 WL 346237 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• **2:98cv06396** (Docket) (Dec. 09, 1998)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.