IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

COPY

| | | |
|---|---|---|
| FLOWSERVE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BURNS INTERNATIONAL SERVICES CORPORATION, and BORG-WARNER CORPORATION,<br><br>Defendants. | ) | Civil Action No. 04-1294-JJF |

United States District Court
866 King Street - Fourth Floor
Wilmington, Delaware

Thursday, March 16, 2006
10:00 a.m.

BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR.
United States District Judge

APPEARANCES:

WILSON B. REDFEARN, ESQ.
TYBOUT REDFEARN & PELL
for the Plaintiff

GREGORY E. ROGUS, ESQ.
and ERICH GLEBER, ESQ.
SEGAL MCCAMBRIDGE
for the Plaintiff

APPEARANCES CONTINUED:

LAWRENCE E. HENKE, ESQ.
FLOWSERVE CORPORATION
for the Plaintiff

FRANCIS J. MURPHY, ESQ.
MURPHY, SPADARO & LANDON
for the Defendant

MICHAEL H. MOIRANO, ESQ.
NISEN & ELLIOTT, LLC
for the Defendant

THE COURT: Are we ready to proceed?

MR. MOORE: Good morning, Your Honor. Francis Murphy of Murphy, Spadaro & Landon. I'm here today for Burns International Services Corporation which is the defendant and counter-claimant. Making the argument today for Burns is Michael Moirano of the Chicago law firm of Nisen & Elliott.

We have filed previously for his admission pro hac vice. We had some indiction from the Court that there might be some time limits on the argument today. Both sides are wondering if the Court has something in mind in that regard?

THE COURT: I was aware and my case manager told me that we allocated 20 minutes each side for argument.

MR. MURPHY: Thank you.

MR. REDFEARN: Will Redfearn of Tybout, Redfearn & Pell. I am local counsel for Flowserve Corporation and I would like to introduce you to Greg Rogus from Segal McCambridge who will be making the argument. Next to him is

Larry Henke who is the senior attorney for Flowserve and next to him is Erich Gleber who is also with Segal McCambridge.

THE COURT: All right. Thank you.

MR. MOIRANO: Good morning, Your Honor. Michael Moirano for the plaintiff -- I'm sorry, defendant, counter-plaintiff. Your Honor, as you know we are seeking a temporary restraining order and ultimately a preliminary injunction. And what we are attempting to do now -- things have changed a little bit since we filed the motion.

We're asking the Court to adjoin Flowserve, the plaintiff in this action, and its subsidiaries and affiliates from in effect using the insurance, the insurance coverage that Burns owns which is the Borg-Warner Insurance to pay for the defense of cases. Or to pay for the settlement of cases that Flowserve is now elected to take control of and to defend on its own.

We are also asking for a separate relief to enjoin closer from filing third-party actions in any of the underlying asbestos cases. Approximately 3,500 pending currently related to

the issues that are before this Court, issues concerning indemnity. Those are the two areas of relief we are seeking.

The reason we are seeking those and the reasons we believe we are entitled to this relief is primarily the agreement between the parties. As you know Judge Beck in 1987 there was a negotiated agreement concerning the purchase of one of the assets of Borg-Warner Corporation's subsidiary. And as part of that lengthy document there was a fairly lengthy indemnity agreement between the parties and each party agreed to indemnify each other for certain liabilities.

And in all cases however the parties as part of their negotiated agreement agreed that if they were indemnifying the other side that they would in effect control the indemnification. They would control the underlying claims. They would control the defense of the claims that's Section 9.04 D of the 1987 Stock Purchase Agreement.

It specifically says that if one party makes a claim for indemnity on the other party the indemnifying party has the right to select counsel. And it also says that the

indemnifying party controls the litigation with the indemnified party having the right to participate in the defense but only at its own cost.

THE COURT: When your client Burns which is its own business essentially --

MR. MOIRANO: Yes.

THE COURT: -- That insurance asset?

MR. MOIRANO: It was transferred. Ultimately what happened the old Borg-Warner Corporation was liquated and this insurance asset became Burns' asset.

THE COURT: And at the time it became Burns' asset -- I'm a little unclear also what was in place with regard to the indemnification?

MR. MOIRANO: All of those documents, the indemnification provisions in the Stock Purchase Agreement and that letter agreement, they were all negotiated in a new place. We got the asset in December of 1987. The Stock Purchase Agreement was closed in March of 1987, effective December 31, 1966, a year before.

So when we came on the scene we got this asset and all of these agreements had been done. We were simply marshaling the assets at this point, administering the asset and that's what we have been doing.

THE COURT: On the purchase of the asset the extent of it was the first level coverage?

MR. MOIRANO: All the coverage. So we have a primary level which the insurers are saying has now been exhausted, and we're into the first level umbrella coverage now. That's where we stand today which is significant, Your Honor, because the defense costs now are eating away at the limits on the umbrella policies at the primary level. Defense costs were paid for by the insurance company and weren't applied against the limits.

And now we're in a different ball game. Defense costs in effect is our expense. It is eating away at our limits of coverage.

THE COURT: Do you contract out the administration of that asset?

MR. MOIRANO: As far as the

individual cases, the insurance company has been doing that. That is one of the benefits we had was that CNA which was the lead insurer both at the primary level and at the umbrella level has been administering the whole thing.

Effectively we just get these cases and we send them out to the designated insurance companies and CNA administers it and then we're done with them essentially. That's the way it has been working until March 1st.

THE COURT: Until you got sued?

MR. MOIRANO: Yes.

THE COURT: Now you're an active participant in asbestos --

MR. MOIRANO: Yes. Things have changed. So we are saying we're entitled to this injunctive relief because the contract says we're entitled to it. If Flowserve wants to appoint their own counsel and they have indicated they want to do that, and they have done that, Judge, the cow is out of the barn.

They can do that but Flowserve wants to control the defense of the cases, they can do that. They have done it and they can do it. If

Flowserve wants to settle the cases they can do it. We're not saying they can't do it. What we are saying though is if they want to do all those things on our dime, if they want to use our asset to pay for it then they have to comply with the terms, the Stock Purchase Agreement which they haven't done.

The counsel they have appointed, we would have never approved the counsel they have appointed because of the conflicts that exist. Let me explain why I am very concerned about what is happening, Judge. The firm they have retained which is Segal McCambridge, a national firm, they have been representing Flowserve in asbestos cases for many years unrelated to the Byron Jackson Pump cases that we're talking about here.

Flowserve has many, many, many product lines that involve asbestos containing products and they are sued in many, many cases in cases Byron Jackson is involved. In cases that we're not involved in but thousands and thousands of cases.

They have their own network of insurance companies -- I'm sorry, defense counsel

and from the minute Mr. Henke got involved in this litigation back in 2003 they wanted to shift this coverage or shift the defense of the Byron Jackson cases to their own private network. One of the reasons we never would do that and we oppose it is because in these cases, many cases, you have the Byron Jackson Pump as being alleged as one of the causes of the plaintiff's injury.

And then you have a number of other products that Flowserve either manufactured or the legacy companies where the plaintiff is also alleging I was injured by their products as well.

The problem we have that we're most concerned about is they want to use now our insurance to settle those cases for all their clients. And pay for either the defense or pay for the settlements using our money. They have limited insurance. All of these companies, these manufacturers have limited insurance. There is going to come a day of reckoning when they are out of insurance.

So everyone is trying to protect their own asset, their insurance asset as much as possible. What they want to do now is use our

insurance to pay for their cases, pay for the defense, pay for the settlement of those cases where they have other products involved, clear conflicts of interest.

We have no problem with that, just don't look to us and try to use or asset. We'll never be able to figure out, Judge, for example, they go to a plaintiff's deposition in the case and the plaintiff says yeah, I was exposed to a Byron Jackson Pump back in 1957. I was exposed to product C,D,E and F of Flowserve's in different years and different times. Not uncommon in these asbestos cases.

If you take a look at Mr. Miller's deposition, the supplemental affidavit we gave you yesterday there is a case in there, the Brewer case. Where if you look at the caption Flowserve is named as the defendant and it says individually and as successor in the interest of 40 different companies that Flowserve is involved in somehow or another.

So in the Brewer case Mr. Brewer goes for his deposition and they ask him about all these different claims related to Flowserve's

products, who is going to pay for that? Who is going to pay for that deposition? Are they going to charge that to Borg-Warner's insurance because it is a Byron Jackson Pump? Are they going to charge it to the other companies? And how are you ever going to monitor any of that?

That's the reason the original indemnity agreement says if you want us to indemnify you we control how much is going to be spent on the defense. How much is going to be spent on settlement. We don't want them to control.

THE COURT: In the litigation that has existed one of the complaints that Flowserve makes is that when Burns or the pumps would have been sued and you get into that discovery period you would point out and bring in Flowserve, what is your response? Is it your contention that that was because is was beyond just the pump that was alleged as the proximate cause of injury?

MR. MOIRANO: No. What happens in a lot of these cases is the plaintiffs' attorneys name literally 20, 30, 40 different defendants and claim their successor to two or 300 different

companies. So it is very confusing as to who the real party of interest should be. Who is the manufacturer and who is responsible for the liability.

And there is no doubt everyone in this room will agree that is a problem in all of these cases, who the correct party to name is. So before my firm's involvement in this litigation there was an agreement worked out that where there was one of these what we call Byron Jackson Pump cases, but I'll refer to them as the pump cases.

Where there was a pump case the appearance would be filed on behalf of what at that time was known as Borg-Warner or BWIP International, Inc., successor and interest of Byron Jackson Pump Company, predecessor and interest of Flowserve International. That's the party that was responsible for the manufacture and sale of these pumps.

That's what was worked out by Mr. Henke and his predecessor with this national network of counsel handling Borg-Warner Insurance. Subsequent to that and the other thing they did about and they tried to do is if

Flowserve Corporation was named they wouldn't file an appearance on behalf of Flowserve Corporation, they would file it on behalf of this BWIP International, you know, this showing, the successorship and who the responsible party is.

To cut through the confusion it apparently was the position and still is the position of CNA and everybody, let's get to the fundamental issue in these underlying cases. Let's not mess around with who the correct party is. Issues of service were never a big deal. Your Honor, we've shown you some examples as recently as January. Service wasn't a big deal.

We're named in the cases in some fashion. Let's get the correct parties in the case and let's defend them on their merits. Because the majority of these cases, Judge, get dismissed on their merits because the plaintiff wasn't exposed to one of our pumps. We never sold it to the company they say they worked for.

So their position is particularly when CNA was running and it was their money, they were saying let's get to the merits of the cases. Let's not mess around with all these procedural

issues and things like that. Burns started getting named in the cases. We don't know why but all of a sudden in the last couple of years Burns started getting named in those cases. And counsel suggested that it was Mike Burn that directed these law firms. That's not correct.

These law firms for years, these local defense lawyers have been filing appearances on behalf of this BWIP International successor and interest, the Byron Jackson predecessor and Flowserve. That's what they were doing and that's what they had been doing and that's what they were doing, Judge. And that's what they still do today.

The bottom line being let's get the real party and interest in. Let's get the party in that should be in, the liable party, and forget about all these naming issues and things like that. If you read their response to our motion you would think that this is the biggest issue that has come along and this is a huge problem for them and, wow, it's a major concern.

I can tell you this, Your Honor, I have been involved in this for the last couple

years and I've met with Mr. Henke and I've met with Mr. Beckel and I've talked to Mr. Rogus, never ever an e-mail, a letter, a phone call, a postcard or anything saying about this was a problem. That what was happening was a problem. And did they know about it? They absolutely knew about it, Judge. Apparently they knew about it because they are saying that was the reason we wanted to switch out counsel.

We got a letter from Mr. Rogus last month saying we want to switch out counsel unless you agree to pay 100 percent of the defense cost. It didn't say we want to switch out counsel because of all these conflicts of interest, blah, blah, blah, blah, blah.

Judge, I've got to tell you, the first time we heard and I talked to Mr. Rogus after he sent his letter that this was an issue. We said why didn't you come to us? Why didn't you tell us you were concerned about the naming issue? We could file an appearance on behalf of Burns. We could come in with our corporate record and say we were incorporated in 1987. We are a security guard company, you've got the wrong

plaintiff. And then the plaintiffs would -- the right plaintiff and we would be back to where we were anyway if that was their concern.

My view on that is this is just the biggest red herring I have ever seen, but that's their position. So we're saying under the contract we have a right to this injunctive relief. We're also saying that these third-party actions and they've taken a different position now. In December of 2004 Mr. Murphy, my partner Ed Miller, our corporate general counsel for our client met with Ted McCullough who is a Segal McCambridge lawyer in New York. And Mr. McCullough said to them at that time that if you don't pay for the defense in these cases we're going to implement what he called this Armageddon strategy.

We're going to sue you and every one of these underlying asbestos cases for indemnity. And our general counsel was very upset about that. He didn't want to be involved in 3,500 more lawsuits where we would have to defend the company or somebody would have to defend the company over issues that were pending in a Delaware court that

they brought before this Court.

So when we filed this TRO we said first off that shouldn't be happening. This court has inherent equitable authority to prevent that. It has the right under the all writs act which specifically gives it statutory authority to prevent that. And we say under the Prince-lite (phonetic) doctrine it should be. It's almost mandatory that it prevents these other courts from trying to resolve these issues.

They respond to that and say you've got it all wrong and we don't intend to file indemnity actions. They don't deny that Mr. McCullough told us back in 2004; they're saying now that we intend to file third-party actions to sue you for ethical issues that arose from the cases. Which I don't understand, I don't know what the cause of action is.

But what has happened since March 1 is any case where Burns was the named defendant regardless of who the appearance was filed on behalf of. And any case where an appearance was filed on behalf of BWIP or Flowserve where they were not served, they refused to take any of these

cases where they claim these ethical issues arose where they say they are going to file third-party actions against. They haven't assumed the defense of them, we're still defending those cases.

They have walked away from them, they have abandoned them and abandoned us and said those are your problems. We weren't served and we're not appearing. Your lawyers appeared, they breached their duty to us and they're on their own. Burns is named, we're not named, we don't care. It's your defense.

So this idea that they're going to file third-party actions in those cases, it doesn't make any sense to me, they haven't taken over those cases. They are not in those cases. They are not defending those cases. So then they say we are going to file third-party actions to resolve the issue of product liability in the underlying cases. And I'm thinking product liability in the underlying cases, what does that mean?

What they are saying, Judge, is that means they're going to try to determine who is liable for the underlying claim which is exactly

why we are here. That's their intent. If you think about it what cause of action do they have against my client, Burns, who is simply a successor to a contract that didn't manufacture any of these products in these underlying asbestos.

The only liability they have from us is the liability if any that arises out of the agreements before this Court.

THE COURT: Is it your intention and I thought I gleamed this from your papers that up until March 15, yesterday, they wouldn't have any damages even if they had a claim?

MR. MOIRANO: Right. Up until yesterday CNA effectively has said we're going to pay 100 percent. Starting today it is a different ball game.

THE COURT: Did you discuss that in your discussions? Did you talk about that --

MR. MOIRANO: With them?

THE COURT: Yeah. You accused us of some ethical consideration possibly but what are your damages?

MR. MOIRANO: I don't think we

specifically talked about that. We talked about in the context of -- I can tell you this, when I was involved in this conversation before we filed the motion, the Friday before we filed, I was a little shocked to hear about these issues they were having with our counsel. They told us they had met with CNA's lawyers and raised various issues about how they are settling the cases for too much. They're not managing them properly, things like that.

I said why didn't you come to us? The agreement says that if you have a problem with the counsel that we have selected you have the right to some input on that decision. Why didn't you ever come to us about it? We're not adverse to working out these problems. We never were and we still aren't.

We don't want to waste defense costs messing around with issues that, you know, so Burns' name and we file a motion to dismiss Burns and they name the correct party. I mean, if that's what they want to do fine. That to me is a waste of money and a waste of the Court's time and a waste of everything. Let's get the real party

in.

But no, we didn't discuss it with them.

THE COURT: How much in a ballpark has been expended?

MR. MOIRANO: Totally on the Flowserve cases and I would be guessing Judge, but I think last year it was somewhere in the neighborhood of 2 to $3 million maybe, maybe more.

THE COURT: Say it's $3 million, that would include all costs, attorney fees, settlement payments --

MR. MOIRANO: I believe so, Judge. I can't say that for sure.

THE COURT: It's not 100 million?

MR. MOIRANO: No. It's not 100 million.

THE COURT: And it's not even probably 10 million?

MR. MOIRANO: Last year I doubt it including the indemnity and the defense costs I doubt it was that much. What the concern is is the threat that they want to settle 3,500 cases in

one swoop. And I have been involved in cases where they have done what is called inventory settlements where there is plaintiffs' firms that have 1,000 cases and they pay a big pot of money. And all that does is encourage the next plaintiff's lawyer to say they paid that guy over there a big pot of money, I want a big pot of money. And it created a nightmare.

It's not the way to administer these cases. And that's what they want to do and they want to do it using our insurance. I don't know what they would have to pay to settle 35,000 cases. They said that is what they are going to do. That's going to be a big number, Judge. That's going to be a huge number.

THE COURT: I thought in the papers your thought was that they wouldn't pay anything, they would assign any rights they have?

MR. MOIRANO: Yes. What they would do is they would settle. What they said they did in this Palo case in California, they said we're going to go in - Mr. Beckel told this to me. I was part of that conversation. We're going to go in and tell Powell's lawyer, we'll pay you

one-million-and-a-half to settle what is maybe a $75,000 case. We'll assign the insurance to you. We'll settle it. We'll confess judgement. The judgement will be entered against us. You have a covenant not to collect from us --

THE COURT: But he didn't actually say it that way because that would be unethical?

MR. MOIRANO: Judge, I am absolutely telling you what he said.

THE COURT: We're going to settle a $75,000 claim --

MR. MOIRANO: Whatever it takes to settle. He didn't use those words. He said whatever it takes to settle the claim with the plaintiff. Whatever the cost is we're going to settle it and we're going to confess judgement and we're going to assign the insurance proceeds.

I have no doubt that is what they intend to do. Whether the plaintiffs' lawyers can do that or not, I don't know.

THE COURT: The plaintiffs' group would be going against the insurance company on the underlying cases.

MR. MOIRANO: Absolutely. And our

concern is not only that it is our money, it's more than just our money. It then sets the tone for what is going to be paid on Byron Jackson Pump cases. What is the settlement level.

THE COURT: Is there a matrix in existence on that?

MR. MOIRANO: No, there is not a matrix. But everybody has a general idea of what --

THE COURT: No, I'm just asking.

MR. MOIRANO: No, there is not a formal matrix at all right now. But once the word gets out amongst the plaintiffs about what is being paid for these cases, not only do you have to pay more for the pending cases, but we're going to get named in a lot more cases.

Our concern is once you start handing out money, writing checks to people and people think they are getting big checks, they are going to line up. They are all going to come with their hands out. That's the issue of irreparable harm that we're concerned about. That's the issue, we don't want them using our insurance without our involvement. Without the insurance

company's involvement in negotiating the settlements and we don't want them suing us.

I think I have just about run out of my time, Your Honor. That's our concern.

THE COURT: I'll give you two minutes to hit the high points.

MR. MOIRANO: I think, Judge, I think the main issue here is whether we're going to suffer any kind of irreparable harm if you don't grant the injunction. Success on the merits, I don't think they really contest. I think if you look at this agreement and I looked at it again last night, it's pretty darn clear what the intent of the parties were.

The intent of the parties was, we're selling the company. We're walking away from all the liabilities including the product liability cases except for certain exceptions.

A deal was made understandably, hey, if you have insurance it will cover it. Why should we have to pay for it and they said fine. To the extent that we have insurance that covers it we'll let you access the insurance. But that's it, we're not paying. These are your claims now

and it's your responsibility.

So I think that's it, Judge. The injunctive relief that we are asking for is simply that they be enjoined from accessing the Burns or Borg-Warner insurance to pay for the defense or settlements of any of the cases they decided to take over on their own.

And be enjoined from filing any third-party actions concerning their right to indemnity from Borg-Warner Corporation under these agreements. They have apparently agreed to the second part. I don't think it's an issue. The first part we think would be irreparable harmed if the injunction wasn't entered and that they would go out and do what they threatened to do and that's why we're here, Judge. Thanks very much.

THE COURT: Thank you.

MR. ROGUS: May it please the Court. I think what Mr. Moirano has just told the Court is something that I refer to in our written submission, they really are not after a TRO here. What they want Your Honor to do is rule on the merits of this case. They want you to issue your declaratory ruling construing the terms of the

agreements right here and now. We have not completed the discovery process.

We have raised issues of ambiguity that we want to create a full record so that not only are you going to render your ruling eventually on the agreement, the letter agreement, but also with respect to the ambiguity arguments that we need to develop for Your Honor to fully consider.

They just want to quote, unquote,"Cut to the chase.", in their view. Never mind any of those other issues. Go ahead and issue your declaratory ruling right now. That's what we want. That's what they're really saying. Blatantly unfair and also not warranted. Not warranted because they haven't despite Mr. Moirano's impassion, they have not shown irreparable harm. Mr. Moirano keeps saying this is a case about us somehow stealing their insurance asset and that that somehow is going to amount to irreparable harm.

What Mr. Moirano hasn't told you and what the other side hasn't given you any indication of whatsoever so that you can

realistically and judiciously rule that there is irreparable harm happening here is how much insurance we are talking about.

There is based on what Mr. Beckel, my colleague, was representing Flowserve in the coverage case in Cook County, Illinois which is the action that is addressing the insurance issues, there is something in the neighborhood of I believe he said $880 million of insurance.

If we have used up two or three million in the last couple years and somehow that is supposed to give rise to this concern or this claim that they are going to be irreparably harmed by all of this Armageddon nonsense that we are supposed to be engaging in here. Not even close to showing irreparable harm.

This suggestion that there is somehow some irreparable harm posed by the transfer of the cases to Segal McCambridge is -- granted I'm a member of Segal McCambridge and I've got to protect my turf, but any suggestion that that somehow is going to pose irreparable harm is ridiculous. Segal McCambridge is a very experienced asbestos defense firm.

Yes, we have probably represented Flowserve since 1997. We have represented them on a number of their other product lines. We have experienced doing national coordinating counsel work. We know how to set up networks to very, very good experienced local counsel. We have been doing it since the 1980s.

So the suggestion that somehow -- we don't want those cases getting into the hands of Segal McCambridge, that is going to cause us irreparable harm. Who knows what is going to happen to the settlement value of these cases. Who knows how much money is going to get spent.

This is all utter and pure unsubstantiated speculation on their part. There is no showing that the transfer of those files to Segal McCambridge is somehow going to work the necessary element of irreparable harm.

The interesting thing about the whole suggestion of irreparable harm is the carriers involved in this case whose network of counsel has been in place up until now, have indicated to us they have no problem with the transfer of the files to Segal McCambridge. I

attached that letter as an exhibit to my submission. It came from CNA's counsel.

Go ahead, transfer, they'll participate. We're all going to pay our share according to what the judge in Cook County said, but it's okay with us if you guys take over the defense. We have no problem with that.

If the carrier who has been quarterbacking, funding kind of running the overall defense network effort up until now has no problem with it, where does Burns come off saying they're going to get irreparably harmed. We also have word that another one of the carriers --

THE COURT: I think at this juncture it's probably a non-issue that Flowserve can select and defend without any dispute.

MR. ROGUS: In the eyes of the carriers no dispute, no problem.

THE COURT: Let's assume that's not in the mix for the present application because Flowserve would be permitted to go out and select, I think it goes to another issue, the actual present application. So now Flowserve has new counselor, they are in the litigation. The

indemnity from the -- is resolved. And does Flowserve intend to settle and assign as part of the settlements rights against Burns?

MR. MOIRANO: Rights against the insurance that is available because it's there and it is there for us to use. We have rights against that insurance.

THE COURT: That is where they say irreparable harm at the point of the motion now arises. How do you defend against that? They say that they assigned their rights and here we are with the plaintiffs now breathing down our neck directly where that wouldn't have happened in the course that had been previously taken and agreed upon by the parties in evidence by some documents apparently?

MR. ROGUS: When you're looking at an insurance tower of $880 million plus. And you're looking at the possible expenditure of a couple million dollars against that tower, number one, it's a money question. It's not I think an equitable relief question. But number two, just looking at the comparison of those numbers, how does that even begin to approach irreparable

harm?

THE COURT: Because you may be defending a lawsuit I don't want to defend is what they're saying. Whether it is 500,000 or a million, you're putting me in a position to be someplace I wouldn't otherwise be in our relationship. In other words, our relationship has been altered by you causing me to be in another piece of litigation that I don't want to be in and shouldn't be in based on the documents of our relationship. I think that's essentially what the papers say.

MR. ROGUS: They are the ones that put us in that position because of the conflict issues. It's necessary for Flowserve to take the actions and it's also consistent with the rights in the agreement as between the two parties.

THE COURT: We're out of conflict now because Flowserve can select counsel. Historically if there is a claim for some sort of conflict based action my reading of all the papers is there would be no damages because everything has been paid. So it would be an interesting liability questions maybe. But it doesn't go

anywhere.

MR. ROGUS: Once again they are speculating as to what exactly we're going to do to protect ourselves and defend ourselves in the cases. There is no showing that we are going to be taking all kinds of action to irreparably harm them. It is speculation on their part.

It is not in Flowserve's interests to take over the defense and then all of a sudden start settling cases at some outrageous value just so that we can turn around and screw burns and stick them and or their insurance companies with the price tag it is. It is in Flowserve's best interest to try to expeditiously, smoothly and as cheaply as possible settle cases. And yes, the global settlement approach is a valid approach.

THE COURT: Tell me how this works because I'm thinking I'm the plaintiff's lawyer and you come to me as Flowserve and you say we'll pay you, this is the value of the case globally. I have to say in my experience handling asbestos cases in the eighties and doing some asbestos bankruptcy, that number can be anything one day and another thing the next day.

But let's assume we got together and I'm the plaintiff's lawyer and you represent Flowserve and we get a number. And I say when will I get the check and you say part of the settlement has to be you can't get a check from us. Maybe partially we get you a check, but what we are going to do is pay you through our agreements with Burns or the carriers and the coverage I understand is another issue somewhere else.

But we're going to give you an assignment. What you do, plaintiff's lawyer, is you go get that other party. Is that the way it would work?

MR. ROGUS: The carrier. That's the way it would work.

THE COURT: Why would I settle? I'm trying to figure out if I'm plaintiff's lawyer and I'm an experienced asbestos counsel and I've seen a lot of them. I've seen the property people. I've seen the personal injury people. I've seen them all in this very courtroom. Why would I ever settle that case, that's what I'm trying to figure out?

MR. ROGUS: You would settle that case because you might not get that much if you decide to push forward. You might end up putting all kinds of additional money into your efforts to get the money on behalf of your clients. You figure that's the best deal you are going to be able to get for them. And you feel there is $880 million insurance tower there; you've got some pretty good security that you are going to collect.

THE COURT: Personal injury claim I might have 5 million sitting out there and I might have a cadre of plaintiffs, and I might think that the case is an average of $55,000 a piece. What I think Mr. Moirano is saying you're offering me and I'm not going to one million but let's say 100,000 and I'm saying the spread is worth the risk of chasing them?

MR. ROGUS: Then the case doesn't settle, does it?

THE COURT: I'm saying as a plaintiff's lawyer I could see some plaintiff's lawyers saying and talking with their clients saying if we drag this thing another three or four

years or we would get a target defendant with deep pockets and insurance company, but what you've got to be willing to do is and I might negotiate with you on the claims I don't collect on, the assignment and I take 10,000. All sorts of things could happen and I think that's the point of their irreparable harm.

Allowing you to assign in the present atmosphere, that is the existence of an indemnification controversy is irreparable harm. Why can't you just get new counsel, defend your cases and let this -- I'm just trying to put myself in your position. I would agree to no assignment until the indemnification case is resolved.

MR. ROGUS: You're talking about --

THE COURT: Right now I'm going to be you. I'm going to get rid of the plaintiff's case, I didn't like it. The money wasn't sure enough. I like that hourly billing. So I came over to your side and I'm on the defense side now and I'm saying listen Mr. Moirano, we have enough stress. In fact it was in there, you called them unethical and they accused you of blackmail.

MR. ROGUS: It sounds a little strong but it hasn't been the first time that we have scoured and grimaced at each other.

THE COURT: I've got to take you fishing and get you a beer or something. Take a ride on a boat or something. I know there is a lot of emotion and I understand. I try to keep that in mind too. Why wouldn't you say to Mr. Moirano okay, let us get new counsel because that is what Mr. Henke wants and the judge is going to let that happen and so is the insurance carrier. You've got a great argument here so now you're out of that whole conflict issue.

But we think that the cases weren't handled properly Mr. Moirano argued but we're going to take you in a different route. And he says the only thing I want you to do is whatever you do with those cases, can you enter into sort of a status quo risk that you won't assign rights against us until the Delaware and Third Circuit courts resolve the indemnification issue. And nobody will delay that so everybody knows where they are and we'll move ahead.

But you can settle cases with

plaintiffs and you can do anything you want in litigation with the plaintiffs. But just agree that you won't assign rights that causes them to come chasing us immediately until we know what our rights are, both sides --

MR. ROGUS: As a practical matter these approaches that we are contemplating, these are going to take some time. This is not all going to get wrapped up in the space of a week, two weeks. We have a lot of plaintiffs' attorneys out there to approach. We have like 3,500 cases. This is not something that is just going to happen over night where all of a sudden Mr. Moirano or anyone else at his firm is going to have somebody knocking on their door with all kinds of assignments in hand --

THE COURT: -- What the assignment will be until you have the decision but actually that may put you in a better position or may put you in a less --

MR. ROGUS: I understand. It could go one way or the other. We know which way we want it to go.

THE COURT: Neither of you are

going to be happy with my decision. You're going to want to go to the Third Circuit and get their view and of course they will look at it de nova. So you're probably two years away from a final answer in my view.

I know there is a motion to expedite the schedule to 60 days discovery. I don't think that is something you really want --

MR. ROGUS: That's correct.

THE COURT: But why wouldn't during that two year period because it does take time for you to negotiate, why wouldn't you agree to establish that they won't make any assignments of any potential rights or existing rights that you have until there is a final Third Circuit decision or a settlement?

MR. ROGUS: We could consider that. We could discuss that with the plaintiffs on the settlements.

THE COURT: That's what I'm saying. But can't you to it with Burns in the context of this case and basically preliminary injunction goes away by agreement. In other words, they let you hire lawyers and you litigate

any way you want. You don't assign the rights and then we get to the actual issue which is, what the heck does, I guess, the two-and-a-half documents say.

Does that make sense? I'm working as hard as I can to get you within the 24 months we do normally. If you want to move it up some, anything that I can do to get you a full factual record because you allege ambiguity. Get you a decision on at least my contract interpretation and get you into the court of appeals I would do.

And to me give them what your real dispute is and given where you want to go, I am thinking that would make sense for you and it resolves their burning immediate issue of being placed with these assignments. That is really the heart of the dispute here today. The underlying dispute is indemnification.

Like I said, I can't imagine you're going to be able to go in six months and do a global settlement without some source to fund it.

MR. ROGUS: Yeah. It's definitely going to take a number of months to get to that point. No question. It's not going to happen

right away.

THE COURT: If I'm the plaintiff's lawyer and you come in with this global settlement and what I have seen in this courtroom and the settlements I approve, I'll be looking at you real funny. I'm going to wonder what the heck is he thinking here. But I'm not going to throw you out because like in the property settlement asbestos cases with the liability being a little more to climb, I'm going to be open to what you're telling me.

And I'm going to be thinking how bad could it be, but it's going to take time to get everything in a comfort level. I'm not so sure you have enough time to litigate the cases the way that Flowserve wants them litigated, to posture yourself to a global settlement.

MR. ROGUS: That's true. It is taking time and the transition is going smoothly. All the files have been forwarded and we're looking at them. We're looking at the service issues and all the other issues that gave rise to the whole conflict in the first place. That is a process that will continue to take some time

before we can take that next step.

THE COURT: Here is what I think today to make everybody be able to go out of here having someone to blame. I tentatively would be prepared to order that nothing in your previous agreement prohibits you from hiring new counsel. Litigating the way you want, how to control the cases. Nothing prohibits you from discussing settlement with the plaintiff. Have every term available to you, settlement term.

But for purposes of status quo I find that there would be irreparable harm if you were permitted to join Burns or assign rights you may have against Burns until the resolution of indemnity issues that are in this court. And I have jurisdiction to do that. It just seems to me it would put you all where you would want to be and then if you all agreeded that there was something that I could do - I mean, I could give you a date when I could get you a decision of contract interpretation that would work for both of you.

And then you would know from that date and whatever date you pick I would work to

get it done. If you say you want a decision in 60 days, you finish your discovery and you want to stay on the schedule, I would say the schedule we have and get the date when the decision would be issued and then you can move to the Third Circuit and do your six months of briefing.

Wait and see if you get argument and if you do then you wait nine months and then three months to a decision. You could have certainty in where the underlying issue in this case which is indemnity.

So maybe what I should do is tell you that is what I'm tentatively thinking about doing. Give you a chance to talk with each other and I'll be here. And then tell me if you want to agree to that which would be the easiest thing or if you want to blame me for it. And I can do it by decision with your comments on it. In other words, that would be my tentative decision.

MR. ROGUS: If you could give us an opportunity to talk?

THE COURT: Sure. Why don't we take a recess and you both can have time to talk to each other.

(Whereupon, a short recess was taken.)

THE COURT: All right. Be seated please.

MR. ROGUS: We conferred, Your Honor. We are not able to arrive at an agreement. It is our position that we absolutely have to preserve our right to assign to plaintiff's counsel their right to collect against the insurance policies, not against Burns.

What we are looking here is a situation where these claims and the payment of the claims is eventually all going to be handled by the carriers. This is just a temporary or interim situation where there could or may be a gap in the coverage. With respect to potential gaps we would not be assigning to the plaintiffs rights to proceed against Burns but we have a direct pipeline to the insurance carriers.

And so we feel we must or we cannot bargain away or agree not to include as part of settlement talks with the plaintiffs that an assignment directly against the insurance. There may be gaps and there may not. Some of these

excess carriers may step right in and they may fully fund the settlements. If there should be a gap we will not assign rights as against Burns to the plaintiffs. That's for us to sort out here in this court.

But it is our position that we have a direct pipeline to the insurance. It's part of what we purchased when we purchased the stock of the BWIP back in 1987 is the right to access that insurance directly. We do not have to go through Burns to get to that insurance.

So part of our settlement talks would include that assignment. I think Your Honor touched upon some concerns and thoughts about third-party action in the state courts. We have represented to you in our papers and we stand by what we represented to you in the papers. We are not going to be redoing, if you will, the arguments and the whole approach that we are here. We brought this action and we asked you to make a declaration of our rights and obligations under the contracts.

This is where that particular argument and that particular fight will be

fought. We are not going to be bringing those types of actions and seeking that type of indemnity against Burns in any of the state court action. But in order to make sure that we fully defend ourselves, fully preserve our defenses, we feel that Burns is an appropriate party in a particular case and we can bring them in via some other means such as claim for contribution. We cannot be barred from doing that.

We are agreeing that we are not going to duplicate the efforts of this Court, duplicate the efforts of the parties in terms of the arguments we are framing for Your Honor. So that part of the third-party practice we are not going to do. But we feel it is necessary in order to make sure that all the proper parties are in front of the state courts when decision time comes.

We have to maintain our rights to at least be able to proceed with other forms of action against Burns such as, for example, contribution of counterclaims.

THE COURT: All right. Let me hear from Mr. Moirano.

MR. MOIRANO: Your Honor, we obviously were agreeable to your suggestion and still are and still think it's the correct approach. We are also as you have indicated willing to expedite the ultimate resolution of the issues so that both parties know where they stand. We talked to them about that and they don't want to do that.

But until that issue is resolved here and by the Third Circuit it is our position that their right to access the insurance arises strictly out of the agreements that this Court is seeking to interpret. But there is no question that if they want to access our insurance then they have to do what the agreement says and that's to allow us to appoint counsel. Allow us to control the defense. Allow us to be involved in the settlements.

We don't want and you're absolutely right, the only way a plaintiff's lawyer would ever settle one of these cases with taking an assignment of insurance and have to pursue an insurance company is if they got a premium. And believe me they would ask for a big premium.

You're obviously familiar with how that goes with these plaintiffs' lawyers. And we don't want them negotiating any settlement where they are paying premiums on cases regardless if it's just the money in those cases because we don't want the plaintiffs' bar thinking that we're paying big money on these relatively minor cases.

Let me respond to another point they made. They said we have this 800 million tower of insurance. We hope we do. There is a case going on in Illinois where the insurance companies say we don't owe you anything. They are trying to get out of -- they've got 15 different counts and 15 different ways they don't want to pay any or certainly less than the full amount of our coverage.

Secondly the primary defendant Borg-Warner Corporation defendant isn't this client. We have Borg-Warner Automotive where last year paid $40 million in insurance proceeds we used to defend and indemnify Borg-Warner Automotive. And we have York which is another defendant that gets sued and they are feeding off this insurance.

So even if we have $80 million in insurance the day is going to come when that insurance is going to be gone and it's an asset that everybody wants to preserve. We don't want them making deals with plaintiffs' lawyers giving away more than they should of that insurance asset.

Unless this Court says, yes, they absolutely have that right to do so under the agreement with us. So we think you should enter an injunction. They have agreed that they can be enjoined from filing these third-party actions regarding indemnity. I don't understand the contribution. We are not a joint tort feasor. We didn't manufacture these products. It's the same product for both defendants. I don't understand contribution.

Unless contribution means indemnity, that they have a right to seek indemnity from us which is the issue before this Court. So if they would agree they won't seek and file these third-party actions the order should reflect that. We have no objection to allowing them to take whatever cases they want, defend them

themselves, settle them themselves. But they shouldn't be able to use our insurance to pay for it or to defend it.

And the reason I say defend it is because again they are eating away at our limits with their defense costs now. I think what they are suggesting, Judge, is they want to use our insurance to file third-party actions against us and that is preposterous.

So we're asking that you enter the TRO that we have requested. We don't think it's going to cause them any harm. They can sell, they can pay. They can pay their defendants - defense costs. If you ultimately rule that we're wrong and they're right they can come back and say, okay, now you owe us that money that we spent.

There is no harm to them in doing that other than they're going to have to pay for their own defense until the Court rules and we're willing to expedite that to the limit, the amount of time it will take and the amount of cost they incurred. But to do anything else is contrary to the agreement and totally unfair to us. Thank you, Judge.

THE COURT: Let me ask you Mr. Rogus, do you in your present capacities in representing defendants, do you coexist in cases currently and -- are you presently together on the defense side --

MR. ROGUS: On behalf of other defendants?

THE COURT: Yes.

MR. ROGUS: I believe there are some instances where we do represent at least one other company and we have conferred both with Mr. Henke and with that other company with respect to conflicts --

THE COURT: It's not conflicts that I'm asking about. So you are coexisting in some cases?

MR. ROGUS: In some cases.

THE COURT: Do you have a defense agreement?

MR. ROGUS: No. Defense agreement?

THE COURT: Right. In other words, sharing - they take different forms but agreements that kind of like said -- not a conspiratorial

agreement, but one that sets forth the way you conduct the litigation. Who will lead in a deposition. Any kind of a written agreement that sort of provides some rules for your coexisting?

MR. ROGUS: No, we do not.

THE COURT: Have you in other cases?

MR. MOIRANO: I'm not sure quite honestly. We really aren't involved. Until now our firm has really just been kind of a conduit. We don't deal with the underlying defense of the cases.

THE COURT: Do I know, Mr. Murphy?

MR. MURPHY: Your Honor, --

THE COURT: Some of the pipe cases may have them.

MR. MOIRANO: I know what you're talking about, Judge. I absolutely understand what you are talking about. I'm not sure we have them in the pump cases.

MR. MURPHY: Not that I'm aware of.

THE COURT: All right.

MR. ROGUS: Thank you, Judge.

THE COURT: Thank you. Mr. Rogus any response.

MR. ROGUS: Just to address the remark that Mr. Moirano keeps reinforcing about how it is their insurance. It is not their insurance exclusively. It is our insurance as well. We have direct rights against the carriers. We do not have to go through them to access that insurance.

THE COURT: That's the coverage action in Chicago; correct?

MR. ROGUS: Not really.

THE COURT: Tell me what that is?

MR. MOIRANO: I'm involved in that coverage. The coverage action is basically the umbrella and some of the -- primarily one umbrella carrier. The primary umbrella carrier CNA.

THE COURT: But that's Burns against the carrier?

MR. MOIRANO: No. The carrier is suing Burns --

THE COURT: Directly you're in that case?

MR. ROGUS: Yes, we are.

MR. MOIRANO: It's basically they're saying for a variety of reasons our coverage is limited. Our coverage doesn't exist. Our coverage doesn't cover these kind of cases. Whatever they are saying.

THE COURT: Who is that in front of?

MR. MOIRANO: Judge Flynn. Circuit Court judge --

THE COURT: In the state court --

MR. MOIRANO: Yes, sir.

THE COURT: Now in that case which has been going on; right?

MR. MOIRANO: A couple years now, since 2004.

THE COURT: I'll tell you a little side story, I had a case in the context of a bankruptcy and it was a California Superior Court judge who had a coverage case and she was very, very adept and I think very, very smart. And she called me up and she said you can do me a favor by not doing anything, and I said okay. I didn't understand how all of this works. And it's amazing what can happen in those coverage cases.

I'm just trying to get information and I don't want to blunder into a catastrophe for either side here. In that case the insurance company attorneys, what is their essential coverage argument?

MR. MOIRANO: Well, first off they are saying they have exhausted the primary and they want to get into the umbrella layer. And then when they get into the umbrella probably the biggest money issue was whether asbestos liability is a single occurrence or you get the aggregate limits which is in that case $120 million issue.

Whether it's a single occurrence believe it or not some courts have said all asbestos liability is a single occurrence and others have said no, they're all separate occurrences which gets you into the aggregate.

That's the biggest. They're also arguing under Illinois law that the asbestos cases, the mesothelioma cases which are the death case, the serious asbestos cases that there is no coverage for mesothelioma cases because the injury that results in mesothelioma occurs within three to five years prior to the death. And that the

cutoff asbestos coverage of 1987, so people that are dying today got injured five years ago and there is no coverage for that.

The issue that is here, the right to access this insurance we actually brought that issue before the state court judge. The judge entered an order saying if you have any cross-claims against anybody file them. The defendant, talk about naming issues, the Flowserve defendant in that case isn't the same defendant in this case. It's another Flowserve entity. I don't know why but it is.

We filed a cross-claim saying we don't know who the correct entity is here for Flowserve but we have this agreement with Flowserve with respect to accessing the insurance because of the compulsory cross-claim or we're filing it here. They came into court and argued successfully in front of the state court judge. That issue is in front of Judge Farnan now in Delaware. You shouldn't be dealing with that issue at all and they won and our counterclaim was dismissed.

So as far as if you're concerned

what is going to happen here is going to impact there, no it's not. The judge is very much well aware of what is going on here.

THE COURT: That's what I want to be careful of.

MR. MOIRANO: I can send you the order and show you exactly. We almost took our counterclaim here and filed it there against this other defendant. And said we don't know who the correct defendant is but if it's this defendant, you know, and the judge dismissed that counterclaim and their claim that there was prior pending action for the exact same cause pending in Delaware.

MR. ROGUS: This would not affect that.

THE COURT: I just wanted to check that out.

MR. ROGUS: Unless you limit our ability to access the insurance contracts in terms of the effect of your ruling upon the Illinois action?

THE COURT: If I provide assignments for the duration of the pending

question here how would that affect it? Would that judge in Illinois -- I mean the carrier -- tell me what you think?

MR. MOIRANO: I think the carriers position is whether they can or cannot access it. We want this issue resolved and we want them in the case so that if there is a resolution and you ultimately determine they can access it we want that issue as to the scope of coverage, whether we are liable for mesothelioma cases, those issues resolved with them in the case.

All you're doing is saying, hey, put a brake on temporarily, actually physically accessing the coverage.

MR. ROGUS: Putting a brake on anything in terms of us accessing anything from them but not the insurance carrier.

THE COURT: If you settle an assignment and the target of the assignment is in that litigation, I guess the assignee, that's the way they usually find out what the Illinois court is going to say about coverage?

MR. MOIRANO: It is possible. Right now the insurance companies are paying.

They are paying. They're saying we're going to hit certain limits. As a matter of fact CNA is saying they are going to hit their limits this year I think they are saying. That we're going to burn out our umbrella coverage because of their single occurrence theory this year.

So at some point you're right, if they assign it it would be the plaintiffs' lawyers that are going to have to wait to see how that judge resolved that occurrence --

THE COURT: On a global settlement there has to be a trustee or somebody who is going to take the funds and be responsible for the distribution particularly for the unmatured claims like mesothelioma. The plaintiffs' lawyers have a nightmare on their hands typically in a mass settlement.

MR. MOIRANO: They do them all the time, Your Honor.

THE COURT: They do them I know. I'm saying the insurance question though, when they claim bankruptcy and they're given insurance questions, once they get a number and it drives the fund everybody is out of court. This is not

rocket science, it's getting the numbers.

You have a legitimate turn on the numbers question because of the indemnification -- well, let me think about it a little bit. No one is rushing off to do a global settlement in the next 48 hours I assume?

MR. ROGUS: I think you've assumed pretty safely again, Your Honor.

THE COURT: You're free to hire counsel and litigate --

MR. MOIRANO: God speed. We have no problems.

THE COURT: You can access the insurance if you have individual settlements. Mr. Moirano says you're going to hit a ceiling --

MR. MOIRANO: Judge, here is the problem. If you look at the letter that they sent to CNA, CNA said if you want to go off and do this on your own go ahead. But CNA wants to be involved in those settlement discussions --

THE COURT: That's in the contract I assume?

MR. MOIRANO: You would think. If you take a look at the letter that they sent in

response, Mr. Beckel's letter, it's attached to our motion and I think it's Exhibit E. It's a letter to Herb Favor, CNA's attorney, who says we're not going to allow you to participate in any settlement discussions. We're going to do it and then go out and do whatever they plan on doing.

That is a violation of the cooperation clause in our --

THE COURT: Let's go back. I thought that plaintiff's lawyer would say -- I mean, what am I missing here? The plaintiff's lawyer is not going to settle with a defendant that has got some sort of an insurance company declaration in place. It wouldn't be a good faith settlement. Don't they have to tell the plaintiff's lawyer that we got to run this by a CNA?

MR. MOIRANO: You would think so.

THE COURT: Don't you think you have to because otherwise you're just putting --

MR. ROGUS: Run it by CNA but in terms of some of the other conditions that they were seeking to impose upon us with our defense that's what we objected to.

MR. MOIRANO: Why don't we ask them what those are because they are letting CNA participate --

THE COURT: Guiding the factors --

MR. MOIRANO: As long as they use their own money, Judge. And then they can come back and try to go --

THE COURT: I have problem settling with the insurance company if the insurance company is not in the declaration for any reason --

MR. ROGUS: And they're not at least as Mr. Favor's last letter they are willing to allow us to go ahead and do it and they will participate in settlement payments.

MR. MOIRANO: Judge, they're claiming the insurance through us. They're saying under the indemnity agreement, under the letter agreement, whatever it is, we have a right to access that insurance. We're saying yes you do if you do it our way, if you do what the agreement says. They say they don't want to do that. They want to hire their own lawyers and they want to settle it independently of us and they want to

control the defense.

If they want to do that they can do that but it's with their dime. It's with their money. They can then come back and sue us in this court and say you've got to reimburse us for this, you agreeded to indemnify us. And if they're right then we have to pay. We have to reimburse them.

What they are not entitled to, what the agreement specifically says they can't do is do what they want to do and that's hire their own lawyers, settle their own cases, defend their own cases. And try to circumvent us and go to the insurance. And that's what we want to prevent.

There is no harm in them settling these cases, doing whatever they want to do with their own money and then seeking indemnity from us in this court. That's what they filed their complaint about --

THE COURT: Let me ask you a question. Suppose CNA says we're tired of Mr. Moirano and Burns and we -- that settlement and we will work about the column deduction with Burns later on?

MR. MOIRANO: You're creating an issue for us because then we're going to say to CNA wait a minute, our position is that you can't.

THE COURT: I'm just testing your premise that CNA is in lack step with Burns.

MR. MOIRANO: I don't know if CNA is in lack step with Burns. But our position is that it's our asset. If nobody makes a claim on CNA they don't pay anything. So the claims normally come through us. That's the way the process has been. We make the claim on CNA and CNA assigns --

THE COURT: And you have no sense that CNA wants to do anything different?

MR. MOIRANO: CNA was happy with the situation that existed. They were controlling the defense of the cases and they were controlling the settlement of the cases, they were doing everything. We were happy with that --

THE COURT: If Burns and CNA says we're not paying Flowserve cases unless we participate in the negotiation of the settlement, what does it matter if they settle?

MR. MOIRANO: As long as they use their own money that is fine.

THE COURT: They don't use any money. They say to the plaintiff we don't have any money, we're in dispute with Burns and CNA, but we will agree to this number; right? There is no assignment of our rights but we got to try to get the money from CNA and Burns?

MR. MOIRANO: You mean if we don't get the money from CNA and Burns then we'll pay, whatever deal and make with the plaintiff's lawyer, that's fine. That's fine. They can settle the cases.

THE COURT: I thought your issue was that you didn't want them to assign rights that would put you in litigation position with a plaintiffs' group?

MR. MOIRANO: Right, absolutely. We don't want them telling the plaintiffs we're settling for $100,000, go collect from these guys and the plaintiffs come after us and try to collect from us. If they want to say to the plaintiffs' lawyers we'll settle for $100,000 but we can't pay you right now because we got this

case going on in Delaware right now.

THE COURT: Let me hear from the other side. Mr. Rogus, what are the mechanics of you settling in that scenario?

MR. ROGUS: The mechanics of our settling would be to arrive at a dollar amount with the plaintiff and to assign to the plaintiff's counsel the right to proceed directly against the insurance, nothing through Burns. Burns is not involved in that process. It's not a necessary component of the process. Mr. Moirano keeps saying we make our claims against the insurance through Burns and that is not true.

We have a direct connection directly to -- we're insured under those policies. We have a direct pipeline to the insurance company. We don't have to go through him and we're not going through him.

THE COURT: So the mechanics would be you would settle singularly or in a global sense a group of cases or all cases and your mechanism is to satisfy the plaintiffs --

MR. ROGUS: Assignment directly to the -- directly against the insurance.

THE COURT: Directly to any rights you possess against the insurance directly?

MR. ROGUS: Right.

THE COURT: Okay. I think I understand it. I didn't want to get you off in a tangent. You stood up to say something, is there something you wanted to tell me?

MR. ROGUS: Just one or two minor points. The whole notion that we have been going through Burns to reach the insurance and that that's a necessary component, I have already argued my brain out that that's not the scenario as we see it.

It is true that up until three or four years the tenders were going through Burns to get to the insurance companies to provide the defense in the cases. That was before any conflict situations arose, any reservation of rights letters started flowing back and forth between Burns and Flowserve. That system was in place and was working very well, no one was questioning anything.

But it was about three or four years ago when the conflict situation started arising.

So the fact that we are making the tenders to get the insurers to provide the defendant with Flowserve is not an acknowledgment or admission on Flowserve's behalf. We never stated that it was that we have to go through Burns as Mr. Moirano keeps arguing.

That was the process that was in place and it was working. No one was questioning it. But it didn't mean that was the only way we reached that insurance.

THE COURT: And you would have a sense that you were impeded if you were allowed to settle but had to in order to have the assignment not barred if you had to submit the settlement to Burns and CNA?

MR. ROGUS: If we had to submit it to Burns we would be impeded. We are saying we don't have to do that.

THE COURT: If you got a really good settlement and were required to submit to Burns it would be in their interest I would think you would settle, to fund it? You don't actually have to bar to settle?

MR. MOIRANO: No. We want the

control. There is no way they are going to pay these plaintiffs' lawyers, agree to settlements and tell the plaintiffs' lawyer we'll collect from the insurance company without paying the premium. That's not their business. They don't chase insurance companies.

THE COURT: Now the new lawyers are in the case for Flowserve and they get the ligation going and Burns gets the plaintiffs in a position where they are willing to take a settlement that's funding. There is no harm to you if it has to come to those settlements have to come to Burns and CNA. That's what you were doing three years ago until they --

MR. MOIRANO: They tendered -- I don't know what he is talking about. Within the last two weeks Mr. Henke tendered 30 or 40 cases to us and said we are tendering pursuant to the agreement sent down to the insurance company. So this idea that for the last few years they have been tendering to us --

THE COURT: There is no harm in that what Mr. Henke did?

MR. MOIRANO: No, that's the way it

should work. They are claiming to our insurance, the letter agreement says that we have to indemnify them to the extent of our insurance. That's what it says. They can send them to us saying we'll assign these to the insurance company and we said fine, and we've done that. I don't know what he's talking about.

THE COURT: Are they getting paid? When that happened did they pay?

MR. MOIRANO: Sure, everything was getting paid. Until yesterday everything was fairly smooth. If they reach a settlement on their own independently and they say we fund this settlement using the insurance proceeds, funding, not assign the insurance, funding. And we look at it and say that's a reasonable settlement in light of settlements and see it more importantly our carriers, we have no problem with that. And the TRO can say that.

We want to get rid of these cases just as much as they do. We want the cases to go away. Settling them all, resolving them all, that's not a problem.

The problem is if they want to pay a

premium and then assign the rights to collect to the insurance companies which we would never agree to. So if that's their plan we would never want to agree to it and that's what we want to stop. But we're not saying they can't settle it and if they say we want to still be able to come to Burns and their carriers and say fund this and it's a reasonable settlement we'll fund it. Absolutely, Judge.

We're not interested in trying to trick bag anybody here. We want the cases to go away and we want them to go away in a reasonable basis. We want to keep things smooth. We don't want to let the plaintiffs' bar know this is going on. We don't want that. It doesn't work to our advantage. The suggestion is and what it really is, Judge, they want to settle for premiums and then assign insurance. We would never agree to that.

MR. ROGUS: Two things. Number one, once again we have a direct relationship to the insurer. We do not need to go through Burns and we do not need to get Burns' blessing. We do not need to get their stamp of approval. We go

directly to the insurer. That is point number one.

Point number two, the suggestion that we want to go out and settle all these cases at a premium, Mr. Moirano has fears and concerns about that. That's not something that we're going to be doing that would be in the best interest of Flowserve. We want to settle the cases for as cheaply as we can. We're not going to be going out there and just doing this wholesale of payment of premiums to plaintiffs just to get rid of cases. That's not in our best interest either. That's not going to happen.

THE COURT: Okay. I don't think much is going to happen that could harm your status quo in the next three or four days. So the middle of next week I'll get you a decision by then.

MR. MURPHY: Your Honor, I know Your Honor has given the parties more than considerable time. I just wanted to raise one matter and that relates to the suggestion by Your Honor that the parties try to reach an agreement about a date to get a decision.

I just wanted to talk about that very briefly, Your Honor. Obviously either side hasn't requested a jury trial, it's a bench trial. I think that we would plan to file a partially case dispositive motion on the subject of ambiguity. But we do not want to delay the case in any way. We have a pretrial conference I believe on September 14th. It's in the first half of September.

What we would like to do is I think we would plan to file a motion saying that the contract is not ambiguous. In the meanwhile we could continue with the discovery that Flowserve wants to take. Obviously ambiguity is an issue for the Court. If the Court were to decide that the contract is not ambiguous, whatever discovery that was taken wouldn't be necessary and there wouldn't be a trial about ambiguity. And you can't use discovery in Delaware to create the ambiguity, it's got to be in the contract itself.

But we're not interested in putting the case on hold. I think we would like to know from our part is there something we can do with the Court to get a trial date right around that

pretrial conference time in either September or something like that or October?

THE COURT: I think my order says something to the effect that you have got to be ready to try the case.

MR. ROGUS: Some time within 20 days after the date of the pretrial conference.

THE COURT: Typically within 60 days of the pretrial conference. And what you're asking for is to give you a firm date now rather than wait for the pretrial?

MR. MURPHY: Yes, Your Honor.

THE COURT: You can pick the start of the trial and talk with each other, your schedules so that it's acceptable for the both of you. Any Monday in November to start the trial. And I'll set time frames for the allocation time for the trial. But look at your schedules and pretty much pick any time in November.

MR. MURPHY: Thank you, Your Honor.

THE COURT: On motions for summary judgment, you know, they are somewhat useless in a bench trial context. If you have a summary

judgment motion or something close to it, the trial is either nonexistent or dead because you put your two witnesses on about ambiguity each and you have a factual record in which I think you were interested in on ambiguity. So the likelihood of guaranteeing summary judgment in the context of this case is zero.

MR. ROGUS: It makes sense.

THE COURT: Just to help you out there, so you're focused on the trial and then in your post-trial briefing I permit you to reading and I'm an expert by reversal on contract interpretation of the Third Circuit. And you should be prepared to digest the cases since like 1992 in the Third Circuit on business contract interpretation.

And there will be two sides, trust me. And bring that with you to try and fold your facts into which line of cases they are going to choose. Then you will get a pretty quick decision and whatever side prevails will at least be satisfied that they were doing it all in relation to what the Third Circuit line of cases they wanted to be aligned with. Does that help you?

MR. MURPHY: Very much, thank you.

MR. ROGUS: Thank you, Your Honor.

THE COURT: Okay. Thank you very much.

* * *

(Court adjourned at 11:35 a.m.)

* * *

State of Delaware )
)
New Castle County )

CERTIFICATE OF REPORTER

I, Karen McCloskey, Professional Reporter and Notary Public, do hereby certify that the foregoing record, is a true and accurate transcript of my stenographic notes taken on March 16, 2006, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 16th day of March, 2006, at Wilmington.

Karen McCloskey
Cert. #183-PS