# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| FLOWSERVE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04-1294-JJF |
| | ) | |
| BURNS INTERNATIONAL SERVICES | ) | |
| CORPORATION and BORG-WARNER | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

---

## FLOWSERVE CORPORATION'S REPLY BRIEF
## IN SUPPORT OF ITS MOTION TO ADOPT FLOWSERVE'S
## VERSION OF TEMPORARY RESTRAINING ORDER

Date:  April 25, 2006

Gregory E. Rogus, Esq.
Erich Gleber, Esq.
Segal McCambridge Singer & Mahoney
830 Third Avenue, Suite 400
New York, NY 10022
Tel:  212-651-7500
Fax:  212-651-7499

Danielle Yearick, I.D. No. 3668
Tybout, Redfearn & Pell
750 S. Madison St., #400
Wilmington, DE 19899
Tel:  302-658-6901

*Attorneys for Plaintiff, Flowserve Corporation*

# TABLE OF CONTENTS

Argument

I.    Flowserve Submitted its Proposed Order in Good Faith to Address Certain
      Points Arising from Arguments and/or Concessions Made by Burns or from
      the Specific Language Utilized by the Court in its Memorandum Opinion ..................... 1

II.   A Materially Relevant Factual Dispute Exists Whether Flowserve May Directly
      Access the BWC Insurance for Reasonable Settlements and Defense Costs, which
      should Preclude an Injunction on that Issue Prior to an Evidentiary Hearing ................. 5

      1.    Burns misperceives Flowserve's argument that it has separate and distinct
            rights to indemnification under the 1987 SPA and the Letter Agreement ........... 7

      2.    Burns has failed to establish the right to injunctive relief with respect to
            precluding Flowserve from accessing the BWC insurance. ................................ 8

      3.    The *status quo* that Burns' seeks would irreparably harm Flowserve and
            is not the actual *status quo* as an evidentiary hearing would demonstrate .......... 9

## TABLE OF CITATIONS

*Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)……………………………… 8

*Bradley v. Pittsburgh Bd. of Ed.*, 910 F.2d 1172 (3$^{d}$ Cir. 1990)……………………………. 10

*Consolidated Gold Field PLC v. Minorco S.A.,* 871 F.2d 252 (2d Cir. 1989)………………. 10

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d. 1996)……………………………………………… 10

*Ortho Pharmaceutical Corporation v. Amgen, Inc.,* 882 F.2d 806, 814 (3rd Cir. 1989)…….. 6

*S.E.C. v. G. Weeks Securities, Inc.* 678 F.2d 649 (6th Cir. 1982)……………………………. 10

*Schisler v. Heckler*, 574 F.Supp. 1538 (W.D.N.Y. 1983)……………………………………. 10

*Sims v. Greene*, 161 F.2d 87, 88 (3d Cir. 1947)……………………………………………. 10

*Williams v. Curtiss-Wright Corp.,* 681 F.2d 161 (3d Cir. 1982)…………………………... 10

*Zenith Laboratories, Inc. v. Eli Lilly & Co.,* 460 F. Supp 812 (D.N.J. 1978)………………. 10

**FLOWSERVE CORPORATION'S REPLY BRIEF
IN SUPPORT OF ITS MOTION TO ADOPT FLOWSERVE'S
VERSION OF TEMPORARY RESTRAINING ORDER**

I.    Flowserve Submitted its Proposed Order in Good Faith to Address Certain Points Arising from Arguments and/or Concessions Made by Burns or from the Specific Language Utilized by the Court in its Memorandum Opinion.

Contrary to Burns' strident allegations and characterizations in its response brief, [1] Flowserve's actions in submitting a separate proposed TRO order and requesting alternative relief in the form of a hearing in the event the Court decides not to adopt Flowserve's proposed language, were taken in good faith once it became evident that the parties could not reach agreement regarding the order to be submitted in accordance with this Court's March 22, 2006 order.   Following this Court's directive to the parties to submit an *agreed* order, Flowserve's counsel conferred and corresponded with Burns' counsel in an effort to fashion such an order. As discussed below, Flowserve proposed several modifications and additions to the initial draft prepared by Burns' counsel. Flowserve respectfully submits that its modifications address and/or incorporate matters argued or conceded by Burns, and are entirely consistent with this Court's remarks during oral argument, as well as the language employed by the Court in its Memorandum Opinion. The parties disagree over the reach of that language, and hence, Flowserve's present motion.

It was Flowserve, not Burns, who started the ball rolling after the Court issued its March 22 order directing the parties to submit an agreed order by March 28.   Flowserve's counsel Gregory E. Rogus emailed Burns' counsel Michael Moirano on March 23 to suggest that Mr. Moirano prepare the initial draft of the order and forward it for review and/or discussion.   Mr.

---

[1] Burns accuses Flowserve of acting "in typical brinkmanship fashion" (Response, p. 1); imposing a "Hobson's choice" upon the Court (*Id.*); raising a "ruse" of a dispute (Response, p. 7); engaging in delaying tactics (Response, p. 9); and "effectively negating the injunctive relief granted to Burns" (*Id.*).

Moirano agreed to do so. (See Ex. A) After Mr. Rogus telephonically conferred with Mr. Moirano on March 24 regarding the status and content of the proposed order, Mr. Moirano emailed Mr. Rogus in the late afternoon of March 27 to advise that the draft would probably not be forwarded until the next day. (Ex. B) Mr. Moirano emailed his initial draft to Mr. Rogus in the mid-afternoon on March 28. (Ex. C) Once Mr. Rogus received it, he conferred with Burns' counsel about requesting additional time from the Court for submission of the order, so as to afford Mr. Rogus an opportunity to confer with his client before submitting any proposed order as an agreed matter. (Both Burns' Response and Mr. Moirano's affidavit neglect to mention that the Court had originally set March 28 as the due date for submitting the agreed order. Since Mr. Moirano did not forward his proposal to Mr. Rogus until 2:23 p.m. that date, thereby causing the parties to request additional time from the Court, his suggestion that Flowserve was delaying the process by not returning a revised proposal until March 30 (Moirano Affidavit par. 6) is disingenuous.) Mr. Moirano's co-counsel, Mr. Murphy, submitted the parties' joint request for additional time via letter dated March 28, 2006. (Ex. D) Mr. Rogus forwarded Flowserve's revised proposal to Mr. Moirano on March 30. (Ex. E)

On March 31, Mr. Rogus telephoned Mr. Moirano to discuss the basis for Flowserve's revisions. For example, Flowserve included the terms "potentially unreasonable settlements" and "unreasonable settlements" in paragraph 4 for two reasons. First, Mr. Moirano had stated during oral argument that Burns would have no problem with the carriers funding reasonable settlements. (See Transcript, pp. 71-72) Burns' real concern, both as conceded by Mr. Moirano and as recognized by this Court, was directed against the settlement of cases at a premium with an assignment of rights to collect against the insurance companies. (Transcript pp. 71-72; also p. 66.) Second, the Court's Memorandum Opinion does not indicate injunctive relief barring

reasonable settlements funded by insurance dollars. Rather, the Court focused on the "suggested … strategy of globally resolving the more than 3500 pending asbestos cases … using a mechanism of assigning to the asbestos plaintiffs Flowserve's rights to insurance proceeds …" (Memorandum Opinion, p. 9)  The Court noted that it "cannot envision a scenario in which a plaintiff's attorney would accept such a risk-laden settlement, unless that settlement offered plaintiffs a chance to obtain a significantly higher recovery than they might have otherwise been entitled." (*Id.*)  It was "[in] *these* circumstances" that the Court found that Burns presented a "real and genuine concern" about Flowserve's proposed strategy and concluded that "irreparable harm will result to Burns if Flowserve is not enjoined from *such* settlements." (Memorandum Opinion, pp. 9-10) (Emphasis added.)  The Memorandum Opinion, therefore, outlines injunctive relief that is narrower in scope than that suggested by Burns' proposed order, which would, in essence, tie Flowserve's hands with regard to *all* potential settlements. Flowserve's proposal, on the other hand, confines the scope of the order to barring unreasonable, or potentially unreasonable, settlements.

In his March 31 phone conversation with Mr. Moirano, Mr. Rogus also discussed the basis for the inclusion of the phrase "historical case valuation utilized by the insurers" in subparagraph (c) on the final page. The intent was to provide a benchmark for determining the reasonableness of a potential settlement. Burns' proposed order provided no such guidance, and hence no basis for this Court to consider, if and when such a situation should present itself, whether a proposed settlement of an underlying case or group of cases is reasonable, and therefore not an intended target of the court's injunctive relief.  Again, Mr. Moirano had suggested at oral argument that previous settlements were an appropriate consideration for determining the reasonableness of a future settlement. (Transcript, p. 71 – "…And we look at it

and say that's a reasonable settlement *in light of settlements* ...") Burns' proposed order, however, did not incorporate any such measure, thereby leaving any determinations as to the reasonableness of *any* future settlement completely to Burns' whim. Flowserve respectfully submits that was not the Court's intent in granting Burns' request for injunctive relief.

Mr. Moirano's affidavit significantly misstates a portion of the discussion between counsel with regard to "inventory settlements." Mr. Rogus never told Mr. Moirano that Flowserve intended "to negotiate 'inventory settlements' with plaintiff's counsel for amounts that would be comparable to *or exceed* the historical settlement values that had been paid by Borg-Warner's insurers in settlement of individual claims." (Moirano Affidavit, par. 8) Instead, in discussing the concepts of reasonable settlements and historical case valuations, Mr. Rogus brought up the possibility of a group settlement where the amount to be paid on each case within the group was reasonable, i.e. within the historical limits. Mr. Rogus inquired regarding Burns' objection to that scenario. It was at that point, and within that context, that Mr. Moirano indicated Burns would *never* agree to any inventory or group settlement. Mr. Moirano's argument that "these settlements almost always assign an unrealistic value to all of the claims a plaintiff's attorney has in his or her 'inventory'" (Moirano Affidavit, par. 8) completely disregards the premise of the discussion – each of the cases being evaluated *within* historically utilized limits.

Once it became evident that Burns' counsel absolutely refused to consider the points raised by Flowserve, Mr. Rogus suggested that the parties submit separate proposed orders.[2]

---

[2] Flowserve's version leaves intact the language barring Flowserve from filing third-party actions against Burns in the underlying cases seeking indemnification on the same basis as asserted in this proceeding.

II.    A Materially Relevant Factual Dispute Exists Whether Flowserve May Directly Access the BWC Insurance for Reasonable Settlements and Defense Costs, which should Preclude an Injunction on that Issue Prior to an Evidentiary Hearing.

Assuming the Court does not adopt the language of Flowserve's proposed order, Flowserve has requested, in the alternative, an opportunity to present documentary and testimonial evidence to support Flowserve's position that it can directly access the BWC insurance without Burns' consent.[3]  Contrary to Burns' Response Brief, the evidence presented to the Court prior to the March 16, 2006 oral argument did not address the discrete factual issue of the respective rights of the parties to access the BWC insurance policies *for reasonable settlements and defense costs*.

Burns' TRO/preliminary injunction motion requested injunctive relief to preclude Flowserve from (1) terminating counsel approved by Burns to defend the underlying asbestos cases and appoint its own counsel; (2) filing third-party complaints for indemnity against Burns in pending asbestos cases; and (3) negotiating global settlements of pending cases.  The Court's March 22, 2006 Memorandum Opinion acknowledged that Flowserve had the right to hire its own counsel to defend the underlying asbestos cases, but stopped short of explicitly *ruling* that Flowserve could not look to *the carriers* for continued partial funding of the defense. (Memorandum Opinion, pp. 10-11.)[4]    (As for Burns' other two points, the Memorandum Opinion held that Flowserve could neither file third-party suits against Burns based on the same

---

[3]    Burns argues that Flowserve has not indicated precisely what evidence it intends to present to establish that Flowserve can directly access the BWC insurance.  Flowserve intends to present the BWC policies themselves and oral testimony from the claims personnel of the insurance carriers who have been paying Flowserve's defense costs and indemnity for years and who consider Flowserve to be an insured under the policies.  Flowserve does not intend to reopen the entire preliminary injunction dispute, but only seeks to present evidence on the discrete issue of Flowserve's right to continue to access the insurance policies during the pendency of this contract dispute in order to reasonably resolve underlying asbestos cases consistent with historical norms.

[4]    The Court did state, based on its review of the language contained in Section 9.04 of the Stock Purchase Agreement, that if Flowserve seeks to participate in the defense of claims to be indemnified *by Burns*, it must do so at its own expense, and Burns has the right, as the Indemnifying Party, to select counsel and control the defense of the claim. (Memorandum Opinion, p. 13.)  But this statement does not, for reasons shown below, squarely address the issue of Flowserve's asserted right to directly access the insurance, either for indemnity or for defense costs.

issues before this Court nor attempt to enter "global" settlements involving assignments of insurance proceeds to plaintiffs' counsel. (Memorandum Opinion pp. 8-10.) Flowserve has agreed to incorporate language into the Order in accordance with each of these findings.)

The Court's Order of March 22, 2006, directed the parties to include provisions addressing, *inter alia*, Flowserve's choice of counsel and precluding Flowserve from "using," "attempting to use," or "assigning" the BWC insurance to fund settlements. (March 22 Order, ¶ 4.) It is this aspect of the order that gives rise to Flowserve's request for hearing. During oral argument, Flowserve disputed Burns' position that Flowserve must obtain Burns' consent for reasonable settlements that the carriers agreed to fund. (Transcript, pp. 45-47.) Burns has presented no evidence to support its position either prior to oral argument,[5] or in its recently filed twenty-five page Response Brief. To the extent the Court intended to issue a broad injunction requiring Flowserve to obtain Burns' consent to fund reasonable settlements using insurance dollars, the Court should have conducted a full evidentiary hearing on this discrete factual issue regarding "control of the policies." *See Ortho Pharmaceutical Corporation v. Amgen, Inc.*, 882 F.2d 806, 814 (3rd Cir. 1989).[6]

---

[5]     Burns did make averments that Flowserve had "no right" to hire its own counsel and then seek reimbursement from the "BWC insurance" under the 1987 Stock Purchase and Letter Agreements. (Burns' Motion For Temporary Restraining Order and Preliminary Injunction at ¶ 8.) Burns' argument, however, was just that – argument. Burns provided no factual support for this position other than its own reading of the Stock Purchase and Letter Agreements, which may or may not be correct. Moreover, Burns was careful to state in its TRO Motion that it did not believe Flowserve should be able to access the *"BWC insurance,"* not the "Burns insurance." *Id.* Accordingly, Flowserve was not "on notice" of Burns' position – a position which Flowserve vehemently disputes – that Burns "controlled the insurance" and that it was "[their] asset" as they stated no fewer than sixteen times during oral argument (Transcript at 6, 7, 9, 10, 11, 12, 23, 25, 32, 48, 51, 63, 65, 70), but not once in the voluminous papers filed with their TRO Motion. Furthermore, Burns' contention that Flowserve acknowledged in its own pleading that the insurance policies were Burns' asset (Response, pp.21-22) is disingenuous. A quick perusal of the initial page of the Complaint reveals that Flowserve used the name "Burns" to refer collectively to both Burns *and Borg-Warner Corporation.*

[6]     Burns devotes a great deal of its response brief to arguing that Flowserve was given "ample notice and opportunity" to be heard on all relevant issues. (Response, p. 8 *et. seq.*) To the contrary, Flowserve had been notified by the Court that it was being allotted twenty minutes for argument, a fact acknowledged by the Court at the outset of the March 16 hearing. (Transcript, p.3.)

1.    Burns misperceives Flowserve's argument that it has separate and distinct <u>rights to indemnification under the 1987 SPA and the Letter Agreement</u>.

Flowserve has consistently argued in this litigation that it bargained for and received the right to two separate sources of indemnification for Byron Jackson products: (1) indemnification under the SPA; *and* (2) indemnification based on available BWC insurance pursuant to the Letter Agreement. (See, *e.g.* Flowserve Memorandum of Law in Support of Motion to Dismiss Burns' TRO Motion, p. 16.)  Flowserve argues that although the separate Letter Agreement makes certain references to the SPA, it provides Flowserve with access to the BWC insurance covering Byron Jackson products, both with respect to indemnity and defense costs, independent and separate from the rights and obligations of the parties under the SPA.  As pointed out by both sides in their respective submissions, the Letter Agreement does state:  "[N]otwithstanding anything to the contrary contained in the [Stock Purchase] Agreement, neither BWIP nor any of its subsidiaries shall be responsible for any Losses to the extent that such Losses are covered by insurance carried by Borg-Warner."  "Losses" under the SPA are defined to include reasonable out-of-pocket expenses and costs.  (See SPA, par. 9.04(a)).  Furthermore, the clause in the Letter Agreement following the word "notwithstanding" includes the phrase "anything to the contrary contained in the Agreement."  In light of this language, regardless of how the parties' rights and obligations under the SPA are resolved in this litigation, Flowserve bargained for and obtained unfettered access to the BWC insurance covering Byron Jackson pumps.

Burns has provided no evidence in this proceeding to contradict Flowserve's position.[7] Instead, Burns has presented several unsupported legal arguments which purport to interpret and

---

[7]    In fact, Burns' as much as conceded at oral argument that Flowserve did bargain for and received access to the BWC insurance under the Letter Agreement:

resolve the ambiguity of the two 1987 Agreements at issue in this case.[8] These arguments frame the contract dispute before this Court and, accordingly, require the Court to make a ruling on the merits of the underlying claims, which as Burns instructs, "is inappropriate when ruling on a motion for preliminary injunctive relief." (Response, p.1.) Indeed, with respect to the discrete issue of Flowserve's right to directly access the BWC insurance during the pendency of the present litigation, Burns, and not Flowserve, seeks to have this Court prematurely resolve the merits of the underlying litigation in order to issue that part of the preliminary injunction order now in dispute.

2.    Burns has failed to establish the right to injunctive relief with respect to precluding Flowserve from accessing the BWC insurance.

The burden of establishing that injunctive relief is warranted rests on the party seeking the relief. *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994). This holds true with respect to each discrete aspect of the injunctive relief sought. Here, as mentioned *supra*, Burns did not present any evidence to establish that Flowserve could not directly access the BWC insurance for the purpose of funding reasonable, carrier approved settlements and, thus, did not meet its burden of proof for that particular injunctive relief sought. [8]

---

[8]    To wit, that the two Agreements should be read together, that the Letter Agreement allows Burns to bar Flowserve from accessing the BWC insurance and that a hypothetical breach of §9.04(d) of the SPA would preclude Flowserve's separate right to access the insurance under the Letter Agreement. To enjoin Flowserve from directly accessing the BWC insurance would require the Court to make critical factual determinations that (a) the two Agreements should be interpreted such that a putative breach of the SPA should result in Flowserve's total loss of access to the BWC insurance under the Letter Agreement, and (b) that Flowserve has in fact breached §9.04(d) of the SPA by retaining its own counsel. Whether the SPA and the Letter Agreement should be read together, however, to provide one source of indemnification (as Burns' argues) or independently to provide two sources of indemnification (as Flowserve argues) can only be determined when the present litigation is ultimately resolved. Moreover, whether or not Flowserve breached §9.04(d) as the "Indemnified Party" also cannot be determined at this stage of the litigation, since it has yet to be determined by this Court which party, Burns or Flowserve, is the "Indemnified Party" for the underlying asbestos cases under the SPA.

Without presenting evidence to the Court, Burns' burden never shifted to Flowserve. Consequently, Flowserve was not obligated to present factual evidence to contradict Burns' unsubstantiated argument that Burns could completely preclude Flowserve from accessing the BWC insurance.  Instead, Flowserve perceived that Burns had ipso facto failed to meet its burden of proof as to this discrete issue, and that the Court would not completely bar Flowserve from accessing the BWC insurance (except with Burns' consent) based on bald assertions and conclusory legal arguments as to the ultimate meaning of the contracts in dispute.

3.     The *status quo* that Burns' seeks would irreparably harm Flowserve and is not the actual *status quo* as an evidentiary hearing would demonstrate.

Under the *status quo*, Flowserve can access the BWC insurance policies.  (Bechhold Aff. at ¶ 7, attached as Ex. 3 to Flowserve's motion.)  Burns argues that Flowserve's decision to retain its own counsel changed the *status quo*.  In fact, Burns' requested injunctive relief – *i.e.* requiring Flowserve to obtain Burns' approval before settling the Byron Jackson claims, the same claims previously paid by BWC insurance – would significantly change the *status quo*.[9] An injunction that bars Flowserve from accessing the insurance to settle asbestos cases would undeniably alter the *status quo*.

Moreover, an injunction which unfairly places the economic burden – *i.e.* the risk of BWC insurance policy exhaustion – on either Burns or Flowserve while the contract dispute is being litigated and the ultimate rights of the parties under the 1987 Agreements remain unresolved would improperly affect the status of that party.  In order to preserve the real *status quo* until the underlying litigation is resolved, both parties should retain unfettered access to the

---

[9]     Flowserve has participated with the carriers in past settlements of Byron Jackson cases, has conferred directly with the carriers as an insured, and is considered a BWC insurance "policyholder" along with Burns, Borg-Warner Inc. and York International Corporation in the Cook County Illinois insurance coverage litigation filed prior to the instant case.

BWC insurance to resolve Byron Jackson asbestos cases for reasonable amounts approved by the carriers. Stated another way, just as Flowserve would not argue that Burns should be precluded from accessing the BWC insurance to settle Byron Jackson cases when Burns has been sued, Burns has not demonstrated through factual evidence that it has any right to preclude Flowserve from relying on the same insurance for the same Byron Jackson cases when Flowserve is sued.[10]

That the parties cannot agree on what the "*status quo*" is with respect to access to the BWC insurance demonstrates a clear need for a hearing to resolve this critical and disputed factual issue prior to the Court's issuance of the extraordinary remedy of a preliminary injunction. *Sims v. Greene*, 161 F.2d 87, 88 (3rd Cir. 1947) (evidentiary hearing needed in light of conflicting claims and pleadings prior to issuance of preliminary injunction).[11] Indeed, there could not be a factual dispute more relevant to the injunction sought. To wit, what are the respective rights of the parties to access the BWC insurance for Byron Jackson asbestos cases during the pendency of the underlying litigation.

---

[10] In fact, Burns has never presented any evidence to establish precisely what rights it obtained from BWC at all. Burns argued in Court that it obtained certain rights to the BWC insurance when BWC liquidated in December 1987. (Transcript, pp. 6-7.) But Burns has not presented any documentation or other evidence to establish that Burns obtained an exclusive right to control access to the BWC insurance.

[11] Burns' cites several cases in its Response holding that a hearing is not always required when a case turns on solely a "legal issue." *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161 (3d Cir. 1982); *see also S.E.C. v. G. Weeks Securities, Inc.* 678 F.2d 649 (6th Cir. 1982); *Elliott v. Kiesewetter*, 98 F.3d 47 (3d. 1996); *Bradley v. Pittsburgh Bd. of Ed.*, 910 F.2d 1172 (3d Cir. 1990). Those cases are distinguishable since part of the injunctive relief sought in the present case – indeed, the only part of the injunctive relief now in dispute – turns on a relevant disputed issue of fact. Moreover, cases cited by Burns for the proposition that Flowserve waived the right to a hearing are manifestly inapposite. In *Consolidated Gold Field PLC v. Minorco S.A.*, 871 F.2d 252 (2d Cir. 1989), the court had first asked Minorco whether it "wanted a remand for a hearing." *Id.* at 256. In *Schisler v. Heckler*, 574 F.Supp. 1538 (W.D.N.Y. 1983), the court only addressed the issue of waiver in dicta in a footnote, without any analysis of the factual circumstances of the case. Finally, in *Zenith Laboratories, Inc. v. Eli Lilly & Co.*, 460 F. Supp 812 (D.N.J. 1978), "both parties agreed that a full evidentiary hearing was unnecessary." *Id* at 814.

## CONCLUSION

For the above reasons, as well as those stated in the Motion for the Adoption of Flowserve's Temporary Restraining Order, Flowserve respectfully requests the Court to adopt the language contained in Flowserve's proposed Temporary Restraining Order. In the alternative, Flowserve requests that the Court grant its request for an evidentiary hearing on the issue whether Flowserve can directly access the BWC insurance without Burns' consent.

Respectfully Submitted,

Segal McCambridge Singer & Mahoney, Ltd.,

By: _____
        Gregory E. Rogus

Gregory E. Rogus, Esq.
Segal McCambridge Singer & Mahoney, Ltd.
330 N. Wabash Drive, Suite 200
Chicago, IL 60611
312-645-7800