## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FLOWSERVE CORPORATION,        )
                                       )
             **Plaintiff,**      )
      **v.**                      )       C.A. No. 04-1294-JJF
                                       )
BURNS INTERNATIONAL SERVICES    )
CORPORATION                    )
                                       )
          **Defendants.**     )

## AMENDED COMPLAINT

Plaintiff, FLOWSERVE CORPORATION ("hereafter FLOWSERVE"), by its attorneys, Segal McCambridge Singer & Mahoney, Ltd., for its Amended Complaint against Defendant, BURNS INTERNATIONAL SERVICES CORPORATION (hereafter "BURNS"), alleges as follows:

### Preliminary Statement

FLOWSERVE seeks this Honorable Court's assistance in determining its rights to indemnification from BURNS for thousands of lawsuits previously filed, now pending, or to be filed or asserted in various jurisdictions throughout the country alleging diseases caused by exposure to asbestos-containing products and/or product components historically manufactured by BORG-WARNER CORPORATION (hereafter "BWC") or its subsidiary, BORG-WARNER INDUSTRIAL PRODUCTS, INC., (hereafter "INDUSTRIAL PRODUCTS"). The asbestos-related suits involve a particular product line known as Byron Jackson pumps. BWC, through one or more of its divisions, manufactured and sold Byron Jackson pumps up to approximately 1984, when it assigned and conveyed the Byron Jackson pump portion of its business to INDUSTRIAL

PRODUCTS, its newly-formed and wholly owned subsidiary. Between 1984 and 1987, INDUSTRIAL PRODUCTS continued manufacturing and selling Byron Jackson pumps.

In 1987, FLOWSERVE's predecessor, BWIP ACQUISITION CORPORATION, (hereafter "ACQUISITION") purchased 100% of the stock of INDUSTRIAL PRODUCTS from BWC, and in so doing, acquired the Byron Jackson product line. The stock purchase was carried out pursuant to a written Stock Purchase Agreement ("SPA"). At the time this agreement was made, there were no asbestos-related liabilities disclosed to ACQUISITION, nor did ACQUISITION factor any such liabilities into the purchase price for that transaction. However, in order to protect itself from such unknown and/or undisclosed liabilities, ACQUISITION negotiated for and obtained extensive indemnification from BWC for all long-tail environmental and/or toxic substance-related liabilities, including indemnification for suits related to latent diseases allegedly caused by exposure to pre-1987 products, including Byron Jackson pumps. In addition, BWC agreed, in a separate letter agreement (the "Letter Agreement") incorporated into and made part of the overall transaction, that neither INDUSTRIAL PRODUCTS nor any of its subsidiaries were responsible for any such claims, referred to both in the SPA and the Letter Agreement as "Losses," to the extent that such Losses are covered by the available insurance carried by Borg-Warner at the time of the Agreement. BWC further agreed to indemnify INDUSTRIAL PRODUCTS, ACQUISITION, and their subsidiaries against all Losses to the extent such Losses were covered by such insurance. Upon information and belief, the extent of BWC's insurance at the time the SPA was executed, and hence the value of BWC's indemnification obligation, was at or near $1.4 billion.

Through a series of corporate successions, mergers, name-changes and/or other

actions or transactions that have occurred since 1987, the named parties to the instant action have acquired their respective indemnification rights and obligations from the original seller (BORG-WARNER CORPORATION) and Buyer (BWIP ACQUISITION CORPORATION) under the provisions of the SPA, and to the extent applicable, the Letter Agreement.    FLOWSERVE, as the successor (via name change and merger, as more fully set forth below) to BWIP HOLDING, INC., has succeeded to the rights of BWIP HOLDING, INC.'s wholly-owned subsidiary, BWIP ACQUISITION CORPORATION.  BURNS INTERNATIONAL SERVICES CORPORATION has, as a result of certain corporate transactions by and between BWC and BURNS' predecessor, BORG-WARNER HOLDINGS CORPORATION (as more fully set forth below), acquired or otherwise succeeded to certain obligations of BORG-WARNER CORPORATION.

It is FLOWSERVE's position that BURNS must indemnify FLOWSERVE, pursuant to the provisions of the SPA and/or the Letter Agreement, for any and all payouts to claimants, expenses, and defense costs associated with the underlying Byron Jackson/asbestos-related claims and lawsuits.    Separate and apart from the indemnification obligations of BURNS, FLOWSERVE has the right to BWC's historic insurance coverage, to the extent it is triggered by any of the underlying asbestos claims.

### Parties

1.    Plaintiff FLOWSERVE is a corporation organized under the laws of the State of New York with its principal office located in Irving, Texas.

2.    Defendant BURNS is a corporation organized under the laws of the State of Delaware with its principal office located in Chicago, Illinois.

## Jurisdiction, Venue and Choice of Law

3.      Section 10.11 of the SPA (out of which FLOWSERVE's instant claims derive) provides that the Agreement and collateral agreements shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

4.      FLOWSERVE has commenced this action seeking declaratory relief and damages, together with costs and attorney's fees based on Defendant's breach of contract and anticipatory breach of contract.  Federal jurisdiction is based in this matter upon diversity of citizenship pursuant to 28 U.S.C. §1332, as plaintiff and defendant are incorporated and domiciled in different states and the matter in controversy exceeds Seventy Five Thousand Dollars ($75,000).

5.      Venue is proper under 28 U.S.C. §1391(a), inasmuch as BURNS is incorporated in Delaware and the choice of law provision establishes consent to venue in Delaware.

## Events Preceding the 1987 Stock Purchase Agreement

6.      From approximately 1955 until 1984, BWC manufactured and sold Byron Jackson industrial pumps either through its Byron Jackson Pump Division or through one of its other divisions.

7.      On or about December 21, 1983, BWC spun off and incorporated its industrial products division under the name BORG-WARNER INDUSTRIAL PRODUCTS, Inc. (hereafter "INDUSTRIAL PRODUCTS").  As part of the spin off transaction, on or about January 1, 1984, BWC assigned, transferred, and conveyed to INDUSTRIAL PRODUCTS, and INDUSTRIAL PRODUCTS accepted and/or assumed various assets and liabilities.  Among the assets that were transferred to INDUSTRIAL

PRODUCTS was the Byron Jackson pump division, which manufactured and sold the group of products at issue in the underlying asbestos claims. Once INDUSTRIAL PRODUCTS was incorporated, it was wholly-owned and operated by BWC until 1987.

8.    On or about February 27, 1987, BWIP ACQUISITION CORPORATION ("ACQUISITION") was formed and incorporated by a venture capital firm, Clayton & Dubilier Private Equity Fund II Limited Partnership for the purpose of purchasing the stock of INDUSTRIAL PRODUCTS.

9.    On or about March 12, 1987, BWIP HOLDING, INC. was formed and incorporated also by Clayton and Dubilier. Between March 12, 1987 and May 20, 1987, BWIP HOLDING, INC. purchased, and thereafter owned, all of the stock of ACQUISITION.

### The 1987 Stock Purchase Agreement

10.    On or about March 12, 1987, BWC and ACQUISITION entered into a written stock purchase agreement ("SPA") whereby BWC sold all of its stock in INDUSTRIAL PRODUCTS to ACQUISITION. A true and correct copy of the SPA is attached hereto as Exhibit A.

11.    On or about May 1, 1987, BWC and ACQUISITION entered into a separate Letter Agreement in which BWC additionally agreed to indemnify ACQUISITION for all claims against the assets conveyed in the SPA to the extent such claims were covered by insurance carried by BWC. A true and correct copy of the Letter Agreement is attached as Exhibit B.

12.    The closing of the SPA took place on or about May 20, 1987.

### The Environmental Indemnifications in the 1987 SPA

13.    The 1987 SPA included a lengthy and detailed indemnification section which provided that the Buyer would indemnify the Seller for certain liabilities and the Seller would indemnify the Buyer for certain other liabilities related to the business of INDUSTRIAL PRODUCTS.  (See SPA Ex. A at §9.04.)

14.    Section 9.04(a)(ii)(E) of the SPA established a broad category of then-unknown product, environmental and disease-related claims, including asbestos-related claims, based on products manufactured by BWC and INDUSTRIAL PRODUCTS prior to the Effective Date of the 1987 SPA, for which BWC agreed to indemnify the Buyer. (See Ex. A at §9.04(a)(ii)(E)(1)(2)(3)).

15.    Section 9.04 (a)(ii)(E) states, in relevant part, that BWC would indemnify and hold the Buyer harmless for, *inter alia*

> (E)    any occurrence, conduct or condition existing on or prior to the Effective Date with respect to the businesses of Borg-Warner, BWIP, and its Subsidiaries and Divisions, that:
>
>> (1)    violated, is alleged to violate or gives rise to a claim under any law, rule or ordinance in effect as of the Effective Date, or any judgment, order or decree in any case relating to conduct prior to the Effective Date with respect to handling or disposal of toxic or hazardous materials, air or water pollution or otherwise relating to protection of or damage to the environment.
>>
>> (2)    is the basis for any common law tort, nuisance or similar claim by a party (other than the Buyer or an affiliate of Buyer) in connection with which Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions, is alleged to have released harmful, toxic or hazardous substances into the environment; or
>>
>> (3)    is the basis for a claim that the claimant contracted a disease as a result of exposure prior to the Effective Date to any product of or raw material used by Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions, except to the extent that such a claim is made

after the Effective Date and arises out of third party use of
a product after sale.

16.    In §4.23 of the 1987 SPA, BWC made separate warranties to the Buyer,

apart from the indemnities in §9.04(a)(ii)(E), that neither BWC nor any of its subsidiaries

had caused any "hazardous or toxic materials" to be "released into the environment"

prior to the Agreement's Effective Date. Ex. A at §4.23.

17.    Each of the three subdivisions of §9.04(a)(ii)(E) of the 1987 SPA

evidenced the parties' intent that BWC would indemnify the Buyer for environmental

and/or disease-related liabilities, including such liabilities that were either: 1) related to

the improper "handling or disposal of toxic substances" such as asbestos (see 1987 SPA

§9.04(a)(ii)(E)(1)); 2) related to the "release of toxic or hazardous substances" such as

asbestos (see 1987 SPA §9.04(a)(ii)(E)(2)); or, 3) related to a claim that the "claimant

contracted a disease from exposure to a product or material," which is precisely the claim

in the underlying asbestos litigation. See 1987 SPA §9.04(a)(ii)(E)(3), Ex. A.

18.    In the alternative and/or at a minimum, the language contained in

§9.04(a)(ii)(E) is ambiguous in numerous respects, thereby requiring consideration of

certain parole evidence to demonstrate the parties' intent.  Various words used in the

Section are not defined, including "occurrence," "conduct," and "condition."  Similarly,

there are certain phrases included within the Section that are neither defined nor

otherwise explained.  These phrases include: "with respect to the business of Borg-

Warner, BWIP, and its Subsidiaries and Divisions," "common law tort," "harmful, toxic

or hazardous substances," "third party use of a product,"  and "after sale." The parole

evidence at the time of the 1987 SPA will demonstrate that the indemnification provided

under §9.04(a)(ii)(E) was intended to be broad and to encompass any unknown, long-tail

liability such as the asbestos-related claims arising out of claimed exposures to BWC or

INDUSTRIAL PRODUCTS' products, component parts,  or raw materials predating the

Effective Date of the SPA.

### The Letter Agreement

19.    In relevant part, the May 1, 1987 Letter Agreement states that:

> The purpose of this letter is to document our mutual agreement
> that, notwithstanding anything to the contrary contained in the
> Agreement, neither BWIP nor any of its Subsidiaries shall be
> responsible for any Losses to the extent that such Losses are
> covered by insurance carried by Borg-Warner.

> Accordingly, as provided by Section 9.04(a) of the Agreement,
> Borg-Warner will indemnify the Buyer, BWIP, and each of their
> respective subsidiaries against *all* Losses to the extent that such
> Losses are covered by such insurance. (Emphasis added.)

20.    At the time BWC executed this Letter Agreement, and for many years

prior thereto, BWC had valid and collectible primary, excess and umbrella insurance

policies that provided, *inter alia*, defense and indemnification coverage for all products

that had been manufactured and sold by BWC and/or its subsidiary prior to March 12,

1987, including Byron Jackson pumps.

### Post-SPA Corporate History - FLOWSERVE

21.    Following the closing, ACQUISITION merged into BORG-WARNER

INDUSTRIAL PRODUCTS, INC.  The surviving corporation retained the name BORG-

WARNER INDUSTRIAL PRODUCTS, INC.  As a result of the closing of the 1987

SPA, and the merger of ACQUISITION into BORG-WARNER INDUSTRIAL

PRODUCTS, INC., BORG-WARNER INDUSTRIAL PRODUCTS, INC., became a

wholly-owned subsidiary of BWIP HOLDING, INC.

22.    On or about February 6, 1988, BORG-WARNER INDUSTRIAL PRODUCTS, INC. changed its corporate name to BW/IP INTERNATIONAL, INC.

23.    On or about May 11, 1994, BWIP HOLDING, INC. changed its name to BW/IP, INC.

24.    On or about April 13, 1998, BW/IP, INC. merged into FLOWSERVE CORPORATION.    The surviving corporation retained the name FLOWSERVE CORPORATION.

25.    On or about August 18, 1998, FLOWSERVE RED CORPORATION was formed and incorporated as a Delaware corporation, a direct, wholly-owned subsidiary of BW/IP INTERNATIONAL, INC., and an indirect, wholly-owned subsidiary of FLOWSERVE CORPORATION.

26.    On or about December 31, 1998, BW/IP INTERNATIONAL, INC. transferred, assigned and conveyed to FLOWSERVE RED CORPORATION its entire right, title and interest in and to the assets relating to the Byron Jackson pump business, and FLOWSERVE RED assumed and agreed to perform all covenants, obligations and liabilities connected with those assets.

27.    Effective December 31, 1998, BW/IP INTERNATIONAL, INC. then changed its name to FLOWSERVE INTERNATIONAL, INC.

28.    On or about September 21, 2000, FLOWSERVE RED CORPORATION changed its name to FLOWSERVE PUMP CORPORATION.

29.    On November 15, 2000, FLOWSERVE CORPORATION resolved to contribute all of its issued and outstanding shares of the capital stock of FLOWSERVE INTERNATIONAL, INC. to the additional paid-in capital of FLOWSERVE PUMP

CORPORATION. This contribution took effect on December 31, 2000.

30. On December 21, 2000, FLOWSERVE PUMP CORPORATION changed its name to FLOWSERVE U.S., INC.

31. FLOWSERVE U.S., INC. remains a direct, wholly-owned subsidiary of FLOWSERVE CORPORATION.

### Post-SPA Corporate History - BURNS

32. On or about June 30, 1987, the Board of Directors for BWC resolved to liquidate the corporation, and formulated a plan for the distribution of the corporation's assets and liabilities.

33. As part of that plan, BWC distributed to BORG-WARNER HOLDINGS CORPORATION, the proceeds from the 1987 sale of BORG-WARNER INDUSTRIAL PRODUCTS, INC., together with assets and liabilities not otherwise specified in BWC's liquidation plan. This occurred on or about December 31, 1987. In exchange for this distribution, BORG-WARNER HOLDINGS CORPORATION canceled its stock holdings in BWC.

34. BORG-WARNER HOLDINGS CORPORATION had initially been incorporated on February 6, 1987 as AV HOLDINGS CORPORATION. AV HOLDINGS CORPORATION had changed its name to BORG-WARNER HOLDINGS CORPORATION on or about May 22, 1987.

35. Among the liabilities that BWC transferred, assigned, conveyed or distributed to BORG-WARNER HOLDINGS CORPORATION was BWC's liability to indemnify the Buyer under the 1987 SPA and the May 1, 1987 Letter Agreement, together with any other liability not otherwise specified in BWC's plan of liquidation.

36.     After making the distribution described in paragraph 33 above, BWC then merged into BW TRANSMISSIONS AND ENGINE COMPONENTS CORPORATION on or about December 31, 1987.

37.     On or about January 25, 1988, BORG-WARNER HOLDINGS CORPORATION changed its name to BORG-WARNER CORPORATION.

38.     On or about January 19, 1993, BORG-WARNER CORPORATION changed its corporate name to BORG-WARNER SECURITY CORPORATION.

39.     On or about July 6, 1999, BORG-WARNER SECURITY CORPORATION changed its corporate name to BURNS INTERNATIONAL SERVICES CORPORATION.

40.     As a result of the distribution that occurred on December 31, 1987, as stated in paragraphs 33 and 35 above, and the subsequent corporate name changes that have occurred between 1988 and the present, as set forth in paragraphs 37 through 39, BURNS has acquired and presently retains the liability of BWC to indemnify the Buyer under the 1987 SPA and the May 1, 1987 Letter Agreement.

## COUNT I – DECLARATORY RELIEF
## WITH REGARD TO §9.04 OF THE 1987 SPA

41.     As FLOWSERVE and its predecessor BW/IP began to be served with complaints in the underlying asbestos claims, it tendered these lawsuits to BURNS or its predecessor, pursuant to the terms and conditions of the 1987 SPA and Letter Agreement.

42.     BURNS initially accepted these tenders without objection, reservation or qualification.  Upon information and belief, BURNS then submitted these lawsuits to the BWC primary liability insurance carriers, whose policies provided coverage for these claims.  BURNS and/or its counsel acted as the administrator who assigned the lawsuits

to local defense counsel.

43.    For many years, those primary insurance carriers provided FLOWSERVE with complete defense and indemnification.

44.    In or about 2004, certain of the primary carriers notified FLOWSERVE and BURNS that the limits of their liability policies had been or were about to be exhausted.

45.    In 2004, certain of the primary and excess liability insurance carriers filed a lawsuit, entitled *Continental Casualty Company, et al. v. Borg-Warner, Inc., et al.*, Case No. 04 CH 01708, in the Circuit Court of Cook County, Illinois, Chancery Division, seeking a declaratory judgment as to the scope of coverage which their policies provide with respect to the underlying asbestos claims.

46.    Beginning in 2004, several of the carriers involved in the Cook County litigation notified FLOWSERVE and BURNS that the carriers would no longer be providing 100% funding to cover settlements and defense costs in connection with the underlying asbestos claims, but would instead be looking to BURNS, FLOWSERVE and others to participate in that funding.

47.    Despite the carriers' earlier notifications, the excess carriers continued to provide full funding, subject to a reservation of rights, through approximately March 15, 2006.

48.    In view of the position taken by the carriers, and to the extent any of the alleged asbestos-related liabilities are or may not be covered by insurance, a dispute has arisen between FLOWSERVE and BURNS as to which of them could or may be liable to indemnify the other for any non-covered claims or portions of claims.

49.     Based on the language of §9.04(a)(ii)(E) of the SPA, FLOWSERVE contends that it is BURNS, by virtue of its successorship to the SPA indemnification liabilities of BWC, that must indemnify FLOWSERVE.

50.     The asbestos-related personal injury and wrongful death claims based on exposure to pre-1987 products are obligations for which BWC agreed to indemnify the Buyer pursuant to §9.04(a)(ii)(E).   The allegations set forth in the various causes of action in those lawsuits closely resembles, and in some cases precisely tracks, the long-tail liability protection the Buyer negotiated, and the Seller agreed to,  in the indemnity language contained in §9.04(a)(ii)(E).

51.     Furthermore, the course of conduct of the parties who negotiated the SPA demonstrates a clear intent that BWC would retain the obligation to indemnify the Buyer for  environmental  or  disease-related  liabilities  in  connection  with  pre-1987 manufacturing activity or exposure claims.   Nothing in the SPA or parole evidence indicates that the Buyer intended to or was willing to accept any unknown or non-disclosed long-tail liability. ACQUISITION  communicated to BWC, prior to the execution of the SPA, that BWC's indemnification for unknown and/or undisclosed environmental or disease-related liabilities was a crucial pre-condition before the transaction could close.  Because these specific indemnification provisions were vital to ACQUISITION, they were moved into a separate section of the SPA and exempted from the five-year sunset provision.

52.     BURNS has taken a contrary position, contending that it has no obligation to defend and indemnify FLOWSERVE.  In addition, since the carriers began notifying FLOWSERVE and BURNS regarding the exhaustion of certain coverage, BURNS began

tendering to FLOWSERVE for defense and indemnification those underlying asbestos cases in which BURNS had been named a defendant, claiming entitlement to indemnification pursuant to §9.04(b) of the SPA.

53.     In light of the parties' disparate positions regarding their respective rights to and/or duties to provide reimbursement and/or indemnity under the SPA, a justiciable controversy exists, and this Court should issue a declaration of the rights and duties of the parties with respect to FLOWSERVE's claims for indemnification from BURNS for all defense costs, settlements, and judgments, arising out of the underlying asbestos cases.

**COUNT II - DECLARATORY RELIEF**
**WITH REGARD TO THE LETTER AGREEMENT**

54.     FLOWSERVE hereby incorporates the allegations contained in paragraphs 1 through 48, as though fully set forth herein.

55.     Based on the language contained in the Letter Agreement, FLOWSERVE contends that it is BURNS, by virtue of its successorship to the indemnification liabilities of BWC, that must indemnify FLOWSERVE against "all Losses to the extent such Losses are covered by [insurance carried by Borg-Warner.]"

56.     The third paragraph of the Letter Agreement contains an explicit statement that "Borg-Warner will indemnify the Buyer ... against all Losses to the extent such Losses are covered by such insurance."

57.     By including this sentence in the Letter Agreement, BWC agreed to do more than simply submit any claimed Losses to its carriers for coverage. It agreed to be the indemnitor, regardless of what any of its carriers might later do in addressing any claims.

58.    Furthermore, the phrase "to the extent such Losses are covered by insurance carried by Borg-Warner" defined the scope of BWC's indemnity obligation and provided a quantification of the value of the consideration that ACQUISITION bargained for, which was the value of BWC's insurance tower at the time.  It did not create a limitation on BWC's liability; i.e. it was not intended to limit the Buyer to some lesser amount based upon remaining availability of solvent coverage or some other diluted consideration later in time.

59.    In entering into the Letter Agreement, ACQUISITION was not contracting for BWC's carriers' future performance.  It contracted for BWC's performance.  The Letter Agreement was with BWC, with the coverage limits serving only to define the parameters of the obligation.

60.    BURNS has taken a contrary position, contending that its only duty under the Letter Agreement is to turn over to BWC's carriers any claims for Losses that are tendered.  BURNS denies that it has any obligation itself, pursuant to the Letter Agreement, to independently defend and indemnify FLOWSERVE.

61.    In light of the parties' disparate positions regarding their respective rights and duties with respect to reimbursement and indemnity under the Letter Agreement, a justiciable controversy exists, and this Court should issue a declaration of the rights and duties of the parties with respect to FLOWSERVE's claims for indemnification from BURNS pursuant to the Letter Agreement for all defense costs, settlements, and judgments arising out of the underlying asbestos cases.

**COUNT III – ALTERNATIVE DECLARATORY**
**RELIEF – FLOWSERVE'S UNFETTERED**
**RIGHT TO ACCESS THE BWC INSURANCE**

62.    FLOWSERVE hereby incorporates the allegations contained in paragraph 1 through paragraph 48 as if fully set forth herein.

63.    The Letter Agreement states that "…notwithstanding anything to the contrary contained in the Agreement, neither BWIP nor any of its Subsidiaries shall be responsible for any Losses to the extent that such Losses are covered by insurance carried by Borg-Warner."

64.    Under the Agreement, "Losses" include "any and all claims, actions, causes of action, liabilities, losses, damages and reasonable out-of-pocket expenses and costs."

65.    As of the date the Letter Agreement was executed, and for many years prior thereto, BWC had in force and effect insurance policies providing coverage for the "Losses" referenced in both the SPA and the Letter Agreement.

66.    As of the date the Letter Agreement was executed, INDUSTRIAL PRODUCTS had both the legal and contractual right and authority to seek and obtain directly from BWC's liability insurance carriers coverage for any Losses covered by those carriers' policies. That right and authority derived from, *inter alia*, the following:

> (a)    The insurance policies themselves included BWC's divisions and subsidiaries as either Insureds, Named Insureds, Assureds, or Named Assureds.   The Byron Jackson pump division had operated as a division of BWC from approximately the mid-1950's until 1984, when BWC transferred and assigned the pump division business to its wholly-owned subsidiary, INDUSTRIAL PRODUCTS. Between 1984 and 1987, INDUSTRIAL PRODUCTS continued to operate as BWC's wholly-owned subsidiary.

> (b)    On or about January 1, 1984, BWC assigned, transferred and conveyed to INDUSTRIAL PRODUCTS all of its right, title and interest in and to the business and assets of the Byron Jackson pump division.   This assignment

included "contract rights" and "other things of value." By virtue of this assignment, BWC transferred, conveyed and assigned to INDUSTRIAL PRODUCTS the right and authority to seek and obtain coverage for Losses directly from BWC's carriers.

67.    The January 1, 1984 assignment described in paragraph 66(b) above was never rescinded prior to the sale of INDUSTRIAL PRODUCTS to ACQUISITION. Therefore, in purchasing INDUSTRIAL PRODUCTS, ACQUISITION purchased INDUSTRIAL PRODUCTS' right and authority to seek and obtain coverage for Losses directly from the BWC carriers.

68.    By virtue of the post-SPA corporate history outlined in paragraphs 21-31 above, FLOWSERVE has succeeded to ACQUISITION'S rights regarding insurance access.

69.    BURNS has taken the contrary position that FLOWSERVE cannot directly access the BWC insurance coverage, either for purposes of funding judgments or settlements or funding defense costs, unless FLOWSERVE first obtains BURNS' approval, authorization or consent.  BURNS also contends that unless FLOWSERVE agrees to use defense counsel chosen by BURNS, FLOWSERVE cannot look to any of the BWC carriers for defense funding.

70.    Contrary to BURNS' position, there is nothing contained in the Letter Agreement or the SPA that controls the relationship between the carriers and their insured or that negates FLOWSERVE'S right and authority to directly access the BWC insurance without first obtaining BURNS' approval, authorization or consent.  Nor does the Letter Agreement or the SPA compel FLOWSERVE to use counsel of BURNS' choosing in order to access insurance carrier funding for defense costs.

71.     In light of the parties' disparate positions regarding FLOWSERVE'S right and authority to directly access the coverage provided for Losses by the BWC insurance carriers, a justiciable controversy exists, and this Court should issue a declaration of the rights and duties of the parties with respect to FLOWSERVE's claim that it can directly access the BWC insurance coverage to obtain funding for settlements, judgments, and defense costs arising out of the underlying asbestos cases without first having to obtain BURNS' consent, approval or authorization.

### COUNT IV – BREACH AND ANTICIPATORY
### BREACH OF CONTRACT – THE SPA

72.     FLOWSERVE hereby incorporates the allegations contained in paragraphs 1 through 52 as though fully set forth herein.

73.     To the extent that BURNS has failed to fully indemnify FLOWSERVE for any payments made to claimants in settlement of any of the underlying asbestos litigation, or for any of the reasonable expenses and costs associated with said litigation, including defense costs, it has breached the terms of the SPA, and in particular §9.04(a)(ii)(E) thereof.

74.     FLOWSERVE has thereby been damaged in that it has been caused to pay, and continue to pay, certain amounts both to fund settlements with claimants in the underlying asbestos litigation, and the reasonable expenses and costs related to said litigation, including defense costs.

75.     To the extent that BURNS persists in its failure to fully indemnify FLOWSERVE for any of the payouts, expenses and costs incurred by FLOWSERVE in connection with the pending and future underlying asbestos litigation, FLOWSERVE will continue to be damaged as a direct result of BURNS' ongoing and future breach.

76.    FLOWSERVE is therefore entitled to an award of damages that will fully and fairly compensate it for any and all amounts that it would not have had to pay out in connection with the underlying asbestos litigation but for BURNS' breach of the terms of the SPA.

### COUNT V – BREACH AND ANTICIPATORY BREACH
### OF CONTRACT – THE LETTER AGREEMENT

77.    FLOWSERVE hereby incorporates the allegations contained in paragraphs 1 through 48, and 55 through 59, as though fully set forth herein.

78.    To the extent that BURNS has failed to fully indemnify FLOWSERVE for any payments made to claimants in settlement of any of the underlying asbestos litigation, or for any of the reasonable expenses and costs associated with said litigation, including defense costs, it has breached the terms of the Letter Agreement.

79.    FLOWSERVE has thereby been damaged in that it has been caused to pay, and continue to pay, certain amounts both to fund settlements with claimants in the underlying asbestos litigation, and the reasonable expenses and costs related to said litigation, including defense costs.

80.    To the extent that BURNS persists in its failure to fully indemnify FLOWSERVE for any of the payouts, expenses and costs incurred by FLOWSERVE in connection with the pending and future underlying asbestos litigation, FLOWSERVE will continue to be damaged as a direct result of BURNS' ongoing and future breach.

81.    FLOWSERVE is therefore entitled to an award of damages that will fully and fairly compensate it for any and all amounts that it would not have had to pay out in connection with the underlying asbestos litigation but for BURNS' breach of the terms of the Letter Agreement.

## COUNT VI – TORTIOUS INTERFERENCE WITH
## <u>FLOWSERVE'S RIGHT TO ACCESS THE BWC INSURANCE</u>

82.    FLOWSERVE hereby incorporates the allegations contained in paragraghs 1 through 47, and 63 through 70 as though fully set forth herein.

83.    If, as FLOWSERVE contends in Count III, and as it has argued previously before this Court, it has an unfettered right to access the BWC insurance to fund reasonable settlements of any of the underlying asbestos cases, as well as defense costs relating to those cases, then BURNS is without the lawful right or authorization to interfere with FLOWSERVE's exercise of that right.

84.    Notwithstanding the foregoing, BURNS has tortiously interfered with FLOWSERVE's contractual right to directly access the BWC insurance in an effort to coerce the carriers to restrict or prevent FLOWSERVE from accessing BWC'S insurance policies.

85.    On or about June 28, 2006, counsel for BURNS directed a letter to counsel representing several of the insurance carriers.  (See letter attached hereto as Ex. C.)

86.    In the June 28th letter, BURNS' counsel misstates the contents of Judge Farnan's March 22, 2006 order (copy of which is attached hereto as Ex. D).  That order had directed the parties to submit an agreed upon Injunction Order *"which shall include provisions for"* terminating and replacing BURNS' choice of defense counsel unless FLOWSERVE paid replacement counsel with its own funds, and negotiating global or other settlements attempting to use or assigning BWC insurance coverage to fund such settlements.  The order did not direct the parties to submit an agreed Injunction Order *prohibiting* FLOWSERVE from doing either of those things.

87.    The June 28th letter also mischaracterizes the Court's March 22nd order as

"binding" and "law of the case" despite the fact that the order on its face demonstrates that it is not intended to constitute a final Injunction Order.

88.     Even though the carriers are not parties to the present action, BURNS' June 28th letter nonetheless states BURNS' "belief" that the order is "binding on the carriers," and that any payment would be "at the carriers' and FLOWSERVE'S sole risk."

89.     The communications embodied in BURNS' June 28th letter constitute an intentional and tortious interference with FLOWSERVE'S right to directly access the BWC coverage to fund reasonable settlement and defense costs in connection with the underlying asbestos cases.

90.     As a direct and proximate result of BURNS' tortious interference, FLOWSERVE has been damaged in that it has been caused to pay, and continue to pay, certain amounts both to fund settlements with claimants in the underlying asbestos litigation, and the reasonable expenses and costs related to said litigation, including defense costs.

## **PRAYER FOR RELIEF**

WHEREFORE, FLOWSERVE prays for judgment as follows:

A)     Declaring that pursuant to §9.04(a)(ii)(E) of the Stock Purchase Agreement, BURNS must indemnify and hold FLOWSERVE harmless for any and all Losses, including defense costs, arising out of the underlying asbestos litigation to the extent the claimants in that litigation allege exposure to pre-1987 products manufactured by Borg-Warner Corporation or Borg Warner Industrial Products, Inc;

B.     Declaring that pursuant to the Letter Agreement, BURNS must indemnify

and hold FLOWSERVE harmless for any and all losses, including defense costs, arising out of the underlying asbestos litigation to the extent that such Losses were covered by the insurance carried by Borg-Warner Corporation as of the date of the Letter Agreement was executed;

C)    Declaring that FLOWSERVE is entitled to directly access Borg-Warner Corporation's insurance coverage to fund Losses incurred in connection with the underlying asbestos litigation, including judgments, reasonable settlements and defense costs, without having to first obtain BURNS' approval, authorization or consent;

D)    Awarding FLOWSERVE damages based upon BURNS' breach, and anticipatory breach, of the SPA and/or the Letter Agreement;

E)    Awarding FLOWSERVE damages based upon BURNS's tortious interference with FLOWSERVE's right to access the Borg-Warner Corporation historical insurance;

F)    Awarding FLOWSERVE its costs, including reasonable attorneys' fees, incurred in this litigation; and

G)    Awarding FLOWSERVE such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Segal McCambridge Singer
& Mahoney, Ltd.

By: _____
Attorneys for Flowserve
Gregory E. Rogus, Esq.
Segal McCambridge Singer & Mahoney, Ltd.
330 N. Wabash Drive, Suite 200
Chicago, IL  60611
312-645-7800

Local Counsel:
Danielle Yearick, Esq.
Tybout, Redfearn & Pell
300 Delaware Avenue  11th Floor
Wilmington, DE 19899
302-658-6901