## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **FLOWSERVE CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **C.A. No. 04-1294-JJF** |
| | ) | |
| **BURNS INTERNATIONAL SERVICES** | ) | |
| **CORPORATION [*and BORG-WARNER*** | ) | |
| ***CORPORATION*],** | ) | |
| | ) | |
| **Defendants.** | ) | |

### AMENDED COMPLAINT

Plaintiff, FLOWSERVE CORPORATION ("hereafter FLOWSERVE"), by its attorneys, Segal McCambridge Singer & Mahoney, Ltd., for its <u>Amended</u> Complaint against Defendant[*s*], BURNS INTERNATIONAL SERVICES CORPORATION [*and BORG-WARNER CORPORATION (collectively "BURNS")*] (<u>hereafter "BURNS"</u>), alleges as follows:

### Preliminary Statement

FLOWSERVE seeks this Honorable Court's assistance in determining its rights to indemnification *[for thousands of asbestos-related suits now pending, and future claims, from across the country against Burns ("Burns" used collectively as described herein to include Burns' predecessor and successor entities) and Flowserve for diseases allegedly caused by products manufactured by Burns prior to Flowserve's acquisition of the product line at issue. The asbestos-related suits primarily involve Byron Jackson pumps – a product line that was acquired by Flowserve ("Flowserve" used collectively as described herein to include Flowserve's predecessor entities) in 1987. These suits have been filed decades after the pumps at issue were manufactured and sold by Burns – not*

*Flowserve.*] from BURNS for thousands of lawsuits previously filed, now pending, or to be filed or asserted in various jurisdictions throughout the country alleging diseases caused by exposure to asbestos-containing products and/or product components historically manufactured by BORG-WARNER CORPORATION (hereafter "BWC") or its subsidiary, BORG-WARNER INDUSTRIAL PRODUCTS, INC., (hereafter "INDUSTRIAL PRODUCTS"). The asbestos-related suits involve a particular product line known as Byron Jackson pumps. BWC, through one or more of its divisions, manufactured and sold Byron Jackson pumps up to approximately 1984, when it assigned and conveyed the Byron Jackson pump portion of its business to INDUSTRIAL PRODUCTS, its newly-formed and wholly owned subsidiary. Between 1984 and 1987, INDUSTRIAL PRODUCTS continued manufacturing and selling Byron Jackson pumps.

[*Each and every one of the Byron Jackson pumps at issue in the asbestos litigation was designed, manufactured, and placed into the stream of commerce by Burns. Profits from each and every one of these pumps was earned by Burns. In 1987, when Flowserve acquired the Byron Jackson line from Burns, asbestos-related liabilities were not disclosed to Flowserve. Nor were these liabilities explicitly factored into the purchase price for that transaction. In order to protect itself from such unknown and/or undisclosed liabilities, however, Flowserve negotiated for and obtained extensive indemnifications from Burns in the 1987 agreement ("1987 Agreement") for all environmental liabilities; including indemnification for suits related to latent diseases allegedly caused by exposure to Burns' pre-1987 product lines, including Byron Jackson pumps. Furthermore, even if one viewed the current asbestos liabilities as undisclosed, unknown, and non-allocated liabilities at the time of the sale, the common law liability*

*for those products lies with Burns who designed, manufactured, and sold the product at issue.*

*Additionally, Burns promised in a separate letter agreement ("Letter Agreement") subsequent to the 1987 Agreement, that to the extent that insurance coverage then existed for any claims against the conveyed assets, Burns would additionally indemnify Flowserve for all such claims to the full extent of the then existing coverage. Insurance coverage continues to exist for the underlying asbestos claims against the conveyed assets, and related losses have not approached the amount of insurance coverage represented to Flowserve at the time the Letter Agreement was executed, but Burns has nonetheless chosen to breach its obligations under this separate Letter Agreement by refusing to indemnify Flowserve to the extent of the represented coverage as of May 1, 1987.*]

In 1987, FLOWSERVE's predecessor, BWIP ACQUISITION CORPORATION, (hereafter "ACQUISITION") purchased 100% of the stock of INDUSTRIAL PRODUCTS from BWC, and in so doing, acquired the Byron Jackson product line. The stock purchase was carried out pursuant to a written Stock Purchase Agreement ("SPA"). At the time this agreement was made, there were no asbestos-related liabilities disclosed to ACQUISITION, nor did ACQUISITION factor any such liabilities into the purchase price for that transaction. However, in order to protect itself from such unknown and/or undisclosed liabilities, ACQUISITION negotiated for and obtained extensive indemnification from BWC for all long-tail environmental and/or toxic substance-related liabilities, including indemnification for suits related to latent diseases allegedly caused by exposure to pre-1987 products, including Byron Jackson pumps. In addition, BWC agreed, in a separate letter agreement (the "Letter Agreement") incorporated into and made part of the overall transaction, that neither INDUSTRIAL PRODUCTS nor any of

its subsidiaries were responsible for any such claims, referred to both in the SPA and the Letter Agreement as "Losses," to the extent that such Losses are covered by the available insurance carried by Borg-Warner at the time of the Agreement. BWC further agreed to indemnify INDUSTRIAL PRODUCTS, ACQUISITION, and their subsidiaries against all Losses to the extent such Losses were covered by such insurance. Upon information and belief, the extent of BWC's insurance at the time the SPA was executed, and hence the value of BWC's indemnification obligation, was at or near $1.4 billion.

Through a series of corporate successions, mergers, name-changes and/or other actions or transactions that have occurred since 1987, the named parties to the instant action have acquired their respective indemnification rights and obligations from the original seller (BORG-WARNER CORPORATION) and Buyer (BWIP ACQUISITION CORPORATION) under the provisions of the SPA, and to the extent applicable, the Letter Agreement. FLOWSERVE, as the successor (via name change and merger, as more fully set forth below) to BWIP HOLDING, INC., has succeeded to the rights of BWIP HOLDING, INC.'s wholly-owned subsidiary, BWIP ACQUISITION CORPORATION. BURNS INTERNATIONAL SERVICES CORPORATION has, as a result of certain corporate transactions by and between BWC and BURNS' predecessor, BORG-WARNER HOLDINGS CORPORATION (as more fully set forth below), acquired or otherwise succeeded to certain obligations of BORG-WARNER CORPORATION.

[*Despite their contractual and common law obligations, Burns is now refusing to indemnify Flowserve for the mounting asbestos liabilities directly related to Burns' products, and their refusal to do so has placed Flowserve in an untenable and unfair*

*position in the underlying asbestos-related actions nationwide. To make matters worse, Burns has now adopted the practice of tendering its own asbestos-related Byron Jackson cases to Flowserve and is refusing to pay defense and indemnity costs in the underlying actions related to the pre-1987 Byron Jackson pump products irrespective of whether Flowserve, Burns, and/or there predecessors or successors are named defendants.*

*One of these entities, and only one of these entities, must immediately defend and take responsibility for the Byron Jackson pump line for products manufactured and sold prior to 1987 by Burns – this action alleges that Burns is that entity. Under both contractual and common law causes of action, Flowserve respectfully seeks a Judgment from this Honorable Court that Flowserve is entitled to indemnification from Defendants for all asbestos claims related to products manufactured and sold by Burns prior to January 1, 1987.*]

It is FLOWSERVE's position that BURNS must indemnify FLOWSERVE, pursuant to the provisions of the SPA and/or the Letter Agreement, for any and all payouts to claimants, expenses, and defense costs associated with the underlying Byron Jackson/asbestos-related claims and lawsuits. Separate and apart from the indemnification obligations of BURNS, FLOWSERVE has the right to BWC's historic insurance coverage, to the extent it is triggered by any of the underlying asbestos claims.

## Parties

1.     Plaintiff FLOWSERVE is a corporation organized under the laws of the State of New York with its principal office located [*at 5215 N. O'Connor Blvd., Suite 2300*] in Irving, Texas.

2.     [*Upon information and belief,*] Defendant BURNS is a corporation

organized under the laws of the State of Delaware with its principal office located [*at 200*

*South Michigan Avenue*] in Chicago, Illinois.

[*3.    Upon    information    and    belief,    Defendant    BORG-WARNER*

*CORPORATION is a corporation organized under the laws of the State of Delaware with*

*its principal office located in Chicago, Illinois.*]


### Jurisdiction, Venue and Choice of Law

[*4*] 3.    Section 10.11 of the SPA (out of which FLOWSERVE's instant claims

derive) provides that the Agreement and collateral agreements shall be governed by and

construed and enforced in accordance with the laws of the State of Delaware.

[*5*] 4.    FLOWSERVE has commenced this action seeking declaratory relief and

damages, together with costs and attorney's fees based on Defendant's breach of contract

and anticipatory breach of contract.  Federal jurisdiction is based in this matter upon

diversity of citizenship pursuant to 28 U.S.C. §1332, as plaintiff and defendant[*s*] are

incorporated and domiciled in different states and the matter in controversy exceeds

Seventy Five Thousand Dollars ($75,000).

[*6*] 5.    Venue is proper under 28 U.S.C.  §1391(a), [as at least one defendant,]

inasmuch as BURNS is incorporated in Delaware and the choice of law provision

establishes consent to venue in Delaware.

### Events Preceding the 1987 Stock Purchase Agreement

[*9.        Upon information and belief, in or around  1983, Borg-Warner*

*Corporation spun off and incorporated its industrial products division under the name*

*Borg-Warner Industrial Products, Inc. (hereafter "BWIC"). The industrial products assets spun off and assumed by BWIC included, inter alia, the Byron Jackson pump division, the same group of products at issue in the Underlying Asbestos Claims. Upon information and belief Byron Jackson pumps were manufactured and sold by Borg-Warner Corporation, the predecessor to Burns, since at least 1954. BWIC was wholly owned and operated by Borg-Warner Corporation until 1987.*]

6.    From approximately 1955 until 1984, BWC manufactured and sold Byron Jackson industrial pumps either through its Byron Jackson Pump Division or through one of its other divisions.

7.    On or about December 21, 1983, BWC spun off and incorporated its industrial products division under the name BORG-WARNER INDUSTRIAL PRODUCTS, Inc. (hereafter "INDUSTRIAL PRODUCTS"). As part of the spin off transaction, on or about January 1, 1984, BWC assigned, transferred, and conveyed to INDUSTRIAL PRODUCTS, and INDUSTRIAL PRODUCTS accepted and/or assumed various assets and liabilities. Among the assets that were transferred to INDUSTRIAL PRODUCTS was the Byron Jackson pump division, which manufactured and sold the group of products at issue in the underlying asbestos claims. Once INDUSTRIAL PRODUCTS was incorporated, it was wholly-owned and operated by BWC until 1987.

[7.    *In 1987, BWIP Acquisition Corporation purchased all the stock of Borg-Warner Corporation's wholly-owned subsidiary Borg-Warner Industrial Products, Inc. ("1987 Sale"). As a result of the 1987 Sale, BWIP Acquisition Corporation acquired substantially all of Borg-Warner Corporation's industrial product assets, including, inter alia, products manufactured and sold under the trade name Byron*

*Jackson. This dispute arises from breach and anticipatory breach of the seller's contractual indemnification obligations to the buyer, established pursuant to the 1987 Sale, for a series of asbestos-related personal injury claims alleging asbestos exposure from products manufactured prior to 1987 brought in various jurisdictions throughout the United States ("Underlying Asbestos Claims").*

*8.     Through a series of corporate successions, the named parties to the instant action have acquired their respective indemnification rights and obligations through the original seller ("Borg-Warner Corporation") and buyer ("BWIP Acquisition Corporation") to the 1987 Sale. Flowserve has succeeded to the rights and obligations of BWIP Acquisition Corporation, while Burns International `Services Corporation (and/or Borg-Warner Corporation now owned by Burns International Services Corporation) has succeeded to the rights and obligations of Borg-Warner Corporation.*]

8.     On or about February 27, 1987, BWIP ACQUISITION CORPORATION ("ACQUISITION") was formed and incorporated by a venture capital firm, Clayton & Dubilier Private Equity Fund II Limited Partnership for the purpose of purchasing the stock of INDUSTRIAL PRODUCTS.

9.     On or about March 12, 1987, BWIP HOLDING, INC. was formed and incorporated also by Clayton and Dubilier. Between March 12, 1987 and May 20, 1987, BWIP HOLDING, INC. purchased, and thereafter owned, all of the stock of ACQUISITION.

### The 1987 Stock Purchase Agreement

[*10.     On March 12, 1987, Borg-Warner Corporation sold all the stock in BWIC pursuant to a written stock purchase agreement ("1987 Agreement") to the BWIP*

*Acquisition Corporation, a company formed and incorporated by a venture capital firm, Clayton & Dubilier Private Equity Fund II Limited Partnership, solely to acquire the stock of BWIC.*]

10.     On or about March 12, 1987, BWC and ACQUISITION entered into a written stock purchase agreement ("SPA") whereby BWC sold all of its stock in INDUSTRIAL PRODUCTS to ACQUISITION.  A true and correct copy of the SPA is attached hereto as Exhibit A.

[*11.     Subsequent to the 1987 Agreement, on or about May 1, 1987, Borg-Warner Corporation and BWIP Acquisition Corporation entered into a separate Letter Agreement that augmented the intent of the 1987 Agreement.  In the Letter Agreement, Borg-Warner Corporation additionally indemnified BWIP Acquisition Corporation for all claims against the assets conveyed in the 1987 Agreement to the extent of the insurance available at that time – May 1, 1987.*]

11.     On or about May 1, 1987, BWC and ACQUISITION entered into a separate Letter Agreement in which BWC additionally agreed to indemnify ACQUISITION for all claims against the assets conveyed in the SPA to the extent such claims were covered by insurance carried by BWC.  A true and correct copy of the Letter Agreement is attached as Exhibit B.

12.     The closing of the SPA took place on or about May 20, 1987.

## The Environmental Indemnifications in the 1987 SPA

[*19.     On May 1, 1987, the parties to the 1987 Sale executed a 125 (one hundred twenty-five) page stock purchase agreement, the 1987 Agreement, intended to govern the transaction.*

20.     *The 1987 Agreement included a lengthy and detailed indemnification provision which stated that the buyer (hereafter, "Flowserve") would assume and indemnify the seller (hereafter, "Burns") for certain liabilities, while Burns would retain and indemnify Flowserve for certain other liabilities related to, inter alia, BWIC and the Byron Jackson pump division.  See 1987 Agreement, Ex. A at §9.04) (for ease of reference, all contractual references hereinafter are to the current holders of the rights and obligations of the original contracting parties to the 1987 Agreement).*]

13.     The 1987 SPA included a lengthy and detailed indemnification section which provided that the Buyer would indemnify the Seller for certain liabilities and the Seller would indemnify the Buyer for certain other liabilities related to the business of INDUSTRIAL PRODUCTS.  (See SPA Ex. A at §9.04.)

14.     Section 9.04(a)(ii)(E) of the SPA established a broad category of then-unknown product, environmental and disease-related claims, including asbestos-related claims, based on [*BWIC and Borg-Warner Corporation products manufactured prior to the Effective Date of the 1987 Agreement for which Burns agreed to retain complete liability and further agreed to indemnify Flowserve.*] products manufactured by BWC and INDUSTRIAL PRODUCTS prior to the Effective Date of the 1987 SPA, for which BWC agreed to indemnify the Buyer.  (See Ex. A at §9.04(a)(ii)(E)(1)(2)(3)).

15.     Section 9.04 (a)(ii)(E) states, in relevant part, that [*Burns*] BWC would indemnify and hold the Buyer harmless for, inter alia,

> (E)     any occurrence, conduct or condition existing on or prior to the Effective Date with respect to the businesses of Borg-Warner, BWIP, and its Subsidiaries and Divisions, that:
>
> > (1)     violated, is alleged to violate or gives rise to a claim under any law, rule or ordinance in effect as of the

Effective Date, or any judgment, order or decree in any case relating to conduct prior to the Effective Date with respect to handling or disposal of toxic or hazardous materials, air or water pollution or otherwise relating to protection of or damage to the environment.

(2)    is the basis for any common law tort, nuisance or similar claim by a party (other than the Buyer or an affiliate of Buyer) in connection with which Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions, is alleged to have released harmful, toxic or hazardous substances into the environment; or

(3)    is the basis for a claim that the claimant contracted a disease as a result of exposure prior to the Effective Date to any product of or raw material used by Borg-Warner, BWIP or any of the Subsidiaries or any business of the Divisions, except to the extent that such a claim is made after the Effective Date and arises out of third party use of a product after sale.

16.    In §4.23 of the 1987 SPA, [*Burns*] <u>BWC</u> made separate warranties to [*Flowserve*] <u>the Buyer</u>, apart from the indemnities in §9.04(a)(ii)(E), that [*BWIC*] <u>neither BWC nor any of its subsidiaries</u> had caused any "hazardous or toxic materials" to be "released into the environment" prior to the Agreement's Effective Date. Ex. A at §4.23.

17.    Each of the three subdivisions of §9.04(a)(ii)(E) of the 1987 SPA [*established*] <u>evidenced</u> the parties' intent that [*Burns would retain liability for*] <u>BWC would indemnify the Buyer</u> for environmental and/or disease-related liabilities, including such liabilities that were either:  1) related to the improper "handling or disposal of toxic substances" such as asbestos (see 1987 SPA  §9.04(a)(ii)(E)(1)); 2) related to the "release of toxic or hazardous substances" such as asbestos (see 1987 SPA §9.04(a)(ii)(E)(2)); or, 3) related to a claim that the "claimant contracted a disease from exposure to a product or material," [*such as asbestos*] <u>which is precisely the claim in the underlying asbestos</u>

litigation.  See 1987 SPA §9.04(a)(ii)(E)(3), Ex. A.

[25.      *The word "sale" at the end of subsection (E)(3) above refers to exposures that occurred prior to the "sale" of the pump lines to Flowserve as set forth in the 1987 Agreement.  To the extent that "sale" in (E)(3) is determined to be ambiguous or a contrary interpretation is offered by Burns, the parole evidence at the time of the 1987 Agreement, exchanged between the sophisticated parties involved, conclusively demonstrates that "sale" in (E)(3) was intended by the parties to be defined as after "sale" of the conveyed assets to the buyer.  All of the known Underlying Asbestos Claims allege exposures to materials used by Burns prior to the Effective Date and that were encountered by the asbestos claimants prior to the 1987 Sale.*]

18.      In the alternative and/or at a minimum, the language contained in §9.04(a)(ii)(E) is ambiguous in numerous respects, thereby requiring consideration of certain parole evidence to demonstrate the parties' intent.  Various words used in the Section are not defined, including "occurrence," "conduct," and "condition."  Similarly, there are certain phrases included within the Section that are neither defined nor otherwise explained.  These phrases include: "with respect to the business of Borg-Warner, BWIP, and its Subsidiaries and Divisions," "common law tort," "harmful, toxic or hazardous substances," "third party use of a product,"  and "after sale."  The parole evidence at the time of the 1987 SPA will demonstrate that the indemnification provided under §9.04(a)(ii)(E) was intended to be broad and to encompass any unknown, long-tail liability such as the asbestos-related claims arising out of claimed exposures to BWC or INDUSTRIAL PRODUCTS' products, component parts,  or raw materials predating the Effective Date of the SPA.

**The Letter Agreement**

19.    In relevant part, the May 1, 1987 Letter Agreement states that:

> The purpose of this letter is to document our mutual agreement that, notwithstanding anything to the contrary contained in the Agreement, neither BWIP nor any of its Subsidiaries shall be responsible for any Losses to the extent that such Losses are covered by insurance carried by Borg-Warner.

> Accordingly, as provided by Section 9.04(a) of the Agreement, Borg-Warner will indemnify the Buyer, BWIP, and each of their respective subsidiaries against *all* Losses to the extent that such Losses are covered by such insurance. (Emphasis added.)

20.    At the time [*that Burns entered*] BWC executed this Letter Agreement, and for many years prior thereto, [*Burns*] BWC had valid and collectible primary, excess and umbrella insurance policies that provided, inter alia, defense and indemnification coverage for all products that had been manufactured and sold by [*Burns*] BWC and/or its subsidiary prior to March 12, 1987, including Byron Jackson pumps. [*Letter Agreement attached hereto as Ex. B. By these representations and warranties, Burns agreed they were contractually obligated to provide Flowserve with indemnity protection to the limits of that coverage as it existed at the time of the Letter Agreement.*]

**Post-SPA Corporate History - FLOWSERVE**

21.    Following the closing, ACQUISITION merged into BORG-WARNER INDUSTRIAL PRODUCTS, INC. The surviving corporation retained the name BORG-WARNER INDUSTRIAL PRODUCTS, INC. As a result of the closing of the 1987 SPA, and the merger of ACQUISITION into BORG-WARNER INDUSTRIAL PRODUCTS, INC., BORG-WARNER INDUSTRIAL PRODUCTS, INC., became a wholly-owned subsidiary of BWIP HOLDING, INC.

22.     On or about February 6, 1988, BORG-WARNER INDUSTRIAL PRODUCTS, INC. changed its corporate name to BW/IP INTERNATIONAL, INC.

[*12.     Upon information and belief, in or around 1987, BWIP Acquisition Corporation changed its name to BW/IP, Inc. ("BW/IP") under which it continued to operate until July 22, 1997, when BW/IP merged with Durco International, Inc. to form a new entity named Flowserve Corporation.*]

23.     On or about May 11, 1994, BWIP HOLDING, INC. changed its name to BW/IP, INC.

24.     On or about April 13, 1998, BW/IP, INC. merged into FLOWSERVE CORPORATION.     The surviving corporation retained the name FLOWSERVE CORPORATION.

25.     On or about August 18, 1998, FLOWSERVE RED CORPORATION was formed and incorporated as a Delaware corporation, a direct, wholly-owned subsidiary of BW/IP INTERNATIONAL, INC., and an indirect, wholly-owned subsidiary of FLOWSERVE CORPORATION.

26.     On or about December 31, 1998, BW/IP INTERNATIONAL, INC. transferred, assigned and conveyed to FLOWSERVE RED CORPORATION its entire right, title and interest in and to the assets relating to the Byron Jackson pump business, and FLOWSERVE RED assumed and agreed to perform all covenants, obligations and liabilities connected with those assets.

27.     Effective December 31, 1998, BW/IP INTERNATIONAL, INC. then changed its name to FLOWSERVE INTERNATIONAL, INC.

28.     On or about September 21, 2000, FLOWSERVE RED CORPORATION

changed its name to FLOWSERVE PUMP CORPORATION.

29.    On November 15, 2000, FLOWSERVE CORPORATION resolved to contribute all of its issued and outstanding shares of the capital stock of FLOWSERVE INTERNATIONAL, INC. to the additional paid-in capital of FLOWSERVE PUMP CORPORATION.  This contribution took effect on December 31, 2000.

30.    On December 21, 2000, FLOWSERVE PUMP CORPORATION changed its name to FLOWSERVE U.S., INC.

31.    FLOWSERVE U.S., INC. remains a direct, wholly-owned subsidiary of FLOWSERVE CORPORATION.

[*13.    Pursuant to the July 22, 1997 merger, Flowserve stepped into the shoes of BW/IP (f/k/a BWIP Acquisition Corporation) and acquired all of BW/IP's contractual rights, including all indemnification rights owed by Borg-Warner Corporation to BW/IP under the 1987 Agreement and the Letter Agreement.*]

**Post-SPA Corporate History - BURNS**

32.    On or about June 30, 1987, the Board of Directors for BWC resolved to liquidate the corporation, and formulated a plan for the distribution of the corporation's assets and liabilities.

[*14.    Upon information and belief, in or around 1987, Borg-Warner Corporation incorporated a separate wholly owned subsidiary named Borg-Warner Security Corporation.*

*15.    Upon information and belief, in or around 1987 and subsequent to the 1987 Agreement, a private group of investors organized a leveraged buyout of the outstanding stock in the Borg-Warner Corporation.*

*16.     Upon information and belief, following the 1987 leveraged buyout, Borg-Warner Corporation operated as a private company until it again went public in or around 1993 under the name Borg-Warner Security Corporation.*]

33.     As part of that plan, BWC distributed to BORG-WARNER HOLDINGS CORPORATION, the proceeds from the 1987 sale of BORG-WARNER INDUSTRIAL PRODUCTS, INC., together with assets and liabilities not otherwise specified in BWC's liquidation plan.  This occurred on or about December 31, 1987.  In exchange for this distribution, BORG-WARNER HOLDINGS CORPORATION canceled its stock holdings in BWC.

34.     BORG-WARNER HOLDINGS CORPORATION had initially been incorporated on February 6, 1987 as AV HOLDINGS CORPORATION.    AV HOLDINGS CORPORATION had changed its name to BORG-WARNER HOLDINGS CORPORATION on or about May 22, 1987.

35.     Among the liabilities that BWC transferred, assigned, conveyed or distributed to BORG-WARNER HOLDINGS CORPORATION was BWC's liability to indemnify the Buyer under the 1987 SPA and the May 1, 1987 Letter Agreement, together with any other liability not otherwise specified in BWC's plan of liquidation.

36.     After making the distribution described in paragraph 33 above, BWC then merged into BW TRANSMISSIONS AND ENGINE COMPONENTS CORPORATION on or about December 31, 1987.

37.     On or about January 25, 1988, BORG-WARNER HOLDINGS CORPORATION changed its name to BORG-WARNER CORPORATION.

38.     On or about January 19, 1993, BORG-WARNER CORPORATION

changed its corporate name to BORG-WARNER SECURITY CORPORATION.

39.    On or about [*May 4*] July 6, 1999, BORG-WARNER SECURITY CORPORATION changed its corporate name to BURNS INTERNATIONAL SERVICES CORPORATION.

[*Upon information and belief, Burns International Services Corporation succeeded to and now possesses all of the contractual obligations owed by Borg-Warner Corporation to BWIP Acquisition Corporation (the predecessor to Flowserve) under the 1987 Agreement and/or is responsible for any residual rights and obligations of Borg-Warner Corporation.*

*As a result of the aforementioned series of corporate acquisitions, successions and name changes, Flowserve has stepped into the shoes of BWIP Acquisition Corporation (and later BW/IP) and now possesses all of the rights and obligations of the original buyer in the 1987 Sale.  Upon information and belief, as a result of the aforementioned corporate successions and name and form changes involving Borg-Warner Corporation, Burns International Services Corporation has stepped into the shoes of Borg-Warner Corporation and now possesses all the rights and obligations of the original seller in the 1987 Sale; and/or is responsible for any residual rights and obligations of Borg-Warner Corporation.  As Burns International Services Corporation has recently reserved its rights as to its status with Borg-Warner Corporation by letter to Flowserve, Borg-Warner Corporation, now owned by Burns International Services Corporation, has been joined to this lawsuit to ensure all necessary parties are before this Court.*]

40.    As a result of the distribution that occurred on December 31, 1987, as

stated in paragraphs 33 and 35 above, and the subsequent corporate name changes that have occurred between 1988 and the present, as set forth in paragraphs 37 through 39, BURNS has acquired and presently retains the liability of BWC to indemnify the Buyer under the 1987 SPA and the May 1, 1987 Letter Agreement.

### COUNT I – DECLARATORY RELIEF
### WITH REGARD TO §9.04 OF THE 1987 SPA

41.    As FLOWSERVE and its predecessor BW/IP began to be served with complaints in the underlying asbestos claims, it tendered these lawsuits to BURNS or its predecessor, pursuant to the terms and conditions of the 1987 SPA and Letter Agreement.

42.    BURNS initially accepted [*the indemnification obligation*] these tenders without objection, reservation or qualification.  Upon information and belief, BURNS then submitted these lawsuits to [*their*] the BWC primary liability insurance carriers, whose policies provided coverage for these claims.  BURNS and/or its counsel acted as the administrator who assigned the lawsuits to local defense counsel.

43.    For many years, those primary insurance carriers provided FLOWSERVE with complete defense and indemnification. [*however, several of Burns' primary insurers now contend that said defense and indemnification coverage was subject to a reservation of rights.*]

44.    In or about 2004, certain of the primary carriers notified FLOWSERVE and BURNS that the limits of their liability policies had been or were about to be exhausted.

45.    In 2004, certain of the primary and excess liability insurance carriers filed a lawsuit, entitled Continental Casualty Company, et al. v. Borg-Warner, Inc., et al., Case No. 04 CH 01708, in the Circuit Court of Cook County, Illinois, Chancery Division,

[["Coverage Lawsuit"] Burns' primary insurance carriers have sued, inter alia, Flowserve.    In the Coverage Lawsuit, Burns' primary insurers seek a] seeking a declaratory judgment as to the scope of coverage which their policies provide [to several past and present Burns entities, including Flowserve] with respect to the underlying asbestos claims.

[32.     In addition, since Burns' primary insurers contend that their limits of liability have been exhausted, upon information and belief, Burns is now tendering the Underlying Asbestos Claims to Burns' umbrella/excess insurers; however, various Burns umbrella/excess insurers also dispute the scope of coverage that their policies provide for the Burns entities, including Flowserve, for the Underlying Asbestos Claims.]

46.    Beginning in 2004, several of the carriers involved in the Cook County litigation notified FLOWSERVE and BURNS that the carriers would no longer be providing 100% funding to cover settlements and defense costs in connection with the underlying asbestos claims, but would instead be looking to BURNS, FLOWSERVE and others to participate in that funding.

47.    Despite the carriers' earlier notifications, the excess carriers continued to provide full funding, subject to a reservation of rights, through approximately March 15, 2006.

48.    In view of the position taken by the carriers, and to the extent any of the alleged asbestos-related liabilities are or may not be covered by insurance, a dispute has arisen between FLOWSERVE and BURNS as to which of them could or may be liable to indemnify the other for any non-covered claims or portions of claims.

[33.     As a result, in accordance with the terms of the 1987 Agreement and