RLZ:3/11/87:7001:8

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement"), dated March 12, 1987, by and between BWIP Acquisition Corporation, a Delaware corporation (the "Buyer"), and Borg-Warner Corporation, a Delaware corporation ("Borg-Warner").

### WITNESSETH:

WHEREAS, Borg-Warner is the owner of all of the issued and outstanding shares of capital stock of Borg-Warner Industrial Products, Inc., a Delaware corporation ("BWIP") (such shares being hereinafter referred to as the "BWIP Common Stock"); and

WHEREAS, except for certain foreign operations, the businesses of Borg-Warner's Byron Jackson Division, Mechanical Seal Division and Fluid Controls Division are conducted by BWIP or a subsidiary or subsidiaries of BWIP; and

WHEREAS, Borg-Warner proposes to reorganize BWIP by causing to be transferred to BWIP or to a subsidiary or subsidiaries of BWIP the assets of certain divisions of

- 1 -

RLZ:3/11/87:7001:8

other Borg-Warner subsidiaries and the capital stock of
the second-tier subsidiaries of Borg-Warner referred to in
Section 1.02(b) that pertain to or are engaged in the
foreign businesses of the Byron Jackson Division and the
Mechanical Seal Division of Borg-Warner, so that, after
giving effect to the proposed reorganization (the
"Reorganization"), all of the businesses of Borg-Warner's
Byron Jackson Division, its Mechanical Seal Division and
its Fluid Controls Division (collectively the "Divisions")
will be owned and conducted by BWIP and its subsidiaries
(BWIP and such subsidiaries, as so reorganized, being
hereinafter referred to as "BWIP and the Subsidiaries,"
which phrase also includes within its meaning the
businesses of the Divisions whether or not the
Reorganization has been consummated and B-W Holland (as
hereinafter defined), and such subsidiaries being
hereinafter referred to as the "Subsidiaries"); and

        WHEREAS, Borg-Warner desires to sell, and the
Buyer desires to purchase, the BWIP Common Stock after such
Reorganization for the consideration, and subject to the
terms and conditions, as stated in this Agreement;

        NOW, THEREFORE, in consideration of the
representations, warranties, covenants, agreements and

- 2 -

undertakings hereinafter made, the parties hereto have agreed as follows:

## ARTICLE I

### STRUCTURE OF BWIP

### AND CONDITION ON THE CLOSING DATE

1.01.   Financial Statements.

(a)   Borg-Warner has previously furnished to the Buyer a separate audited balance sheet as of December 31, 1986 for each of the Divisions, each accompanied by the opinion rendered by Peat, Marwick, Mitchell & Co. ("PMM") with respect thereto. Such audited balance sheets, copies of which are included in Exhibit A-1 hereto, are hereinafter collectively referred to as the "BWIP Balance Sheet." Borg-Warner will cause such audited balance sheets to be combined and, as combined, to be audited by PMM, and copies of such audited combined balance sheet and PMM's opinion with respect thereto will be furnished to the Buyer by Borg-Warner as quickly as is reasonably possible, but in any event within 15 days after the date of thi· Agreement.

(b)   Borg-Warner has previously furnished to the Buyer separate statements of income and separate statements

- 3 -

RL2:5/11/87:7001:8

of changes in financial position for the year ended December 31, 1986 for each of the Divisions, which have been subject to review by PMM, copies of which and the related review letters of PMM are included in Exhibit A-1 hereto. Borg-Warner will cause such statements of income and changes in financial position to be combined and, as combined, to be reviewed by PMM, and copies of such combined statements of income and changes in financial position and PMM's review letter with respect thereto wi 1 be furnished to the Buyer by Borg-Warner as quickly as is reasonably possible, but in any event within 15 days after the date of this Agreement. Collectively, the combined balance sheet and combined statements of income and changes in financial position of BWIP and the Subsidiaries are referred to herein as the "1986 BWIP Financial Statements."

(c)    Borg-Warner also has furnished to the Buyer the unaudited combined balance sheet and income statement of BWIP and the Subsidiaries as of December 31, 1985, and for the year then ended, copies of which are attached hereto as Exhibit A-2. Such 1985 financial statements, together with the 1986 BWIP Financial Statements, are hereinafter referred to as the "BWIP Historical Financial Statements."

- 4 -

RD2:3/11/87:7001:8

1.02.   <u>Transfers to BWIP</u>.   Borg-Warner covenants and agrees (unless notified by the Buyer within 5 business days after the execution of this Agreement not to effect those parts of the Reorganization provided for in Sections 1.02(a)(iv) and 1.02(b), in which event Borg-Warner will not effect those parts) that prior to the Closing Date (as defined in Section 3.01), in order to carry out the Reorganization:

(a)    It will have caused to be transferred to BWIP or to one or more wholly-owned subsidiaries of BWIP, the business, assets and properties, as a going concern, of certain divisions of wholly-owned subsidiaries of Borg-Warner as follows:

(i)    The Mechanical Seal Division and the Byron Jackson Division of Borg-Warner K.K., a Japanese corporation, will be incorporated in separate, newly-formed corporations and transferred to BWIP;

(ii)   The Byron Jackson Division of Borg-Warner (Canada) Ltd. an Ontario (Canada) corporation, will be incorporated in a newly-formed corporation and transferred to BWIP;

- 5 -

KL2:3/11/87:7001:8

(iii)     The   Mechanical   Seal   Division
(Singapore) of Borg-Warner International, Inc., a
Delaware corporation, will be incorporated in a
newly-formed corporation and transferred to BWIP;
and

(iv)   The Mechanical Seal Division and the
Byron Jackson Division of Borg-Warner B.V., a
Netherlands corporation, will be incorporated in a
newly-formed corporation and transferred to BWIP;

in each case subject to all liabilities of such divisions
included in or reflected in the BWIP Balance Sheet and all
other liabilities of such divisions incurred since December
31, 1986 up to the opening of business on the date of such
transfer, and subject to all contracts, commitments,
engagements, leases and other obligations, absolute or
contingent, of such divisions as of the opening of business
on the date of such transfer, which liabilities, contracts,
commitments, engagements, leases and other obligations
shall be assumed by the transferee; _provided_ that such
liabilities, contracts, commitments, engagements, leases
and other obligations incurred after December 31, 1986 have
been incurred in the ordinary course of business and in

- 6 -

RLZ:3/11/87:7001:8

...cordance with the terms of this Agreement and provided that such assumption shall not negate any obligations of Borg-Warner under Section 9.04 of this Agreement. The properties of such divisions to be transferred shall include (A) all assets and properties necessary to conduct the business of the divisions in the manner theretofore conducted other than those assets and properties associated with Borg-Warner corporate services provided to such divisions, (B) all tangible properties of such divisions, whether or not listed on the accounts of such divisions (including all items of fully depreciated plant, property and equipment) and (C) all intangible assets, including, but not limited to, contract rights, all rights with respect to employee-related matters (including contracts, understandings, plans, policies, procedures and arrangements), permits, franchises, goodwill, causes of action (whether fixed or contingent), claims, licenses, patents, copyrights, trademarks, trade names, service marks and any applications for any of the foregoing, trade secrets, technology, processes, drawings, royalties, privileges, memberships and all similar intangible personal property owned by such divisions or used exclusively by or in connection with the activities and business of such divisions, as well as a royalty-free, non-exclusive license in perpetuity to use all such intangible personal property

- 7 -

not owned by such divisions but used on a non-exclusive basis by or in connection with the activities and business of such divisions, together with all papers, documents, instruments, books, records, customer lists and all other writings and archives pertaining to and necessary for the efficient operation of such divisions. If any such transfer requires notification to, filing with or the consent, approval, authorization or permit of any governmental authority or work council or other employee-related body, Borg-Warner shall timely make such notification or filing and obtain such consent, approval, authorization or permit. If any such transfer requires the consent of another party or parties, Borg-Warner shall use its best efforts either to obtain such consent or, if such consent is unobtainable, shall secure for BWIP (in such a way that will not reasonably be expected to have a material adverse effect on BWIP and the Subsidiaries) the benefits of that which was attempted to be transferred to BWIP, provided that BWIP shall fulfill its obligations thereunder as if the transfer had been accomplished.

(b)    It will have caused to be transferred to BWIP or a wholly owned Subsidiary of BWIP, or, at Buyer's written request made to Borg-Warner within five business days after execution of this Agreement, will transfer on

- 8 -

RLZ:3/11/87:7001:8

the Closing Date to Buyer or an entity under common control with Buyer (an "Affiliate") or to B-W Holland, as directed in such request, (i) all of the issued and outstanding capital stock of Borg-Warner Industrial Products S.r.l., an Italian corporation, (ii) all of the issued and outstanding capital stock of Borg-Warner Industrial Products, SARL, a French corporation, (iii) all of the issued and outstanding capital stock of Borg-Warner Industrial Products S.A., a Spanish corporation, (iv) all of the issued and outstanding capital stock of Borg-Warner Industrial Products, GmbH, a corporation of West Germany, and (v) all of the issued and outstanding capital stock of Borg-Warner Industrial Products Limited, an English corporation, in each case constituting all of the capital stock of such corporations owned, directly or indirectly, by Borg-Warner.

1.03.  _Change of Name_.  The Buyer covenants and agrees except as otherwise provided in Section 1.04 in connection with the business of Borg-Warner's Mechanical Seal Division that within six months after the Closing Date (as defined in Section 3.01), the Buyer will have caused BWIP and the Subsidiaries to have changed their respective names to names that do not include "Borg-Warner," "BW," or any variation or combination of such names, such changes to be effected in each jurisdiction in which such corporations are qualified to do business.

- 9 -

RLZ:3/11/87:7001:8

1.04.  <u>Names and Trademarks.</u>  Borg-Warner cove-
nants and agrees that after the Closing Date, the Buyer
shall have a non-exclusive royalty-free license granted by
Borg-Warner to use the trademarks and trade names set forth
in Schedule 1.04 and the name "BW" or any variation or
combination of any such marks or names for a period of six
months after the Closing Date as used in connection with
the business of BWIP and the Subsidiaries as conducted on
the Closing Date, <u>provided</u> that Buyer may use the name "BW
Mechanical Seal" and the name "BWMS" in connection with the
business of Borg-Warner's Mechanical Seal Division
indefinitely.  After such six-month period, the Buyer may
use such trademarks and trade names only in connection with
products manufactured by or for any one of BWIP and the
Subsidiaries prior to the Closing Date and, after such
six-month period, BWIP and the Subsidiaries may use, in
conjunction with their respective corporate names, the
phrase "formerly Borg-Warner Industrial Products, Inc." or
an appropriate variation for an additional six-month
period.  The above license will be subject to the Buyer's
maintenance of the quality standards of Borg-Warner, and
shall be documented in a license agreement (the "License
Agreement"), in form and substance substantially including
the terms set forth in Section 1.04.

- 10 -

RLZ:3/11/87:7001:8

1.05.   Reorganization, Income, Sales and Transfer Taxes.  Borg-Warner covenants and agrees that on the Closing Date all taxes, assessments and other governmental charges, including, but not limited to, income, sales, transfer or other similar taxes, arising out of or in connection with the reorganizations and transfers described in Section 1.02 shall have been fully paid or provided for by Borg-Warner (and not with any assets of BWIP or the Subsidiaries) and that any such taxes that have not been fully paid or provided for by Borg-Warner prior to the Closing Date will be paid in full by Borg-Warner when due. (Transfer costs relative to patents and similar rights are covered in Section 9.01.)

## ARTICLE II

### SALE OF STOCK AND TERMS OF PAYMENT

2.01.   The Sale.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, at the Closing Borg-Warner will sell, assign, transfer and deliver to the Buyer, and the Buyer will purchase and acquire from Borg-Warner, the BWIP Common Stock and, if the Buyer delivers the request to Borg-Warner not to effect certain aspects of the Reorganization as

- 11 -

RL2:3/11/87:7001:8

contemplated by Section 1.02, such request shall specify Buyer's election to proceed as contemplated by either clause (i) or (ii) below, and

      (i)    the Buyer or one or more of its Affiliates will purchase and acquire from Borg-Warner or one of its subsidiaries the assets referred to in clause (iv) of Section 1.02(a) it would otherwise have been transferred to a newly-formed corporation in the Reorganization (the "Dutch Assets") and the stock referred to in Section 1.02(b) (the "European Stock"), and will assume the liabilities (but only those reflected in the BWIP Balance Sheet or incurred in the ordinary course of business since December 31, 1986 and in accordance with the terms of this Agreement), contracts, commitments, engagements, leases and other obligations of the Mechanical Seal Division and the Byron Jackson Division of Borg-Warner B.V. (the "Dutch Liabilities"), provided that such assumption shall not negate the obligations of Borg-Warner under Section 9.04, or

      (ii)   Borg-Warner shall cause the Dutch Assets (subject to the Dutch Liabilities) to be

- 12 -

RLZ:3/11/87:7001:8

transferred to a newly-formed Netherlands subsidiary of Borg-Warner B.V. ("B-W Holland") and shall cause to be transferred to B-W Holland all of the European Stock, and Buyer or one or more of its Affiliates shall purchase and acquire from Borg-Warner B.V. all of the issued and outstanding shares of stock of B-W Holland.

Borg-Warner agrees to use its best efforts to accomodate Buyer's requests respecting the structure of the transactions contemplated by clause (i) or (ii) above, as the case may be.

If Buyer or its Affiliate so purchases the Dutch Assets or the stock of B-W Holland pursuant to clause (i) or clause (ii) above, Borg-Warner and Borg-Warner B.V. will execute and deliver an asset purchase agreement or stock purchase agreement, as the case may be (the "Dutch Agreement") having only such terms as are deemed necessary by Dutch Counsel (whose fees and disbursements will be equally shared by Buyer and Borg-Warner) selected jointly by Dutch Counsel for Borg-Warner and the Buyer to comply with Dutch law in carrying out this Agreement with respect to the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, which shall not repeat or

RLZ:3/11/87:7001:8

expand the representations and warranties of Borg-Warner herein or its obligations hereunder or under the Collateral Agreements.

2.02.   Consideration.   Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale, assignment, transfer and delivery of the BWIP Common Stock and the Dutch Assets and European Stock or the stock of B-W Holland if Buyer or its Affiliate purchases the same, at the Closing the Buyer will pay or cause to be paid to Borg-Warner (i) the amount of $214,361,000 (the "Principal Amount") plus (ii) simple interest on the Principal Amount at the rate of 7.5% per annum from January 1, 1987 and including April 10, 1987 (the "Interest") (such Principal Amount plus the Interest being hereinafter referred to as the "Cash Amount"), plus (iii) $10,000,000 in aggregate principal amount of 8.5% Junior Subordinated Notes of the Buyer's parent (the "Subordinated Note"), having substantially the terms set forth in Exhibit D attached hereto (the Cash Amount and such Subordinated Note hereinafter collectively referred to as the "Purchase Price"). In the event that the Closing shall not have occurred by April 10, 1987, there shall be added to the Purchase Price, payable in cash at Closing, the following

- 14 -

RLZ:3/11/87:7001:8

additional simple interest charges, computed on the Cash Amount from April 11, 1987 to the Closing Date, as follows: (i) if the Closing does not occur on or before April 10, 1987 due to the Buyer's failure to satisfy the conditions contained in Sections 7.02(a)-(g), at the rate of 7.5% per annum, and (ii) if the Closing does not occur on or before April 10, 1987 due to the failure to satisfy the conditions contained in the first sentence of 7.01(k) and in Section 7.02(h), at the rate of 3.75% per annum. No such additional interest charges shall be added to the Cash Amount if the Closing does not occur on or before April 10, 1987 due to Borg-Warner's failure to satisfy the conditions contained in Sections 7.01(a)-(j). Notwithstanding the foregoing, in the event that the Buyer or its Affiliate purchases the Dutch Assets and the European Stock or the stock of B-W Holland, a portion of the Cash Amount to be determined at or prior to the Closing by the Buyer, and not to exceed $50,000,000 or be less than $40,000,000 shall be paid to Borg-Warner B.V. in payment for the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, in lieu of payment of such amounts to Borg-Warner.

2.03. <u>Cash Adjustments During Interim Period.</u> During the period from January 1, 1987 until the Closing

- 15 -

RLZ:3/11/87:7001:8

Date (the "Interim Period") Borg-Warner will cause BWIP to operate its business as provided in Section 6.02 of this Agreement.     Cash     receipts,     cash     disbursements     and intercompany charges or credits (other than those related to Taxes) by Borg-Warner or its subsidiaries for the BWIP business during the Interim Period shall be recorded by Borg-Warner or its subsidiaries in special advance accounts (the "Advance Accounts"), the balances of which as of the Closing Date shall be settled in cash between Borg-Warner and the Buyer within 30 days following the Closing Date as set forth below:

        (a)     Borg-Warner shall deliver to the Buyer not later than 20 days following the Closing Date a statement reflecting the balances of the Advance Accounts as of the Closing Date due to BWIP and Borg-Warner (the "Adjustment Statement").     The Advance Accounts shall be determined in a manner consistent with the prior practice of Borg-Warner as reflected in the audit workpapers from which the 1986 BWIP Financial Statements were prepared, provided that the Advance Accounts shall not reflect charges for corporate allocations or corporate services provided by Borg-Warner except for ordinary course business charges as reflected in the 1986 BWIP Financial Statements.

- 16 -

RLZ:3/11/87:7001:8

(b)    Borg-Warner shall pay or cause its subsidiaries to pay not later than 10 days from the date of the delivery of the Adjustment Statement, in such manner as the Buyer shall direct, the net balance of the Advance Accounts shown by the Adjustment Statement to be due BWIP; or the Buyer shall pay or cause BWIP to pay not later than 10 days from the date of the delivery of the Adjustment Statement, in such manner as Borg-Warner shall direct, the net balance of the Advance Accounts shown by the Adjustment Statement to be due Borg-Warner or its subsidiaries, as the case may be.

(c)    The Adjustment Statement will be subject to audit within 45 days from the date of the delivery of the Adjustment Statement at the option of the Buyer and at its expense by an audit firm acceptable to both the Buyer and Borg-Warner.  Cash settlement of billing errors identified by the audit shall be promptly made between Borg-Warner and the Buyer.

(d)    Intercompany charges incurred prior to the Closing which are owed to BWIP or to Borg-Warner and which cannot be calculated in time for inclusion in the Adjustment Statement shall be invoiced to Borg-Warner or to BWIP as the case may be, directly by Borg-Warner or BWIP,

RLZ:3/11/87:7001:8

as the case may be, and the amounts so invoiced shall be paid within 30 days therefrom by the party invoiced. No invoices may be submitted more than 120 days following the Closing, except for any charges, payments or reconciliations provided for in the Employee Assets Agreement provided for in Section 6.07 and except that the invoicing and payment of amounts relating to Taxes shall be handled in accordance with and governed by the Tax Agreement provided for in Section 6.06. Such charges shall be subject to audit as contemplated by Section 2.03(c).

## ARTICLE III

## THE CLOSING

3.01. _Time and Place of Closing_. Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the sale and purchase contemplated by this Agreement (the "Closing") will take place at the offices of Debevoise & Plimpton in New York, New York, at 11:00 A.M. (local time) on the later of (i) April 10, 1987, (ii) the fifth business day after expiration or termination of all waiting periods prescribed under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"), and (iii) the date on which the conditions set forth in Sections 7.01 and 7.02

- 18 -

RLZ:3/11/87:7001:8

shall be satisfied or duly waived, or at such other place
and time as the parties may agree.  The date and time at
which the Closing actually occurs is herein referred to as
the "Closing Date."

3.02.  <u>Deliveries by Borg-Warner</u>.  At the Closing,
Borg-Warner will deliver the following to the Buyer:

(i)    Stock certificates representing all of the
shares of the BWIP Common Stock, duly endorsed in blank or
accompanied by duly executed instruments of transfer, and
any other documents that are necessary to transfer to the
Buyer good and marketable title to all shares of BWIP
Common Stock;

(ii)   The legal opinion and the certificate
contemplated by Section 7.01;

(iii)  All other documents, instruments and
writings required to be delivered by Borg-Warner at the
Closing pursuant to this Agreement;

(iv)   In the event that the Buyer elects to buy
or have one of its Affiliates buy the Dutch Assets and
European Stock or the stock of BW-Holland, bills of sale,

- 19 -

RLZ:3/11/87:7001:8

deeds and other conveyancing documents customarily provided in transactions involving the transfer of foreign assets and stock certificates representing all of the shares of the European Stock or the stock of B-W Holland, as the case may be, duly endorsed in blank or accompanied by duly executed instruments of transfer, and any other documents that are necessary to transfer to such Affiliate good and marketable title to all of the Dutch Assets and the European Stock or to the stock of B-W Holland, as the case may be;

(v)    The original stock books, stock ledgers, minute books and corporate seals of BWIP and the Subsidiaries; and

(vi)    Originals of all leases, contracts, commitments, surveys, licenses, title policies or any other documents held by Borg-Warner or any of its Subsidiaries relating to absolute or contingent interests or rights with respect to the Properties (as defined in Section 4.09).

3.03.    Deliveries by the Buyer.    At the Closing, the Buyer will deliver the following to Borg-Warner or, as contemplated by Section 2.02, to Borg-Warner B.V.:

- 20 -

RLZ:3/11/87:7001:8

(i)     The Cash Amount (separated into the amount payable to Borg-Warner and into the amount payable to Borg-Warner B.V.) by (A) interbank transfer of immediately available funds, or (B) such other means as may be agreed upon by Borg-Warner and the Buyer;

(ii)    The Subordinated Note, registered in the name of Borg-Warner;

(iii)   The legal opinion and the certificate contemplated by Section 7.02;

(iv)    In the event that the Buyer elects to buy or have one of its Affiliates buy the Dutch Assets and the European Stock, duly executed agreements and instruments and any other documents needed to bind the Buyer to an assumption of the Dutch Liabilities; and

(v)     All other documents, instruments and writings required to be delivered by the Buyer at the Closing pursuant to this Agreement.

3.04.   <u>Effective Date</u>.  When the Closing occurs, it is the intent of the parties hereto that the purchase and sale hereunder shall be effective as of the close of

RLZ:3/11/87:7001:8

business of BWIP on December 31, 1986 (the "Effective Date") and that the operations of BWIP and the Subsidiaries after the Effective Date shall be for the account of the Buyer.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BORG-WARNER

Borg-Warner represents and warrants to the Buyer as follows:

4.01.    Organization; Qualification.

(a)    Borg-Warner is a corporation duly organized, validly existing and in good standing under the laws of Delaware and has all corporate power to own and dispose of the shares of the BWIP Common Stock, and Borg-Warner B.V. is a corporation duly organized, validly existing and in good standing under the laws of the Netherlands and has all corporate power to own and dispose of the Dutch Assets and the European Stock.

(b)    On the Closing Date each of BWIP and the Subsidiaries will be a corporation duly organized, validly existing and in good standing under the laws of the

- 22 -

RLZ:3/11/87:7001·8

jurisdiction of its incorporation, and each will have all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. Each of BWIP and the Subsidiaries will on the Closing Date be duly qualified or licensed to do business as a foreign corporation and in good standing in each jurisdiction in which the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification necessary, except in each case in those jurisdictions where the failure to be so duly qualified or licensed and in good standing would not have a material adverse effect on the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole. Schedule 4.01 sets forth, as of the date of this Agreement, each jurisdiction in which BWIP is qualified to do business as a foreign corporation. Borg-Warner has heretofore delivered to the Buyer a complete and correct copy of the Certificate of Incorporation and By-laws of BWIP as currently in effect.

4.02. <u>Capitalization of BWIP</u>. The authorized capital stock of BWIP consists of 1,000 shares of Common Stock ($1.00 par value per share), all of which are issued and outstanding and owned by Borg-Warner. All outstanding shares of BWIP Common Stock are validly issued, fully paid

- 23 -

RLZ:3/11/87:7001:8

and nonassessable.  Other than this Agreement, there is no subscription, option, warrant, call, right or other agreement or commitment relating to the issuance, sale, delivery or transfer by BWIP or Borg-Warner (including any right of conversion or exchange under any outstanding security or other instrument) of the BWIP Common Stock or other capital stock of BWIP.  There are no outstanding contractual obligations of BWIP to repurchase, redeem or otherwise acquire any outstanding shares of its capital stock.

4.03.  Title to Stock.  Borg-Warner owns the BWIP Common Stock free and clear of all pledges, security interests, liens, charges, encumbrances, equities, claims, options or limitations affecting its ability to vote such shares or to transfer such shares to the Buyer.  At the Closing Borg-Warner will transfer to the Buyer good title to the shares of the BWIP Common Stock, free and clear of all pledges, security interests, liens, charges, encumbrances, equities, claims, options or limitations of whatever nature.

4.04.  Subsidiaries; Investments.

(a)  Schedule 4.04 sets forth, as of December 31, 1986:  (i)  the name of each Subsidiary, the

- 24 -

RLZ:3/11/87:7001:8

jurisdiction of its incorporation and each jurisdiction in
which it is qualified to do business as a foreign
corporation; and (ii) the name of each corporation,
partnership, joint venture or other person (other than the
Subsidiaries) (the "Investments") in which BWIP directly or
indirectly has, or pursuant to any agreement or agreements
has or will have the right to acquire by any means, an
equity interest or investment exceeding 5% of the equity
capital thereof and which corporation, partnership, joint
venture or other person has a net book value in excess of
$50,000. In the case of each corporation specified
pursuant to clauses (i) (to the extent that such Subsidiary
has a net book value of $50,000 or more) and (ii) above,
such Schedule 4.04 also sets forth the following:

(A) if such corporation is not a directly
or indirectly wholly-owned Subsidiary, the
percentage of each class of capital stock owned
directly or indirectly by BWIP and the names and
approximate percentage ownerships of any other
record owners of the shares of capital stock of
such corporation;

(B) a list of the agreements or other
instruments (excluding laws, rules or regulations)

- 25 -

RLZ:3/11/87:7001:8

containing any limitations on BWIP's ability to vote or alienate the securities of such corporation held by BWIP;

(C) a list of the agreements or other instruments containing any outstanding options or other rights to acquire securities of such corporation to which Borg-Warner, BWIP or any of the Subsidiaries is a party or as to which Borg-Warner, BWIP or any of the Subsidiaries has knowledge; and

(D) a list of the agreements and other instruments containing any other charge or impediment which would materially limit or impair the ownership by BWIP of the securities of such corporation or the ability of BWIP effectively to exercise the full rights of ownership of such securities.

In the case of each unincorporated person specified pursuant to clause (ii) above, Schedule 4.04 also sets forth the equivalent of the information provided pursuant to the preceding sentence with respect to corporations.

- 26 -

RLZ:3/11/87:7001:8

(b)    Except as set forth in Schedule 4.04, all outstanding shares of capital stock of each Subsidiary (except for directors' qualifying shares, if any) are or will be as of the Closing owned by BWIP or a Subsidiary, in each case free and clear of all pledges, security interests, liens, charges, encumbrances, equities, claims, options or limitations of whatever nature. All such shares are or will be as of the Closing validly issued, fully paid and nonassessable. There are no subscriptions, options warrants, calls, rights or other agreements or commitments relating to the issuance, sale, delivery or transfer by any Subsidiary with a net book value in excess of $50,000 (including any right of conversion or exchange under any outstanding security or other instrument) of the shares of capital stock of such Subsidiary.

(c)    Prior to the Closing, (i) Schedule 4.04 will be updated so that it is complete and correct as of the Closing, and (ii) Borg-Warner will deliver to the Buyer a complete and correct copy of the Certificate of Incorporation and By-Laws of each Subsidiary. Such updated Schedule 4.04 shall be subject to the Buyer's verification that the updating involves only the changes needed to accurately reflect the new Subsidiaries resulting from the Reorganization or the formation of B-W Holland.

- 27 -

RLZ:3/11/87:7001:8

4.05.  <u>Authority  Relative  to  this  Agreement</u>.
Borg-Warner  has  full  corporate  power  and  authority  to
execute  and  deliver  this  Agreement,  the  Tax  Agreement
referred  to  in  Section  6.06  (the  "Tax  Agreement")  and  the
Employee  Assets  Agreement  referred  to  in  Section  6.07
(together  with  the  Tax  Agreement,  the  License  Agreement  and
the  Dutch  Agreement,  the  "Collateral  Agreements")  and  to
consummate  the  transactions  contemplated  hereby  and
thereby.  No  corporate  proceedings  on  the  part  of
Borg-Warner,  other  than  authorization  by  the  Board  of
Directors  of  Borg-Warner,  are  necessary  to  authorize  this
Agreement  and  the  Collateral  Agreements  or  to  consummate
the  transactions  contemplated  hereby  and  thereby.  Subject
to  such  authorization  by  the  Board  of  Directors  of
Borg-Warner,  this  Agreement  is  duly  and  validly  executed
and  delivered  by  Borg-Warner  and  constitutes  the  valid  and
binding  agreement  of  Borg-Warner,  enforceable  against  it  in
accordance  with  its  terms.  On  the  Closing  Date,  this
Agreement  and  the  Collateral  Agreements  will  have  been  duly
and  validly  executed  and  delivered  by  Borg-Warner  and  will
constitute  the  valid  and  binding  agreements  of  Borg-Warner,
enforceable  against  Borg-Warner  in  accordance  with  their
respective  terms.

- 28 -

RLZ:3/11/87:7001:8

4.06. <u>Consents and Approvals; No Violation</u>. Except as set forth in Schedule 4.06, neither the Reorganization nor the execution and delivery of this Agreement and the Collateral Agreements by Borg-Warner, nor the sale by Borg-Warner of the BWIP Common Stock (and, if applicable, the sale by Borg-Warner and its subsidiaries of the Dutch Assets and the European Stock or the stock of B-W Holland) pursuant to this Agreement, nor the performance of the Collateral Agreements, nor the consummation of the transactions contemplated hereby and thereby will (i) conflict with or result in any breach of any provision of the respective Certificates of Incorporation or By-laws (or other similar governing documents) of Borg-Warner, BWIP or any of their respective subsidiaries or affiliates; (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any United States or foreign governmental or regulatory authority or other third party, except in connection with the HSR Act, except with respect to employee-related matters (if any) in the countries listed on Schedule 1.4EA to the Employee Assets Agreement provided for in Section 6.07, except for foreign government approvals, and third-party consents which must be obtained for the Reorganization or the Closing and except for those requirements which become applicable solely as a result of the specific regulatory status of the

- 29 -

RLZ:3/11/87:7001:8

Buyer or its Affiliates; (iii) result in a default (or give
rise to any right of termination, cancellation or
acceleration) under any of the terms, conditions or
provisions of any note, bond, mortgage, indenture, license,
agreement or other instrument of obligation to which
Borg-Warner, BWIP or any of their respective subsidiaries
is a party or by which Borg-Warner, BWIP or any of their
respective subsidiaries or any of their respective assets
may be bound, except for such defaults (or rights of
termination, cancellation or acceleration) as to which
requisite waivers or consents have been obtained and shall
be provided to the Buyer prior to the Closing or which,
individually and in the aggregate, would not have a
material adverse effect on the business, operations or
financial condition of BWIP and the Subsidiaries taken as a
whole; or (iv) assuming compliance with the HSR Act and
other requirements listed in this Section 4.06 and in
Schedule 4.06 and receipt of the requisite foreign
government approvals for the Reorganization and the
Closing, result in violations of (A) any statute, rule or
regulation or (B) any order, writ, injunction or decree
applicable to Borg-Warner, BWIP or any of their respective
subsidiaries or any of their respective assets, except for
violations of orders, writs, injunctions or decrees which,
individually or in the aggregate with all other such

RLZ:3/11/87:7001:8

violations, would not have a material adverse effect on the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole.  Within 5 business days from the date of this Agreement, Borg-Warner will deliver to the Buyer a true and complete list of the consents, approvals, authorizations and permits of, and filings and notifica-tions to, any United States or foreign governmental or regulatory authority or other third-party required to be obtained by Borg-Warner in connection with the consummation of the transactions contemplated by this Agreement and the Collateral Agreements, and the approvals, authorizations and permits held by Borg-Warner or any of its subsidiaries, including BWIP and the Subsidiaries, for the operation by BWIP and the Subsidiaries of the businesses of the Divisions, as presently conducted, including, without limitation, all facility and personnel security clearances and all approvals and consents from the appropriate United States and foreign government agencies or departments required for the performance by BWIP and the Subsidiaries of all existing contracts or subcontracts held by BWIP or any Subsidiary or any of the businesses of the Divisions for work to be done for the United States or any foreign government or any department or agency thereof.

- 31 -

RLZ:3/11/87:7001:8

4.07.  <u>Financial  Statement  Matters;  Undisclosed</u>
<u>Liabilities.</u>

(a)  The  1986  BWIP  Financial  Statements
(including  the  footnotes  thereto)  referred  to  in  Section
1.01  will  present  fairly  the  combined  financial  position
and  results  of  operations  of  BWIP  and  the  Subsidiaries  as
of  December  31,  1986  and  for  the  year  then  ended,  all  in
accordance  with  generally  accepted  accounting  principles
applied  on  a  consistent  basis,  except  as  noted  in  Exhibit
A-1.   The  BWIP  Historical  Financial  Statements  referred  to
in  Section  1.01  present  fairly  or  will  present  fairly  when
delivered  to  the  Buyer,  as  the  case  may  be,  the  combined
financial  position  of  BWIP  and  the  Subsidiaries  as  of
December  31,  1985  and  1986  and  the  results  of  operations
for  the  years  then  ended  in  accordance  with  the  accounting
principles  used  in  the  preparation  of  the  1986  BWIP
Financial  Statements,  after  eliminating  all  intercompany
and  interdivision  accounts  and  transactions,  respectively,
and  have  been  or  will  have  been  prepared  on  a  consistent
basis.   (Corporate  allocation  charges  of  $4,049,000  and
$6,244,000  for  the  years  ended  December  31,  1985  and
December  31,  1986,  respectively,  have  not  been,  or  will  not
be,  as  the  case  may  be,  charged  in  the  BWIP  Historical
Financial  Statements.)

- 32 -

RLZ:3/11/87:7001:8

(b)      Except as set forth in Schedule 4.07 or in the Employee Assets Agreement provided for in Section 6.07 (including the schedules thereto) or arising under the agreements, leases and other documents listed in any other schedule to this Agreement, neither BWIP nor any Subsidiary has any liability or obligation, secured or unsecured (whether absolute, accrued, contingent or otherwise, and whether due or to become due), which is not accrued or reserved against in the BWIP Balance Sheet or disclosed in the notes thereto except (i) those which were incurred in the ordinary course of business and in accordance with the terms of this Agreement after the date of the BWIP Balance Sheet and (ii) those which individually and in the aggregate are not material to BWIP and the Subsidiaries taken as a whole.

4.08. <u>Absence of Certain Changes or Events</u>. Except as set forth in Schedule 4.08, the Tax Agreement provided for in Section 6.06, or the Employee Assets Agreement provided for in Section 6.07, and except as otherwise contemplated by this Agreement, since December 31, 1986 (and, in the case of clauses (iv) and (x), since December 31, 1985) there has not occurred or arisen:

- 33 -

RLZ:3/11/87:7001:8

(i)    any material adverse change in the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole;

(ii)    except as provided for in Section 2.03 hereof, any declaration, setting aside or payment of any dividend or other distribution (whether in cash, stock, property or any combination thereof) in respect to BWIP's or any Subsidiary's capital stock, or any redemption or other acquisition by BWIP or any Subsidiary of any shares of BWIP's or any Subsidiary's capital stock, or any payment by BWIP or any Subsidiary to Borg-Warner;

(iii)    any damage, destruction or casualty loss, whether covered by insurance or not, materially and adversely affecting the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole;

(iv) any new arrangement with any of BWIP's or any Subsidiary's directors, officers or key employees, except in the ordinary course of business in accordance with its customary practices (which shall include normal periodic performance reviews and related compensation and benefit increases);

RLZ:3/11/87:7001:8

(v) any entry into any agreement, commitment or transaction (including, without limitation, any borrowing, capital expenditure or capital financing) by BWIP or any Subsidiary, which is material to BWIP and the Subsidiaries taken as a whole;

(vi) any material change by BWIP or any Subsidiary in accounting methods, principles or practices except as required by generally accepted accounting principles;

(vii) any acquisition or disposition of any material assets of BWIP or any Subsidiary except the sale of products in the ordinary course of business and except for the sale of the Charlotte, North Carolina plant of the Byron Jackson Division of BWIP;

(viii) any forgiveness, cancellation or waiver of any material debts owing to BWIP or any Subsidiary or material claims or rights held by BWIP or any Subsidiary;

(ix) any grant by BWIP or any Subsidiary of any material right or license;

(x) any change in relations with or loss of customers or employees that might reasonably be expected to

- 35 -

RLZ:3/11/87:7001:8

have a material adverse effect on the business, operations
or financial condition of BWIP and the Subsidiaries taken
as a whole; or

(xi)    any creation, incurrence, assumption or
guarantee by BWIP or any Subsidiary of indebtedness for
money borrowed other than from Borg-Warner not reflected on
an Exhibit or Schedule hereto.

4.09.    <u>Title and Related Matters</u>.  On the Closing
Date, Buyer will own or have a valid leasehold interest in
or license to use, either directly or through its
Subsidiaries (including BWIP), all of the assets and
properties, tangible and intangible, used in the businesses
of the Divisions or necessary to conduct the businesses of
the Divisions in the manner theretofore conducted, other
than those assets and properties associated with
Borg-Warner corporate services provided to such Divisions
and the Charlotte, North Carolina plant of the Byron
Jackson Division of BWIP.  Except as set forth in Schedules
4.09 and 9.04, Borg-Warner and its subsidiaries have, and
BW_P and the Subsidiaries will have at the Closing, good
ar¿ marketable title to, or a valid leasehold interest in,
or a valid license to use, all of the properties and
assets, tangible or intangible (other than real property),

- 36 -

RLZ:3/11/87:7001:8

used in or material to the business, operations or
financial condition of BWIP and the Subsidiaries taken as a
whole, including, without limitation, good and marketable
title to the properties and assets reflected in the BWIP
Balance Sheet (other than those which have been disposed of
since the date thereof in the ordinary course of business),
in each case free and clear of all security interests,
mortgages, deeds of trust, claims, liens, pledges, charges
or other encumbrances or adverse claims of any nature.
Except as set forth in Exhibit A-1, Exhibit A-2 or
Schedule 4.09 and except for Permitted Exceptions (as
defined in Section 10.09) Borg-Warner or its subsidiaries
have, and BWIP and the Subsidiaries will have at Closing,
good and marketable title to, or a valid leasehold interest
in, all of the real property (collectively the
"Properties") used in or material to the business,
operations or financial condition of BWIP and the
Subsidiaries taken as a whole, including, without
limitation, good and marketable title to the Properties
reflected in the BWIP Balance Sheet (other than those which
have been disposed of since the date thereof in the
ordinary course of business and in accordance with the
terms of this Agreement), in each case free and clear of
all security interests, mortgages, deeds of trust, claims,
leases, pledges, charges or other encumbrances or adverse

- 37 -

RLZ:3/11/87:7001:8

claims of any nature. Schedule 4.09 sets forth a complete and correct list of all of the Properties owned by Borg-Warner or any of its affiliates and to be owned at the Closing by BWIP or any Subsidiary. Borg-Warner has delivered to the Buyer copies of any existing title insurance policies, commitments for title insurance, surveys, title opinions and abstracts relating to such real property. There are no existing material defaults by Borg-Warner or any of its affiliates under any mortgage, easement, right of way, covenant, restriction or agreement affecting any of the Properties.

4.10.    Patents, Trademarks, Trade Names, Etc.

Schedule 4.10 lists, as of December 31, 1986, (i) all patents, trademarks, trade names and registered copyrights owned by BWIP or any Subsidiary, and all licenses and other agreements relating thereto, and (ii) all agreements relating to third party technology, know-how and processes which BWIP or any Subsidiary is licensed or authorized to use. Subject to the licenses and other restrictions listed in Schedule 4.10, BWIP and each Subsidiary hold free from contractual restrictions and any other restrictions, except those imposed by law or governmental regulation and those which are not material to the business, operation or financial condition of BWIP and the Subsidiaries taken as a

- 38 -

RLZ:3/11/87:7001:8

whole, all such scheduled patents, trademarks, trade names,
copyrights, technology, know-how and processes and such
Schedule 4.10 constitutes a true and complete list of the
patents, trademarks, trade names, and licenses used in or
necessary to operate the businesses of the Divisions in the
manner in which they have heretofore been operated. As of
the Closing, BWIP and the Subsidiaries will own or have all
necessary rights to the patents, trademarks, trade names,
copyrights, licenses, technology, know-how, processes and
other intellectual property used in or necessary to operate
the businesses of the Divisions in the manner in which they
have heretofore been operated. Except as set forth in
Schedule 4.15, no claims have been asserted by any person
(A) against Borg-Warner, BWIP or any of the Subsidiaries
with respect to the use by BWIP or any of the Subsidiaries
of any of its trademarks, trade names, copyrights,
technology, know-how or processes or (B) for patent
infringement, with respect to which there is a reasonable
likelihood of a determination which, individually or in the
aggregate, would have a material adverse effect on the
business, financial condition or operations of BWIP and the
Subsidiaries taken as a whole.

4.11.  Leases.  Schedule 4.11 lists (i) all real
property leases under which BWIP or any Subsidiary is or

- 39 -

RLZ:3/11/87:7001:8

acts as a lessee or lessor and (ii) all personal property leases under which BWIP or any Subsidiary is or acts as a lessee or lessor and which (A) individually provide for annual rental payments of more than $25,000 or (B) are material to the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole or (C) are leases to which the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954 (as formerly in effect) apply.  Except as set forth in Schedule 4.11, all such leases are valid, binding and enforceable in accordance with their terms and are in full force and effect, there are no existing material defaults by Borg-Warner or any of its subsidiaries thereunder, and no event has occurred which (whether with or without notice, lapse of time or both) would constitute such a material default thereunder. Borg-Warner has delivered to the Buyer a complete and correct copy of each such real property lease and all supplements and amendments thereto.  Borg-Warner has delivered a complete and correct copy of any mortgages or other documents evidencing a lien, pledge, charge, encumbrance or restriction on any of the Properties or the assets (whether intangible or tangible) of BWIP and any Subsidiary as described in clauses (i) and (ii) of Section 10.09(b).  As of the Closing all of the leases listed or required to be listed in Schedule 4.11 will be held in the

- 40 -

RLZ:3/11/87:7001:3

name of BWIP (in the case of property located in the United
States) or in the name of the appropriate Subsidiary of
BWIP, except that for property located abroad which is used
by Borg-Warner B.V. or any issuer of the European Stock or
the stock of B-W Holland, the lease may be held in the name
of a wholly-owned subsidiary of Borg-Warner if Buyer has
notified Borg-Warner not to effect certain parts of the
Reorganization as contemplated in Section 1.02).

4.12.  Labor Matters.  Except to the extent set
forth in Schedule 4.12 or in the Employee Assets Agreement
provided for in Section 6.07 and except for such matters as
will not individually or in the aggregate have a material
adverse effect on the business, operations or financial
condition of BWIP and the Subsidiaries taken as a whole,
there has not been since December 31, 1984 any (i) unfair
labor practice complaint against any BWIP operation in the
United States pending before the National Labor Relations
Board; (ii) labor strike, dispute, or work stoppage
actually pending or threatened against or affecting any
BWIP business operation in the United States; (iii)
representation petition respecting the employees of any
BWIP operation in the United States filed with the National
Labor Relations Board; or (iv) arbitration proceeding
arising out of or under collective bargaining agreements

RLZ:3/11/87:7001:8

pending against any BWIP business operation in the United States. Except for such matters as will not individually or in the aggregate have a material adverse effect on the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole, there has not been since December 31, 1984 any (a) unfair labor practice complaint against any BWIP operation outside of the United States relevant authorities; (b) labor strike, dispute, or work stoppage actually pending or threatened against or affecting any BWIP business operation outside of the United States; (c) representation petition respecting the employees of any BWIP operation outside of the United States filed with the relevant authorites; or (d) arbitration proceeding arising out of or under collective bargaining agreements pending against any BWIP business operation outside of the United States.

4.13.  <u>ERISA; Benefit Plans</u>.

(a)  All employee benefit, stock, option, deferred compensation and other fringe benefit plans, programs or arrangements established, maintained or contributed to by BWIP or any other employer which is together with BWIP, treated as a single employer under Section 414(b), (c) or (m) of the Code (a "Related

- 42 -

RLZ:3/11/87:7001:8

Person") which covers employees or former employees (as the terms "employees" and "former employees" are defined and used in the Employee Assets Agreement provided for in Section 6.07) of BWIP or any Subsidiary as of the Closing Date (the "Plans") are listed in the Schedules attached to the Employee Assets Agreement provided for in Section 6.07.

(b)   Borg-Warner has delivered to the Buyer complete and correct copies of each Plan and, if applicable, trust agreements, funding agreements and insurance contracts relating thereto and, with respect to each Plan, if applicable, (i) the most recent actuarial valuation report, (ii) the last filed Form 5500 or 5500-C and Schedules A and B thereto, (iii) the summary plan descriptions currently in effect, and (iv) the last financial statement for each Plan and its related trust and any group annuity contracts.

(c)   The Plans, except for those required by foreign governmental law, regulations or authority and maintained by a foreign governmental board, agency or authority, comply in all material respects with the presently applicable requirements of all United States and foreign law, including, but not limited to, the Employee Retirement Income Security Act of 1974, as amended,

- 43 -

RLZ:3/11/87:7001:8

("ERISA") and the Code.   There are no actions, suits or claims pending (other than routine claims for benefits) or, to the knowledge of BWIP or a Related Person, threatened with respect to any Plan.  No Plan which is subject to Part 3 of Subtitle B of Title I of ERISA (a "Pension Plan") has incurred any "accumulated funding deficiency" within the meaning of section 302 of ERISA or section 412 of the Code, whether or not waived, and full payment has been made of all amounts which BWIP or a Related Person is required under the terms of each Pension Plan (or under the terms of any collective bargaining agreement or governmental rule or regulation) to make as contributions to such Pension Plan prior to the Closing Date, or such amounts will be paid as specifically provided for under the terms of the Employee Assets Agreement.  The present value of the vested accrued benefits under each Pension Plan did not, as of the end of the most recently ended fiscal year of Borg-Warner, exceed the current value of the assets of each Pension Plan.  For purposes of the preceding sentence, the terms "current value", "present value" and "accrued benefit" have the meanings specified in section 3 of ERISA.  No liability to the Pension Benefit Guaranty Corporation has been or is expected to be incurred with respect to any Pension Plan subject to Title IV of ERISA or any other employee pension benefit plan maintained by Borg-Warner covering employees

- 44 -

RLZ:3/11/87:7001:3

or former employees of BWIP, other than for the payment of premiums. There has been no reportable event (within the meaning of section 4043(b) of ERISA) or any other event or condition which represents a risk of termination of any such Pension Plan or any other employee pension benefit plan maintained by BWIP or Borg-Warner covering employees or former employees of BWIP by the Pension Benefit Guaranty Corporation under circumstances which, in any case, could result in liability which would be materially adverse to BWIP or any of its Subsidiaries. Neither BWIP nor a Related Person has engaged in any transaction described in section 4069 of ERISA including the Plans, and neither BWIP nor Borg-Warner has incurred any liability for any tax imposed by section 502(i) of ERISA or section 4975 of the Code. No Pension Plan or related trust subject to section 407 of ERISA owns any securities issued by Borg-Warner or any affiliate of Borg-Warner in an amount which violates section 407 of ERISA. No termination of any pension plan by Borg-Warner (or any member of a "controlled group" of Borg-Warner, as defined in section 4001(a)(14) of ERISA), prior to the Closing Date, has resulted or will result in the imposition of liability on BWIP or its Subsidiaries, and no proceeding has been initiated or is expected to be initiated by the Pension Benefit Guaranty Corporation to terminate any pension plan.

- 45 -

RLZ:3/11/87:7001:8

(d)     Except as described on Schedule 4.13, neither BWIP nor any of its Subsidiaries contributes or is required to contribute to any "multiemployer plan" (as defined in section 3(37) of ERISA). Neither BWIP nor any Related Person has completely or partially withdrawn from any multiemployer plan so as to result in any material liability to Borg-Warner or BWIP under section 4201 of ERISA.

(e)     The Internal Revenue Service ("IRS") has issued a letter for each Plan intended to qualify under section 401(a) of the Code determining that such Plan so qualifies and is exempt from United States Federal Income Tax under section 401(a) and 501(a) of the Code, and there has been no occurrence, other than the passage of federal legislation, since the date of any such determination letter which would have a material adverse effect on such qualification.

4.14.  Certain Contracts and Arrangements. Except as listed in Schedule 4.14 or any other schedule to this Agreement or as set forth in the Employee Assets Agreement provided for in Section 6.07 or as reflected or set forth in the BWIP Balance Sheet, neither BWIP nor any Subsidiary

- 46 -

RLZ:3/11/87:7001:8

is a party to any:  (i) employment or collective bargaining agreement; (ii) indenture, mortgage, note, installment obligation, agreement or other instrument relating to the borrowing of money by or the extension of credit to BWIP or any Subsidiary in excess of $200,000 or the guaranty of any obligation for the borrowing of money by BWIP or any Subsidiary in excess of $200,000; or (iii) agreement which is not terminable by BWIP or a Subsidiary on 90 or fewer days' notice at any time without penalty and which involves the receipt or payment by BWIP or any Subsidiary of more than $200,000, except for agreements with customers, suppliers, distributors and sales representatives entered into in the ordinary course of business.  A complete and correct copy of each of the aforesaid obligations has been delivered to the Buyer.  Except as set forth in Schedule 4.14 or in the Employee Assets Agreement provided for in Section 6.07, there is not, under any of the aforesaid obligations, any default or event which, with notice or lapse of time or both, would constitute a default on the part of BWIP or any Subsidiary or, to the knowledge of Borg-Warner, BWIP and the Subsidiaries, any other party to such obligation, except (with respect to defaults on the part of BWIP or any Subsidiary only) such events of default and other events as to which requisite waivers or consents have been obtained or (with respect to defaults on the part

RLZ:3/11/87:7001:8

of BWIP, any Subsidiary or any other party) which would
not, individually or in the aggregate, have a material
adverse effect on the business, operations or financial
condition of BWIP and the Subsidiaries taken as a whole.

4.15.  Legal Proceedings, Etc.

(a)  Schedule 4.15 or the Employee Assets
Agreement provided for in Section 6.07 describes each
claim, action, proceeding or investigation pending or
threatened, as of the date hereof (or, in the case of
claims based on environmental or waste product disposal
regulations, at any time since December 31, 1984), against
or relating to the operations of BWIP or any Subsidiary
before any court or governmental or regulatory authority or
body.  Except as expressly noted in Schedule 4.15 or the
Employee Assets Agreement provided for in Section 6.07,
there is no such claim, action, proceeding or investigation
with respect to which, individually or in the aggregate, an
adverse determination would (i) have a material and adverse
effect on the business, operations or financial condition
of BWIP and the Subsidiaries taken as a whole, or (ii)
prevent or delay the transactions contemplated in this
Agreement.  Except as set forth in Schedule 4.15, neither
BWIP nor any of the Subsidiaries is subject to any

- 48 -

RLZ:3/11/87:7001:8

outstanding order, writ, injunction or decree which (A) materially and adversely affects the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole, or (B) would prevent or delay the transactions contemplated in this Agreement.

(b)     Prior to the Closing, Schedule 4.15 will be updaʾed so that when Section 4.15 is repeated and made to speak as of the Closing Date, it will be an accurate representation and warranty, taking into account the changes made in Schedule 4.15.

4.16.    <u>Governmental Authorization and Regulations</u>. All licenses, permits, approvals, consents and other United States and foreign governmental or regulatory authorizations held by BWIP or any Subsidiary are valid and sufficient for all business conducted by it (including all environmental permits necessary for the operation and use of the Properties and for the disposal of any wastes or other substances generated or used in the operation of BWIP's or any Subsidiary's business or of the Properties) except where the failure to hold such licenses, permits and other governmental or regulatory authorizations would not, individually or in the aggregate, have a material adverse effect on the business, operations or financial condition

- 49 -

RLZ:3/11/87:7001:8

of BWIP and the Subsidiaries taken as a whole.  Except for violations which, individually and in the aggregate, would not have a material adverse effect on the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole, neither Borg-Warner nor BWIP nor any Subsidiary has knowledge or notice that the businesses of BWIP and the Subsidiaries are not bein conducted in compliance with, or that the Reorganization will not by the Closing have complied with, all applicable laws, ordinances, rules and regulations of any governmental authority, including, without limitation, export rules and regulations.

     4.17.  <u>Taxes</u>.

     (a)    BWIP and each of the Subsidiaries and any joint, affiliated, combined or unitary group of which BWIP or any Subsidiary is or has been a member (an "Affiliated Group") to the best of Borg-Warner's knowledge have accurately prepared in all material respects and filed all returns and reports relating to Taxes (as defined below) required to be filed by law as of the date of this Agreement and have paid when due all material Taxes due and payable except those Taxes which may be paid without interest or penalty or are being contested in good faith

RLZ:3/11/87:7001:8

and are provided for as a liability on the books of account of BWIP or the appropriate Subsidiary.    Except to the extent specifically provided for on the BWIP Balance Sheet, there are no material Tax liabilities for which any Consolidated Subsidiary may be held liable, due or which will become due for any taxable period commencing prior to December 31, 1986, whether or not disputed.    All material Taxes and other levies which BWIP or any Subsidiary is required by law to withhold or collect have been duly withheld or collected and, to the extent required, have been paid over to the proper governmental authorities or are held in separate bank accounts for such purpose.    As used herein, the term "Tax" shall include all taxes, assessments and other governmental charges, including, without limitation, value added taxes,   including interest and penalties thereon, which are levied upon the property, assets, income or franchise of any party.

(b)    Neither BWIP nor any Subsidiary has filed a consent pursuant to section 341(f) of the Code or agreed to have section 341(f)(2) of the Code apply to any disposition of a "subsection (f) asset" (as such term is defined in section 341(f)(4) of the Code).  Neither BWIP nor any Subsidiary is, or during the five year period preceding the Closing Date has been, a "United States real property

- 51 -

RLZ:3/11/87:7001:8

holding corporation" within the meaning of section 897(c)(2) of the Code.

(c)    Except as set forth on Schedule 4.17, neither BWIP nor any Subsidiary is a party to, is bound by, or has any obligation under any tax sharing or similar agreement with respect to Taxes.

4.18.    <u>Transactions with Shareholders, Officers<sup>ar</sup></u> <u>Directors and Employees</u>. Other than as disclosed in Schedule 4.18 or as set forth in the Employee Assets Agreement provided for in Section 6.07, there are no amounts owing to BWIP or any Subsidiary from any shareholder, officer, director or employee of BWIP, other than advances for travel, moving or other expenses in the ordinary course of business. Other than as disclosed in Schedule 4.18, to the knowledge of Borg-Warner, BWIP and the Subsidiaries, no officer of Borg-Warner owns, directly, indirectly, beneficially or otherwise, any controlling interest in or directs the affairs of any material customer or material competitor of BWIP or any Subsidiary, and neither Borg-Warner nor any subsidiary of Borg-Warner other than BWIP and the Subsidiaries are competitors or customers or suppliers, as to any material amount of sales or purchases, of BWIP and the Subsidiaries.

- 52 -

RLZ:3/11/87:7001:8

4.19.  <u>Commissions</u>.  Except for Morgan Stanley & Co. Incorporated, which is acting for Borg-Warner and whose fees and expenses will be paid by Borg-Warner, no broker, finder or other person is entitled to any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement by reason of any action taken by Borg-Warner.

4.20  <u>Insurance</u>.  Schedule 4.20 accurately lists the policies of insurance covering the business and operations of BWIP.  Schedule 4.20 accurately lists the claims submitted to insurance carriers under insurance coverage maintained by Borg-Warner with respect to the property and business operations of BWIP and the Subsidiaries for the period from January 1, 1985 through February 1, 1987, inclusive.

4.21  <u>Powers of Attorney; Bank Accounts</u>.  Except as disclosed on Schedule 4.21, there are no outstanding powers of attorney binding upon BWIP or any Subsidiary. Schedule 4.21 also contains a complete and correct list of (i) all banks in which BWIP or any Subsidiary has a line of credit, account or safe deposit box or in which any assets of BWIP or any Subsidiary are located, and (ii) the names

and titles of all persons authorized to draw thereon or have access thereto.

4.22   Disclosure.   To the best knowledge of Borg-Warner, BWIP and the Subsidiaries, neither this Agreement, the schedules hereto, the Confidential Offering Memorandum dated November 1986 relating to the disposition of BWIP nor any other documents furnished by Borg-Warner the Buyer contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein and therein not misleading, and except as disclosed herein or therein, there is no fact (other than matters of a general economic or political nature which do not affect BWIP and the Subsidiaries uniquely) known to Borg-Warner, BWIP or the Subsidiaries which materially adversely affects or presently is reasonably expected by them to materially adversely affect the future business, operations or financial condition of BWIP and the Subsidiaries taken as a whole.

4.23   Environmental Representations and Warranties.

(a)   The Properties and their existing uses comply, and Borg-Warner and its subsidiaries are not in violation of, and have not violated, in connection with the

- 54 -

RLZ:3/11/87:7001:8

ownership, use, maintenance or operation of any of the Properties and the conduct of the businesses related thereto, any applicable federal, state, county or local statutes, laws, regulations, rules, ordinances, codes, licenses and permits of any governmental authorities relating to environmental matters, except as disclosed on Schedule 4.23.

(b)    Borg-Warner and its subsidiaries (i) have operated all of the Properties and have at all times received, handled, used, stored, treated, shipped and disposed of all hazardous and toxic substances, petroleum products and waste in compliance with all applicable environmental, health or safety statutes, ordinances, orders, rules, regulations and requirements, except as disclosed in Schedule 4.23, and (ii) have removed from and off the Properties all hazardous or toxic substances, petroleum products and waste (other than petroleum products and other hazardous and toxic substances and waste used and disposed of in accordance with law in the ordinary course of business).

(c)    There are no statutes, orders, rules or regulations relating to environmental matters requiring any work, repairs, construction or capital expenditures with

- 55 -

RLZ:3/11/87:7001:8

respect to any of the Properties, nor has Borg-Warner or any of its subsidiaries received any notice of any of the same, other than as set forth on Schedule 4.23.

(d) No hazardous or toxic materials, substances, pollutants, contaminants or wastes have been released into the environment, or deposited, discharged, placed or disposed of at, on or near any of the Properties by Borg-Warner or any of its subsidiaries, nor have the Properties been used at any time by Borg-Warner or any of its subsidiaries as a landfill or a waste disposal site except in compliance with all applicable environmental health or safety statutes, ordinances, rules or regulations except as disclosed on Schedule 4.23.

(e) Except as set forth in Schedule 4.23, no notices of any violation of any of the matters referred to in subsections (a) through (d) of this Section 4.23 relating to any of the Properties or their use have been received by Borg-Warner or any of its affiliates. There are no writs, injunctions, decrees, orders or judgments outstanding, and no lawsuits, claims, proceedings or investigations pending or threatened, relating to the ownership, use, maintenance or operation of any of the Properties, nor is there any basis for the institution or

- 56 -

RLZ:3/11/87:7001:8

filing of any lawsuit, claim, proceeding or investigation except t ne extent disclosed in Schedule 4.23.

) Prior to the Closing, Schedule 4.23 will be updated o that when Section 4.23 is repeated and made to speak of the Closing Date, it will be an accurate represe ation and warranty, taking into account the changes made in Schedule 4.23.

4.24. <u>Acquisition of Subordinated Note.</u>     Borg-Warner is acquiring the Subordinated Note for investment and not with a view toward, or for sale in connection with, any distribution thereof, or with any present intention of distributing or selling the Subordinated Note. Borg-Warner agrees that the Subordinated Note may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act of 1933 (except pursuant to an exemption from such registration available under such Act) and without the prior consent of the issuer thereof.

- 57 -

RLZ:3/11/87:7001:8

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to Borg-      ner as follows:

5.01.  _Organization_.  The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and as planned to be conducted.  The Buyer has heretofore delivered to Borg-Warner complete and correct copies of its Certificate of Incorporation and By-laws, as currently in effect.  Any Affiliate of the Buyer that purchases the Dutch Assets and the European Stock or the stock of B-W Holland will at the time of the Closing be a corporation duly organized, validly existing and in good standing under the laws of the state or country in which it is incorporated and will have all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as then conducted and as then planned to be conducted.

RLZ:3/11/87:7001:8

5.02.  <u>Authority Relative to this Agreement</u>.  The Buyer has full corporate power and authority to execute and deliver this Agreement and the Collateral Agreements and to consummate the transactions contemplated hereby and thereby, and the issuer of the Subordinated Note (the "Issuer") has full corporate power and authority to execute and deliver the Subordinated Note.  Any Affiliate of the Buyer that purchases the Dutch Assets and the European Stock or the stock of B-W Holland at the time of the Closing will have full corporate power and authority to consummate such transaction, and the consummation of such transaction will have been duly and validly authorized by all necessary corporate action on the part of such Affiliate, and no other corporate proceedings on the part of such Affiliate will be necessary to authorize and consummate such transaction. The execution and delivery of this Agreement, the Collateral Agreements and the Subordinated Note and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by the Board of Directors of the Buyer, or, in the case of the Subordinated Note, by the Issuer, and no other corporate proceedings on the part of the Buyer or the Issuer, as the case may be, are necessary to authorize this Agreement, the Collateral Agreements and the delivery of the Subordinated Note or to consummate the transactions

- 59 -

RLZ:3/11/87:7001:8

contemplated hereby and thereby. This Agreement has been duly and validly executed and delivery by the Buyer and constitutes the valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms. As of the Closing Date, the Collateral Agreements and the Subordinated Note shall have been duly and validly executed and delivery by the Buyer or the Issuer, as the case may be, and will constitute the valid and binding agreements of the Buyer or the Issuer, as the case may be, enforceable against the Buyer or the Issuer, as the case may be, in accordance with their respective terms.

5.03. <u>Consents and Approvals; No Violation</u>.

Neither the execution and delivery of this Agreement, the Collateral Agreements and the Subordinated Note by the Buyer or the Issuer, as the case may be, nor the purchase by the Buyer of the BWIP Common Stock pursuant to this Agreement, or the purchase of the Dutch Assets and the European Stock or the stock of B-W Holland by the Buyer or an Affiliate of the Buyer as provided in this Agreement will (i) conflict with or result in any breach of any provision of the Certificate of Incorporation or By-laws of the Buyer, such Affiliate of the Buyer or the Issuer (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or

- 60 -

RLZ:3/11/87:7001:8

regulatory authority or such third-party, except work councils or other employee related bodies, except in connection with the HSR Act and except for foreign government approvals, consents, authorizations, permits, filings or notifications which must be obtained or made prior to the acquisition of the BWIP Common Stock, the Dutch Assets, the European Stock or the stock of B-W Holland and the requisite U.S. and foreign government security clearances and defense department or other comparable department approvals or notifications which must be obtained or made prior to such acquisition, (iii) result in a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any note, bond, mortgage, indenture, agreement, lease or other instrument or obligation to which the Buyer or any of its Subsidiaries or such Affiliate or the Issuer is a party or by which any of their respective assets may be bound, or (iv) assuming compliance with the HSR Act and the requirements of work councils and other employee related bodies, the receipt or making of requisite foreign government approvals, consents, authorizations, permits, filings and notifications and the requisite U.S. and foreign government security clearances and defense department or comparable department approvals, violate any order, writ, injunction, decree, statute, rule

- 61 -

RLZ:3/11/87:7001:8

or regulation applicable to the Issuer, the Buyer, any of their respective subsidiaries or any of their respective assets.

5.04. <u>Commissions</u>. Except for Clayton & Dubilier, Inc. and Shearson Lehman Brothers, Inc., which are acting for the Buyer and whose fees and expenses will be paid by the Buyer, no broker, finder or other person is entitled to any brokerage fees, commissions or finders' fees in connection with the transactions contemplated by this Agreement by reason of any action taken by the Buyer.

5.05. <u>Acquisition of Stock for Investment</u>. The Buyer is acquiring the shares of BWIP Common Stock, and the Buyer or an Affiliate of the Buyer is acquiring the European Stock or the stock of B-W Holland, for investment and not with a view toward, or for sale in connection with, any distribution thereof, or with any present intention of distributing or selling the same. The Buyer agrees (and agrees that it will obtain a convenant to this effect for the benefit of Borg-Warner from any Affiliate that purchases the European Stock or the stock of B-W Holland) that the shares of BWIP Common Stock and the European Stock or the stock of B-W Holland may not be, and that it will cause its Affiliate that purchases such stock not to have

RLZ:3/11/87:7001:8

such stock, sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration under the Securities Act of 1933 except pursuant to an exemption from such registration available under such Act.

5.06    Capitalization of Issuer.    The Issuer will, at the time of Closing, have received not less than $18,000,000 in payment for its common stock.

5.07    Disclosure.    To the best knowledge of the Buyer, neither this Agreement nor any other documents furnished by the Buyer to Borg-Warner contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein and therein not misleading.

### ARTICLE VI

### COVENANTS OF THE PARTIES

6.01.    Access to Records and Properties Prior to the Closing Date.    Between the date of this Agreement and the Closing Date, Borg-Warner agrees to give the Buyer and its representatives full access to all of the premises and books and records of BWIP and the Subsidiaries, and to furnish and to cause the officers of BWIP and the

- 63 -

RLZ:3/11/87:7001:8

Subsidiaries to furnish the Buyer such financial and
operating data and other information with respect to the
business and properties of BWIP and the Subsidiaries as the
Buyer shall from time to time request; provided, however,
that any such investigation shall be conducted in such
manner as not to interfere unreasonably with the operation
of the respective businesses of BWIP and the Subsidiaries.
In the event of termination of this Agreement, the Buyer
and each of its representatives will return to Borg-Warner
all documents, workpapers and other material (including all
copies made thereof) obtained from Borg-Warner, BWIP or the
Subsidiaries at any time in connection with the trans-
actions contemplated hereby.  Any information provided to
the Buyer or its representatives pursuant to this Agreement
shall be held by the Buyer and such representatives in
accordance with, and shall be subject to the terms of, the
Confidentiality Agreement of Clayton & Dubilier, Inc. in
favor of Borg-Warner.

6.02.  Operation of the Business of BWIP.  Borg-
Warner agrees that from January 1, 1987 until the Closing
Date, except (i) for transactions contemplated by this
Agreement, (i_) for proposed transactions which have
heretofore been disclosed in writing to the Buyer by
Borg-Warner and (iii) to the extent that the Buyer shall

- 64 -

RLZ:3/11/87:7001:8

otherwise consent, Borg-Warner will cause BWIP and the Subsidiaries to operate their businesses substantially as presently operated and only in the ordinary course and, consistent with such operation, to use their best efforts to preserve intact their present business organization and their relationships with persons having business dealings with them and to retain the services of their key officers and operating employees. Buyer will not take any action that that interferes with Borg-Warner's ability to carry out the foregoing covenants. Without limiting the generality of the foregoing, Borg-Warner will cause BWIP and the Subsidiaries to operate their businesses so that the representations and warranties set forth in Article IV, to the extent within the control of BWIP and the Subsidiaries and Borg-Warner, shall be true and correct as of and on the Closing Date.

6.03. <u>Consents</u>. Borg-Warner and the Buyer shall each use its best efforts to obtain the consent or approval of each person (including without limitation work councils) and governmental authority whose consent or approval shall be required in order to permit the sale of the BWIP Common Stock, the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, to be consummated as contemplated herein, and to satisfy or cause to be

- 65 -

RLZ:3/11/87:7001:8

satisfied each of the conditions to the Closing set forth
in Article VII hereof.  Borg-Warner and the Buyer shall
cooperate in attempting to have Borg-Warner released from
those obligations listed in Schedule 9.04 and, if such
release is not feasible in all cases, in arranging for
Borg-Warner to receive commitments arranged and paid for by
the Buyer from a responsible financial institution, which
are satisfactory to Borg-Warner, that such obligations will
be adequately provided for at and after the Closing.

6.04.  <u>Additional Financial Statements</u>.  As soon
as reasonably practicable after they become available,
Borg-Warner shall furnish to the Buyer consolidated balance
sheets and income statements for BWIP and the Subsidiaries
for each month after December 31, 1986 and prior to the
Closing Date, in each case as prepared by BWIP and
submitted to Borg-Warner in the normal course of its
financial reporting system.

6.05.  <u>Insurance</u>.  Borg-Warner agrees to maintain
in effect through the Closing Date the insurance coverage
presently being carried with respect to the assets,
properties and businesses of BWIP and the Subsidiaries and
Buyer and Borg-Warner agree to review such coverage and, in
cases where such coverage is provided under a Borg-Warner

RLZ:3/11/87:7001:8

policy, to cooperate in obtaining similar coverage for BWIP and the Subsidiaries following the Closing.

6.06.    Tax Agreement.    Borg-Warner and the Buyer shall enter into an agreement substantially in the form of Exhibit C hereto with respect to the handling of various Tax matters relating to BWIP and the Subsidiaries.    To the extent the Tax Agreement conflicts with the terms of this Agreement, the terms of the Tax Agreement shall control.

6.07.    Employee Assets Agreement.    Borg-Warner and the Buyer shall enter into an agreement substantially in the form of Exhibit D hereto with respect to the treatment of employee-related contracts, understandings, plans, policies, procedures, arrangements and other employee-related matters.    To the extent such Employee Assets Agreement conflicts with the terms of this Agreement, the terms of the Employee Assets Agreement shall control.

6.08.    Filings.

(a) Borg-Warner and the Buyer will file, or cause to be filed, as soon as practicable after the date hereof, with the United States Federal Trade Commission and the

- 67 -

RLZ:3/11/87:7001:8

Antitrust Division of the United States Department of Justice pursuant to the HSR Act all requisite documents and notifications in connection with the transactions contemplated by this Agreement, and Borg-Warner or the Buyer, or both, as appropriate, will make any representations and filings required by any governmental regulation or program, including, without limitation, the United States Department of Defense Industrial Security Program, in order to secure all permits, clearances and approvals required for the Buyer's continued operation of the businesses of BWIP and the Subsidiaries from and after the Closing.

(b) The Buyer will make or cause to be made all such other filings and submissions (including without limitation to work councils and other employee-related bodies) under the laws and regulations applicable to the Buyer, if any, as may be required of the Buyer for the consummation of the sale of the BWIP Common Stock and the Dutch Assets and the European Stock or the stock of B-W Holland pursuant to this Agreement. Borg-Warner will make or cause to be made all such other filings and submissions under laws and regulations applicable to Borg-Warner (including, without limitation, to work councils and other employee-related bodies), if any, as may be required of Borg-Warner for consummation of the Reorganization, the

- 68 -

RLZ:3,

sale of the BWIP Common Stock, the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, pursuant to this Agreement.  The parties hereto will coordinate and cooperate with one another in exchanging such information and providing such reasonable assistance to one another as may be requested in connection with all of the foregoing.

6.09.  <u>Public Announcements</u>.  Borg-Warner and the Buyer will consult with each other before issuing, or permitting any agent or affiliate to issue, any press releases or otherwise making, or permitting any agent or affiliate to make, any public statements with respect to this Agreement and the transactions contemplated hereby, and shall provide to the other party in connection with such consultation the proposed text of any such press release or public statement, and neither of them shall issue, or permit any agent or affiliate to issue, any such press release or make any such public statement prior to such consultation.  The execution of this Agreement shall constitute Borg-Warner's consent to the Buyer's making of disclosures pursuant to the preceding sentence that otherwise would be prohibited pursuant to the Confidentiality Agreement of Clayton & Dubilier, Inc. in favor of Borg-Warner, which consent shall cease to be

RLZ:3/11/87:7001:8

this Agreement is terminated pursuant to

hereof.

6.10.  <u>Commissions</u>.  Each of Borg-Warner and the Buyer will pay to the other or otherwise discharge, and will indemnify and hold the other harmless from and against, any and all claims or liabilities for all brokerage fees, commissions and finders' fees incurred by reason of any action taken by the indemnifying party.

6.11.  <u>Sales and Transfer Taxes</u>.  All transfer Taxes (including transfer Taxes in connection with the transfer of the Dutch Assets to an Affiliate of the Buyer and all stock transfer Taxes, if any, but excluding New York Real Property Gains Tax and any Tax imposed on net income or gain) incurred in connection with this Agreement and the transactions contemplated hereby will be borne by the Buyer, other than (i) Taxes to be borne by Borg-Warner pursuant to Section 1.05 of this Agreement or pursuant to the terms of the Tax Agreement, and (ii) in the event the Dutch Assets and the European Stock are not transferred to BWIP or one of the Subsidiaries, transfer Taxes in connection with the transfer of the European Stock to B-W Holland and transfer Taxes in connection with the transfer of the stock of B-W Holland to the Buyer or an Affiliate of

RLZ:3/11/87:7001:8

the Buyer.   The Buyer will, at its own expense, file all necessary Tax returns and other documentation with respect to all such transfer Taxes, and, if required by applicable law, Borg-Warner will join in the execution of any such Tax returns or other documentation.

6.12.   <u>No Shopping, Etc.</u>   Borg-Warner will not, and will cause BWIP and the Subsidiaries not to, directly or indirectly, through any officer, director, agent or otherwise, solicit, initiate or encourage submission of proposals or offers from any person relating to any acquisition or purchase of any equity interest in, or all or (other than in the ordinary course of business) a substantial portion of the assets of, BWIP or any of the Subsidiaries or any business combination with BWIP or any of the Subsidiaries, or participate in any negotiations regarding or furnish to any other person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate or encourage, any effort or attempt by any other person to do or seek any of the foregoing, except as provided for herein.   Borg-Warner will not sell or otherwise transfer any of the BWIP Common Stock except as contemplated hereby, and will not vote the BWIP Common Stock in favor of, or otherwise approve, any merger, consolidation, assets acquisition or other takeover

RLZ:3/11/87:7001:8

transaction involving BWIP or any of the Subsidiaries.

    6.13    <u>Non-Competition</u>.    In furtherance of the sale of BWIP and the Subsidiaries to the Buyer, except for the businesses presently conducted by Borg-Warner (Australia) which are licensees from BWIP, for a period of five years following the Closing neither Borg-Warner nor any persons at the time controlled by Borg-Warner (including third parties subject to any non-competition agreement enforceable by Borg-Warner) will for any reason, directly or indirectly, engage in any business activity which is substantially similar to or directly competitive with the business now being conducted or carried on by BWIP and the Subsidiaries within any country in which BWIP and the Subsidiaries presently conduct or carry on such business.    If any provision of the covenant contained in this Section 6.13 shall be held to be invalid or otherwise unenforceable, in whole or in part, the remainder of the provisions, or the enforceable parts thereof, shall not be affected thereby.    Borg-Warner and the Buyer acknowledge that compliance by Borg-Warner with the covenant contained in this Section 6.13 is necessary to protect the goodwill and other proprietary interests of ьWIP and the Subsidiaries, that a breach of the covenant contained in this Section 6.13 will result in irreparable and continuing

- 72 -

RLZ:3/11/87:7001:8

damage to the Buyer for which there will be no adequate remedy at law, and that the Buyer and its successors and assigns shall be entitled to injunctive relief with respect to the covenant contained in this Section 6.13 in addition to such other and further relief as may be appropriate.

6.14    Personal Property Locations.    As promptly as possible, but in any event within ten days after the date of this Agreement, Borg-Warner will furnish to Buyer a schedule showing the locations (in the case of property located in the United States, by state, county and city or town) of all personal property owned or to be owned at the Closing by BWIP or any Subsidiary, except for those locations at which the aggregate value of such personal property does not exceed $10,000.

6.15    Other Agreements.    Borg-Warner and the Buyer and/or their respective affiliates, as the case may be, shall enter into the License Agreement referred to in Section 1.04, and, if required, as contemplated by Section 2.01, the Dutch Agreement referred to in Section 2.01.

6.16    Environmental Matters.    Borg-Warner ill, at its own direction and expense and with all reasonable promptness after obtaining the consent of the Buyer (which

- 73 -

RLZ:3/11/87:7001:8

will not be unreasonably withheld), take or cause to be taken such action as is necessary to bring each matter shown on Schedule 4.23, as updated in accordance with Section 4.23(f), into compliance with applicable federal, state, county or local statutes, laws, regulations, rules, ordinances, codes, licenses and permits of any governmental authorities relating to environmental matters, including, without limitation, the actions set forth on Schedule 4.23.  The Buyer and its employees will allow reasonable access to the property and business records for the purpose of completing the actions on Schedule 4.23.  The Buyer and its employees will cooperate in obtaining all permits, approvals, or authorizations which may be necessary for Borg-Warner to carry out its obligations under this Section 6.16.  Borg-Warner takes no responsibility for the maintenance of programs, processes or waste manifesting systems or other systems and equipment installed pursuant to this Section 6.16 after initiation or installation pursuant to Schedule 4.23 and this Section 6.16.

6.17  <u>Update of Schedule 9.04</u>.  Borg-Warner shall update Schedule 9.04 so that, as of the Closing Date, Schedule 9.04 shall be a true and complete list of all recourse obligations against Borg-Warner, BWIP or any of its Subsidiaries.  Borg-Warner, BWIP and the Subsdiaries

RLZ:3/11/87:7001:8

shall not incur, without the prior written consent of the Buyer, any additional recourse obligations which individually exceed $50,000 or which, when added to all recourse obligations of Borg-Warner, BWIP and the Subsidiaries including those listed in Schedule 9.04, exceed $8,000,000 at any time prior to the Closing Date.

## ARTICLE VII

### CLOSING CONDITIONS

7.01.  <u>Conditions to Obligations of the Buyer.</u> The obligations of the Buyer to perform this Agreement and the Collateral Agreements are subject to the satisfaction of each of the following conditions at or prior to the Closing Date unless waived by the Buyer:

(a)     The representations and warranties of Borg-Warner set forth in this Agreement and the Collateral Agreements shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing Date as though made on and as of the Closing Date; Borg-Warner shall, in all material respects, have performed all agreements and conditions required to be performed or complied with by it under this Agreement and the Collateral Agreements prior to or on the Closing Date; and the Buyer

shall have received a certificate to the foregoing effects, dated the Closing Date, executed on behalf of Borg-Warner by its President or any Vice-President.

(b)    All actions necessary to authorize the execution, delivery and performance of this Agreement and the Collateral Agreements by Borg-Warner and the consummation of the other transactions contemplated herein and therein shall have been duly and validly taken by the Board of Directors of Borg-Warner.

(c)    The Buyer shall have received an opinion of the General Counsel or an Associate General Counsel of Borg-Warner, dated the Closing Date, satisfactory in scope and substance to the Buyer to the effect that:

(i)    Borg-Warner has good and marketable title to the BWIP Common Stock, and has the right and power to sell, assign and transfer the BWIP Common Stock, and that the transfer, assignment and delivery to the Buyer of the BWIP Common Stock pursuant to this Agreement will vest in the Buyer a good, valid, marketable and indefeasible title to the BWIP Common Stock, free of any mortgage, lien, claim, charge, pledge or encumbrance whatever other than those created by or in the Buyer;

RLZ:3/11/87:7001:8

(ii)    BWIP is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power to own, lease and operate its properties and to conduct the business presently being conducted by it;

(iii)    Borg-Warner has full corporate power to carry out the transactions provided for in this Agreement and the Collateral Agreements; all corporate and other proceedings required to be taken by or on the part of Borg-Warner to authorize it to execute and deliver this Agreement and the Collateral Agreements and to consummate the transactions contemplated herein and therein have been duly and validly taken; and this Agreement and the Collateral Agreements have been duly and validly authorized, executed and delivered by Borg-Warner and constitute valid and binding obligations of Borg-Warner, enforceable against it in accordance with their respective terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable

- 77 -

RLZ:3/11/87:7001:8

defenses and to the discretion of the court before which any proceeding therefor may be brought;

(iv)    each Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation and has all requisite corporate power to own, lease, and operate its properties and to conduct its business as presently being conducted;

(v)    BWIP and each Subsidiary are duly qualified to do business and in good standing as a foreign corporation in the jurisdictions set forth in Schedules 4.01 and 4.04, respectively;

(vi)    all of the outstanding shares of the BWIP Common Stock have been duly authorized and are validly issued, fully paid and nonassessable;

(vii)    all of the outstanding shares of capital stock of each Subsidiary have been duly authorized and are validly issued, fully paid and nonassessable;

(viii)    the execution and delivery of this Agreement and the Collateral Agreements, the consummation

RLZ:3/11/87:7001:8

by Borg-Warner of the transactions contemplated hereby and thereby and the fulfillment of the terms and compliance with the provisions hereof, and thereof will not conflict with or result in a breach of any provision of the Certificates of Incorporation or By-laws of Borg-Warner or BWIP or, except as specifically disclosed herein or in a schedule hereto, conflict with or result in a breach of or default under (or in an occurrence which with the lapse of time or action by a third party could result in a default under), or give rise to a right of termination, cancellation or acceleration with respect to, the terms, conditions, or provisions of any material note, bond, mortgage, indenture, license, agreement or other instrument or obligation to which Borg-Warner, BWIP or any Subsidiary is a party or is subject or by which they or any of their properties or assets are bound, of which such counsel has knowledge after making due inquiry with respect thereto, or violate any material court order, writ, injunction or decree applicable to Borg-Warner, BWIP or any Subsidiary or any of their respective properties or assets, of which such counsel has knowledge after making due inquiry with respect thereto, or violate any law, statute, rule or regulation applicable to Borg-Warner, BWIP or any Subsidiary or any of their respective properties or assets;

- 79 -

RLZ:3/11/87:7001:8

(ix)    any consent or approval by any gov-
ernmental authority which is required in connection with
the consummation by Borg-Warner of the transactions
contemplated hereby has been obtained;

(x)    after due inquiry, such counsel does
not know of any litigation, proceeding or investigation
that is pending or threatened against Borg-Warner or BWIP
(except as disclosed in Schedule 4.15 or the schedules
provided for in the Employee Assets Agreement provided for
in Section 6.07) in which an adverse determination would
materially and adversely affect the business, operations or
financial condition of BWIP and the Subsidiaries, taken as
a whole, or which might prevent or delay any of the
transactions contemplated by this Agreement;

(xi)    such counsel does not know of any
item called for by Schedules 4.11 and 4.14 which is not
disclosed therein or of any material default under, or of
the occurrence of any event which with the lapse of time or
action by a third party would result in a material default
under, any outstanding lease, contract, promissory note,
license or other agreement listed in any such schedule; and

(xii)    such other matters incident to the

- 80 -

RLZ:3/11/87:70G1:8

transactions contemplated by this Agreement or the Collateral Agreements as the Buyer or its counsel may reasonably request.

In the event that Buyer or one of its Affiliates acquires the Dutch Assets and the European Stock, or the stock of B-W Holland, as the case may be, the Buyer shall have received an opinion of special Dutch counsel for Borg-Warner, dated the Closing Date, in form and substance satisfactory to the Buyer, to the effect that the instruments conveying the Dutch Assets are sufficient to effect the valid transfer to the Buyer or such Affiliate of all of the right, title, and interest of Borg-Warner B.V. in and to such assets and that Borg-Warner B.V. has good and marketable title to the European Stock or the stock of B-W Holland, as the case may be, has the right and power to sell, assign and transfer such stock, and that the transfer, assignment and delivery to Buyer or its Affiliate, as the case may be, as contemplated by this Agreement will vest in the Buyer or its Affiliate, as the case may be, a good, va_id, marketable and indefeasible title to such stock, free of any mortgage, lien, claim, charge, pledge or encumbrance whatever other than those created by or in the Buyer.

- 81 -

RLZ:3/11/87:7001:8

In rendering such opinions each such counsel may rely to the extent recited therein on certificates of other officers of Borg-Warner and of officers of BWIP as to matters of fact and, as to any matter contained in such opinion, such counsel may rely upon the opinion of local counsel of established reputation and reasonably satisfactory to the Buyer and its counsel, whether or not employed by Borg-Warner, BWIP or any Subsidiary, provided that each such counsel shall state that he believes that he and the Buyer are justified in relying upon such certificates and opinions and copies of such opinions are addressed to and delivered to the Buyer. Such opinions shall also state that any institutions making loans to the Buyer or its Affiliates in connection with the Closing to facilitate the transactions contemplated by this Agreement shall be entitled to rely on such opinions as if such opinions were addressed to them.

(d)    The form and substance of all legal matters contemplated hereby and of all papers delivered hereunder and in connection with the Reorganization shall be acceptable to Debevoise & Plimpton, special counsel to the Buyer.

(e)    To the extent that the Buyer shall have

RLZ:3/11/87:7001:8

made a written request to Borg-Warner for resignations of the directors and officers of BWIP who are also officers, directors or employees of Borg-Warner within 5 days prior to the Closing, the Buyer shall have received from each such officer, director or employee in respect of whom such request was made a letter containing his resignation as such a director and/or officer of BWIP as of the Closing Date, provided, however, Buyer shall not request the resignations of those persons listed on Schedule 7.01(e).

(f)     At the Closing Date all waiting periods prescribed under the HSR Act shall have expired.

(g)     Borg-Warner shall have executed and delivered and/or caused one or more of its subsidiaries, as the case may be, to have executed and delivered the agreements called for by Sections 6.06, 6.07 and 6.15 of this Agreement.

(h)     Buyer shall have obtained all facility and personnel security clearances and all approvals and consents from the appropriate United States and foreign government agencies or departments to enable the continued performance by BWIP and the Subsidiaries after the Closing of all existing contracts or subcontracts held by BWIP or

RLZ:3/11/87:7001:8

any of its Subsidiaries for work to be done for the United States or any foreign government or any department or agency thereof.

(i)     The 1986 BWIP Financial Statements shall have been received by the Buyer as contemplated by this Agreement and shall not contain any information which the Buyer, as of the date of this Agreement, should not reasonably have expected to be contained therein, based upon the draft of the unaudited 1986 BWIP Financial Statements furnished to the Buyer by Borg-Warner on March 10, 1987.

(j)     The Buyer shall have received complete and correct copies of the agreements entered into between Borg-Warner and BWIP in connection with the formation of BWIP in 1984, together with such evidence of the effective consummation of the transactions contemplated by such agreements as Buyer may reasonably request and such agreements and evidence of effective consummation shall be reasonably satisfactory to the Buyer or shall have been amended and supplemented to be reasonably satisfactory to the Buyer.

- 84 -

RLZ:3/11/87:7001:8

(k)    All    licenses,    permits,    authorizations, consents and approvals of and filings with or notification to any United States or foreign governmental or regulatory body (including work councils and other employee-related bodies) required to be obtained or made in connection with the consummation of the transactions contemplated by this Agreement and the Collateral Agreements shall have been duly obtained or made by or on behalf of Borg-Warner or the Buyer, as the case may be.    All consents of other third-parties required to have been obtained in connection with the consummation of such transactions shall have been obtained by or on behalf of Borg-Warner or the Buyer, as the case may be, except where the failure to obtain any such consent could not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations or financial condition of BWIP and the subsidiaries taken as a whole.

(l)    The updating of Schedule 4.15 as provided in Section 4.15(b) shall not have identified any new claim, action, proceeding or investigation pending or threatened which materially and adversely affects the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole, except for claims, actions, proceedings or investigations covered by Borg-Warner's indemnification provided for in Section 9.04.

- 85 -

RLZ:3/11/87:7001:8

7.02.    <u>Conditions to Obligations of Borg-Warner</u>.
The obligations of Borg-Warner to perform this Agreement
and the Collateral Agreements are subject to the
satisfaction on or prior to the Closing Date of the
following conditions unless waived by Borg-Warner:

(a)    The representations and warranties of the
Buyer set forth in this Agreement and the Collateral
Agreements shall be true and correct in all respects on and
as of the date of this Agreement and on and as of the
Closing Date as though made on and as of the Closing Date;
the Buyer shall, in all material respects, have performed
all agreements and conditions required to be performed by
it under this Agreement and the Collateral Agreements prior
to or on the Closing Date; and Borg-Warner shall have
received a certificate to the foregoing effects, dated the
Closing Date, executed on behalf of the Buyer by its chief
executive officer.

(b)    All actions necessary to authorize the
execution, delivery and performance of this Agreement, the
Collateral Agreements and the Subordinated Note by the
Buyer or the Issuer, as the case may be, and the
consummation of the transactions contemplated herein and

RLZ:3/11/87:7061:8

therein shall have been duly and validly taken by the Boards of Directors of the Buyer or the Issuer, as the case may be.

(c)    Borg-Warner shall have received an opinion of Debevoise & Plimpton, special counsel to the Buyer, dated the Closing Date, satisfactory in scope and substance to the General Counsel of Borg-Warner, to the effect that:

(i)    The Buyer and the Issuer are corporations duly organized, validly existing and in good standing under the laws of the State of Delaware;

(ii)    The Buyer or the Issuer, as the case may be, has full corporate power to carry out the transactions provided for in this Agreement, the relevant Collateral Agreements and the Subordinated Note; all corporate and other proceedings required to be taken by or on the part of the Buyer and the Issuer, as the case may be, to authorize it to execute and deliver this Agreement, the relevant Collateral Agreements and the Subordinated Note and to consummate the transactions contemplated herein and therein have been duly and validly taken; and this Agreement and the relevant Collateral Agreements have been duly and validly authorized, executed and delivered by the

RLZ:3/11/87:7001:8

Buyer and constitute valid and binding obligations of the
Buyer enforceable against them in accordance with their
respective terms, except (A) that such enforcement may be
subject to bankruptcy, insolvency, reorganization,
moratorium or other similar laws now or hereafter in effect
relating to creditors' rights, and (B) that the remedy of
specific performance and injunctive and other forms of
equitable relief may be subject to certain equitable
defenses and to the discretion of the court before which
any proceeding therefor may be brought;

      (iii)   the execution and delivery by the
Buyer and the Issuer, as the case may be, of this Agree-
ment, the relevant Collateral Agreements and the Subor-
dinated Note, the consummation by the Buyer and the Issuer,
as the case may be, of the transactions contemplated hereby
and thereby and the fulfillment of the terms and compliance
by them with the provisions hereof and thereof will not
conflict with or result in a breach of any provision of
their respective Certificates of Incorporation or By-laws;

      (iv)   such counsel does not know of any
litigation, proceeding or investigation that is pending or
threatened against the Buyer in which an adverse determi-
nation might jeopardize or adversely affect any of the
transactions contemplated by this Agreement;

- 88 -

RLZ:3/11/87:7001:8

(v)    the Subordinated Note has been duly authorized, executed and delivered on behalf of the Issuer and constitutes a valid and binding obligation of the Issuer, enforceable against it in accordance with its terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, and (C) that acceleration of the Subordinated Note may affect the collectibility of that portion of the stated principal amount thereof which might be determined to constitute unearned interest thereon; and

(vi)    the Affiliate which acquires the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation, and has full corporate power to acquire the Dutch Assets and the European Stock and to assume the Dutch Liabilities or to

RLZ:3/11/87:7001:8

acquire the stock of B-W Holland, as the case may be; all proceedings required to be taken by or on its part to authorize it to make such acquisition and to assume the Dutch Liabilities have been duly and validly taken; and the agreements or instruments by which it has assumed the Dutch Liabilities have been duly and validly authorized, executed and delivered by it and constitute its valid and binding obligations, enforceable against it in accordance with their terms, except (A) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights generally, and (B) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought; and

(vii) such other matters incident to the transactions contemplated by this Agreement or the Collateral Agreements as Borg-Warner or its counsel may reasonably request.

In rendering such opinion such counsel may rely, to the extent recited therein, upon certificates of officers of the Buyer as to matters of fact and, as to any matter

- 90 -

RLZ:3/11/87:7001:8

contained in such opinion, such counsel may rely upon the opinion of local counsel of established reputation, whether or not employed by the Buyer, provided that such counsel shall state that they believe that they and Borg-Warner are justified in relying upon such certificates and opinions and copies of such opinions are addressed to and delivered to Borg-Warner.

(d)   The form and substance of all legal matters contemplated herein and of all papers delivered hereunder shall be acceptable to the General Counsel or an Associate General Counsel of Borg-Warner.

(e)   At the Closing Date all waiting periods prescribed under the HSR Act shall have expired.

(f)   Borg-Warner shall have been released from those obligations listed in Schedule 9.04 or shall have received commitments from a responsible financial institution arranged by the Buyer and satisfactory to Borg-Warner under which such obligations shall have been adequately provided for.

(g)   The Buyer shall have executed and delivered (and, where appropriate, shall have caused its Affiliate

RLZ:3/11/87:7001:8

which is acquiring the Dutch Assets and the European Stock or the stock of B-W Holland, as the case may be, to have executed and delivered) the agreements called for by Sections 6.06, 6.07 and 6.15 of this Agreement.

(h)    All approvals of any foreign government or regulatory body required to be obtained in connection with the consummation of the transactions contemplated by this Agreement shall have been duly obtained by or on behalf of Borg-Warner or the Buyer, as the case may be.

## ARTICLE VIII

## TERMINATION

8.01.    Termination.    This Agreement may be terminated at any time prior to the Closing by:

(i)    The mutual consent of Borg-Warner and the Buyer; or

(ii)    Borg-Warner or the Buyer at any time after June 30, 1987; or

(iii)    The Buyer, if the conditions set forth in Section 7.01 shall not have been met by June 30, 1987; or

RLZ:3/11/87:7001:3

(iv)    Borg-Warner, if the conditions set forth in Section 7.02 or in Section 7.01 (h) hereof shall not have been met by June 30, 1987; or

(v)    The Buyer, if Borg-Warner shall have materially breached or failed in any material respect to comply with any of its obligations under this Agreement or the Collateral Agreements, or any representation or warranty of Borg-Warner contained in this Agreement or the Collateral Agreements shall have been inaccurate when made in any material respect; or

(vi)    Borg-Warner, if the Buyer shall have materially breached or failed in any material respect to comply with any of its obligations under this Agreement or the Collateral Agreements, or any representation or warranty of the Buyer contained in this Agreement or the Collateral Agreements shall have been inaccurate when made in any material respect; or

(vii)    Borg-Warner or the Buyer, if Borg-Warner's Board of Directors or an appropriate committee thereof has not duly authorized and approved this Agreement and the Collateral Agreements within three business days after the

RLZ:3/11/87:7001:8

date of this Agreement, provided that Borg-Warner's termination right under this paragraph shall be conditioned upon this Agreement and the Collateral Agreements having been duly submitted to Borg-Warner's Board of Directors or an appropriate committee thereof for authorization and approval within three business days after the date of this Agreement.

8.02  Procedure and Effect of Termination.  In the event of termination of this Agreement by either or both of Borg-Warner or the Buyer pursuant to Section 8.01, written notice thereof shall forthwith be given by the terminating party to the other party hereto, and this Agreement and the Collateral Agreements shall thereupon terminate and shall become void  and have no effect, and the transactions contemplated hereby and thereby shall be abandoned, without further action by either of the parties hereto, except as provided in Sections 6.01, 8.03 and 10.03. If this Agreement is terminated as provided herein:

(i)  said termination shall be the sole remedy of the parties hereto with respect to breaches of any agreement, representation or warranty contained in this Agreement and the Collateral Agreements, and neither of the parties hereto nor any of their respective shareholders,

- 94 -

RLZ:3/11/87:7001:8

directors, officers or affiliates, as the case may be, shall have any liability or further obligation to the other party or any of its shareholders, directors, officers or affiliates pursuant to this Agreement and the Collateral Agreements, except in each case as stated in Sections 6.01, 8.03 and 10.03; and

(ii)    all    filings,    applications    and    other submissions made pursuant to Section 6.08 shall, to the extent practicable, be withdrawn from the agency or other person to which they were made.

8.03    Payment of Expenses.

(a)    Notwithstanding the provisions of Section 10.03, if this Agreement is terminated pursuant to clause (iii) or clause (v) of Section 8.03, (other than a termination because of the failure to satisfy Section 7.01(h) or the first sentence of Section 7.01(k) relating to approvals to be obtained by the Buyer), then Borg-Warner shall pay to the buyer, promptly upon submission of a statement therefor, the out-of-pocket expenses (including, without limitation, attorneys' and accountants' fees and disbursements) incurred by the Buyer in connection with this Agreement, provided, however, that such out of pocket

RLZ:3/11/87:7001:8

expenses shall not include commitment fees to any financial institutions.

(b)    Notwithstanding the provisions of Section 10.03, if this Agreement is terminated pursuant to clause (iv) or clause (vi) (other than termination because of a failure to satisfy that part of Section 7.02(h) relating to approvals to be obtained by Borg-Warner), then the Buyer shall pay to Borg-Warner, promptly upon submission of a statement therefor, the out of pocket expenses (including, without limitation, attorneys' and accountants' fees and disbursements) incurred by Borg-Warner in connection with this Agreement, provided that only out of pocket expenses incurred by Morgan Stanley & Co. Incorporated after February 25, 1987 shall be included within the scope of this Section 8.03(b).

ARTICLE IX

POST-CLOSING AGREEMENTS

9.01.    Continued Prosecution and Perfecting Title to Patents and Similar Rights.    Borg-Warner agrees to continue the prosecution of all U.S. and foreign patent applications and all U.S. and foreign trademark applica-tions, as well as trademark renewals, by responding to all

RLZ:3/11/87:7001:8

official inquiries or actions with respect thereto, and to
pay any taxes due, for a period of one month following the
Closing Date, and to make the same efforts with respect
thereto as Borg-Warner makes with its own patents and
trademarks in order to avoid the abandonment of any of the
patents and/or patent applications and trademarks and
trademark applications listed in Schedule 4.10.    In
connection with the action required by the preceding
sentence, reasonable legal fees and other out-of-pocket
expenses attributable to BWIP and paid by Borg-Warner shall
be borne by the Buyer at actual cost to Borg-Warner.
Borg-Warner agrees to cooperate with the Buyer to perfect
title in BWIP to the patents, trademarks, copyrights and
applications therefor as listed in Schedule 4.10, which
perfection will include the preparation and recording of
assignments in the respective countries where said patents,
trademarks, copyrights and applications therefor exist on
the Closing Date.  All out-of-pocket expenses in connection
with the recording of such items shall be borne by
Borg-Warner.  Borg-Warner agrees to prepare, execute and
deliver to the Buyer all documents, if any, necessary to
perfect such title in BWIP.


     9.02.  <u>Stored Records and Access to Records</u>
<u>Following the Closing Date.</u>  Promptly after the Closing,

RLZ:3/11/87:7001:8

Borg-Warner shall arrange for the transportation, at its cost, of all records in its possession relating to BWIP and the Subsidiaries located in the Borg-Warner record center to a location identified by the Buyer within the United States, except with respect to records required to be retained by Borg-Warner except for those records for which a greater period is provided in Section 9.01 of this Agreement. The Buyer and Borg-Warner agree that following the Closing Date (i) each will promptly provide (and, in the case of the Buyer, will cause BWIP and the Subsidiaries to promptly provide) the other with such information and data relating to the business and properties of BWIP and the Subsidiaries prior to the Closing Date as the other may from time to time reasonably request, including without limitation such information and data developed at Borg-Warner's research facility in Des Plaines, Illinois, and the party requesting any such information will promptly reimburse the other for its out of pocket cost incurred in providing same; and (ii) each will retain and permit (and, in the case of the Buyer, will cause BWIP and the Subsidiaries to retain and permit) the other party reasonable access to their respective books and records, insofar as such relate to the business and properties of BWIP and the Subsidiaries prior to the Closing Date. Specific procedure as to the retention and destruction of

RLZ:3/11/87:7001:8

such books and records will be developed by Borg-Warner and the Buyer and kept on file in the Controller's office of both parties.

9.03.  _Further Assurances_.  Subject to the terms and conditions of this Agreement, each of the parties hereto will use all reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the sale of the BWIP Common Stock and, if applicable, the transfer of the Dutch Assets and the European Stock or the stock of B-W Holland to an Affiliate of the Buyer pursuant to this Agreement and the transfer of all of the businesses of the Divisions to BWIP and the Subsidiaries.  From time to time after the Closing, without further consideration, Borg-Warner will, at its own expense, execute and deliver such documents to the Buyer as the Buyer may reasonably request in order more effectively to vest in the Buyer or its Affiliate, as the case may be, good title to the BWIP Common Stock and, if applicable, the Dutch Assets ard the European Stock or the stock of B-W Holland and to vest in BWIP and the Subsidiaries and the Affiliate of Buyer which acquires the Dutch Assets and the European Stock or the stock of B-W Holland all right, title and interest in and

RLZ:3/11/87:7001:8

to the businesses of the Divisions.   Borg-Warner hereby agrees that to the extent that the transfer of the business of the Divisions intended to be made by it to BWIP in 1984 has not been effectively consummated and, as a result thereof, licenses, permits, agreements, patents, trademarks and other assets (including all environmental permits necessary for the operation and use of the Properties and for the disposal of any wastes or other substances generated or used in the operation of BWIP's or any Subsidiary's business or of the Properties) are held in a name other than that of BWIP or one of the Subsidiaries of BWIP, it will use reasonable efforts to take, or cause to be taken, all action, and to do, or to cause to be done, all things, necessary, proper or advisable to make effective such 1984 transaction, at Borg-Warner's sole cost and expense, including the obtaining of licenses, permits, consents, authorizations  and approvals of any requisite United States or foreign governmental entity or third party necessary in connection therewith.


     9.04     Indemnification.


     (a)     Borg-Warner shall defend, indemnify and hold harmless the Buyer, BWIP and each of their respective

RLZ:3/11/87:7001:8

subsidiaries including, without limitation, the Subsidi-
aries, and any Affiliate of Buyer that purchases the Dutch
Assets and the European Stock or the stock of B-W Holland,
from any and all claims, actions, causes of action,
liabilities, losses, damages, and reasonable out-of-pocket
expenses and costs, ("Losses") resulting from, arising out
of or relating to the following:

        (i)   (A)   the breach or falsity of any
    representation or warranty made by Borg-Warner in
    this Agreement or in any of the Collateral
    Agreements or pursuant hereto or thereto and as to
    which a written claim with respect to such breach
    or falsity is submitted to Borg-Warner by the
    Buyer before the representations and warranties
    expire as provided in Section 10.02, and (B) the
    real estate, appurtanant rights thereto and
    improvements thereon comprising the Charlotte,
    North Carolina facility of the Byron Jackson
    Division of BWIP, located at 12200 Steele Creek
    Road in Mecklenburg County, North Carolina
    (collectively the "Charlotte Real Estate"), as
    more particularly described in the Real Estate
    Sales Agreement, dated February 9, 1987, by and
    between BWIP and Okuma Machine Tools, Inc. (the

RLZ:3/11/87:7001:8

"Sales Agreement"), including, without limitation, Losses arising from (x) BWIP's ownership, use and occupancy of the Charlotte Real Estate prior to the Effective Date, (Y) the transfer of title to the Charlotte Real Estate from BWIP to Borg-Warner (including, without limitation, the adequacy of consideration for such transfer, any failure to record such transfer, to deliver deeds or other requisite documents of conveyance or otherwise to legally effect such transfer of title) and (z) the Sales Agreement, including, without limitation, the execution, delivery and performance thereof and the giving of representations and warranties thereunder; and

(ii)    subject to the provisions in subsections (b) and (c) of this Section 9.04, the Covered Liabilities (as defined below). The term "Covered Liabilities" shall mean the following (but shall not include any of the Specified Liabilities as defined in paragraph (b) of this Section 9.04):

(A)    any liability of BWIP and the Subsidiaries (other than intercompany

RLZ:3/11/87:7001:8

liabilities of BWIP and Subsidiaries eliminated in the 1986 BWIP Financial Statements) that, in accordance with generally accepted accounting principles, should have been shown as a liability on the BWIP Balance Sheet or in the notes thereto and was not so shown;

(B)     any Loss to the extent that it results from, relates to or arises out of any business of Borg-Warner or any of its subsidiaries or affiliates other than the businesses of the Divisions;

(C)     any product liability claim, whether based on theories of negligence, warranty or strict liability, made prior to the Closing Date, with respect to products manufactured or sold by the businesses of the Divisions;

(D)     any product liability claim, whether based on theories of negligence, warranty or strict liability, whenever made (i.e., whether made prior to,

RL2:3/11/87:7001:8

on or after the Closing Date), in connection with a product which is in a product category that as of Effective Date was no longer manufactured or held out for sale or for which parts were no longer manufactured or held out for sale by the businesses of the Divisions;

(E) any occurrence, conduct or condition existing on or prior to the Effective Date with respect to the businesses of Borg-Warner, BWIP and its Subsidiaries and the Divisions that:

(1) violated, is alleged to violate or gives rise to a claim under any law, rule, or ordinance in effect as of the Effective Date, or any judgment, order or decree in any case relating to conduct prior to the Effective Date with respect to handling or disposal of toxic or hazardous materials, air or water pollution or otherwise relating to protection of or damage to the environment;

- 104 -

RLZ:3/11/87:7001:8

(2)  is  the  basis  for  any common  law  tort,  nuisance  or  similar claim  by  a  party  (other  than  the  Buyer or  an  affiliate  of  Buyer)  in  connection with  which  Borg-Warner,  BWIP  or  any  of the  Subsidiaries  or  any  business  of  the Divisions  is  alleged  to  have  released harmful,  toxic  or  hazardous  substances into  the  environment;  or

(3)  is  the  basis  for  a  claim that  the  claimant  contracted  a  disease as  a  result  of  exposure  prior  to  the Effective  Date  to  any  product  of  or  raw material  used  by  Borg-Warner,  BWIP  or any  of  the  Subsidiaries  or  any  business of  the  Divisions,  except  to  the  extent that  such  a  claim  is  made  after  the Effective  Date  and  arises  out  of  third party  use  of  a  product  after  sale;

(F)  any  worker's  compensation  claim  by an  employee  or  former  employee  of

RLZ:3/11/87:7001:8

Borg-Warner, BWIP or any of its Subsidiaries or any business of the Divisions with respect to an accident or occurrence prior to the Closing Date;

(G)    any claim that is first asserted within six months after the Effective Date by an employee or former employee of BWIP or any of its Subsidiaries or of any of the businesses of the Divisions which claim involves or alleges discrimination on the basis of race, religion, sex, age or other factors that occurred or are alleged to have occurred on or prior to the Effective Date;

(H)    any claim or obligation which Borg-Warner assumes or agrees to perform or be responsible for or pay under the terms of the Tax Agreement provided for in Section 6.06 or the Employee Assets Agreement provided for in Section 6.07;

(I)    any cause of action or judicial or administrative action, suit, proceeding or

RLZ:3/11/87:7001:8

investigation pending or threatened that is
set forth in or should have been set forth
in Schedule 4.15 hereto or in Schedule 4.23
or in Schedules 4.2EA and 4.4EA to the
Employee Assets Agreement provided for in
Section 6.07;

(J)    any failure or alleged failure to
comply with, or any violation or alleged
violation of, any law, rule, regulation,
statute, ordinance, permit, judgment,
injunction, order, decree, license or other
governmental authorization or approval
applicable to BWIP or any of its
Subsidiaries or any of the businesses of
the Divisions, which failure or violation
occurred or was alleged to have occurred on
or prior to the Effective Date except for
failures or violations relating to subjects
specifically covered by paragraphs E, G, H
or K of this Section 9.04(a) which the
parties intend to be covered by the
provisions thereof;

RLZ:3/11/87:7001:8

(K)   any  payment  or  other  use  of  any
assets  on  or  prior  to  the  Effective  Date  by
Borg-Warner  or  any  of  its  subsidiaries,
including  BWIP  or  any  of  its  Subsidiaries,
to  or  on  behalf  of  an  official  of  any
government,  or  for  any  purpose  related  to
political  activity,  except  as  permitted  by
applicable  law,  or  for  any  of  the  purposes
described  in  Section  162(c)  of  the  Code  or
for  establishment  or  maintenance  of  any
concealed  fund  or  concealed  bank  account;

(L)   any  recourse  obligation  against
Borg-Warner,  BWIP  or  any  of  its
Subsidiaries  with  respect  to  any  notes,
bonds,  accounts  receivable  or  other
evidences  of  indebtedness  of  or  rights  to
receive  payments  from  any  person,  which
recourse  obligation  existed  on  the
Effective  Date  and  has  not  been  disclosed
on  Schedule  9.04  hereto,  but  excluding  any
such  obligation  to  the  extent  offset  by  a
related  acquisition  of  assets  by  the  Buyer,
BWIP  and  the  Subsidiaries  or  any  Affiliate
of  the  Buyer  and  exclu

- 108 -

RLZ:3/11/87:7001:8

performance obligations for which Buyer is responsible under subsection (b)(B) of this Section 9.04; and

(M)   any liability of BWIP or any of its Subsidiaries to the extent covered by insurance carried by Borg-Warner.

(b)   The Buyer shall defend, indemnify and hold harmless Borg-Warner and its subsidiaries from, and there shall be excluded from Borg-Warner's obligation to defend, indemnify and hold harmless under preceding paragraph (a) of this Section 9.04, the following Losses (the "Specified Liabilities"):

(A)   any Losses to the extent reserved or otherwise provided for in the BWIP Balance Sheet or resulting from operations in the ordinary course of business of BWIP and the Subsidiaries after the Effective Date and any debt, liability, contract, commitment, engagement, lease or other obligation relating to the businesses of BWIP and the Subsidiaries and properly transferred to BWIP or any of its Subsidiaries or to the Buyer or an Affiliate of the Buyer on or prior to the Closing

- 109 -

RLZ:3/11/87:7001:8

Date in accordance with Section 1.02(a) and the
other terms of this Agreement, _provided_ that none
of the foregoing Losses shall be "Specified
Liabilities" to the extent that the Collateral
Agreements or another section of this Agreement
provides that Borg-Warner is to be responsible for
any such Loss;

(B)   any claim based solely upon an express
warranty, to the extent that such claim involves
Loss within the scope of such warranty, with
respect to a product manufactured or sold by BWIP
or any of its Subsidiaries, except those claims
set forth in Schedule 4.15 hereto and those claims
required to be disclosed in Schedule 4.15 hereto
that are not so disclosed;

(C)   any product liability claim asserted
after the Effective Date, whether based on
theories of negligence, warranty or strict
liability, arising from a product manufactured or
sold by any of the businesses of the Divisions,
whenever manufactured or sold, unless set forth in
Schedule 4.15 or required to be disclosed in
Schedule 4.15 and not so disclosed, _provided_,

- 110 -

RLZ:3/11/87:7001:8

however, that BWIP or one of its Subsidiaries manufactures or holds out for sale such product or parts therefor as of the Effective Date;

(D)   any claim that is first asserted more than six months after the Effective Date by an employee or former employee of the businesses of the Divisions, which claim involves or alleges discrimination on the basis of race, religion, sex, age or other factors that occurred on, prior to or after the Effective Date;

(E)   any claim or obligation which the Buyer assumes or agrees to perform or be responsible for or to pay under the terms of the Employee Assets Agreement provided in Section 6.07;

(F)   any claim or obligation which the Buyer assumes or agrees to perform or be responsible for or to pay under the terms of the Tax Agreement provided for in Section 6.06; and

(G)   Losses arising from BWIP's failure to perform its obligations under the Occupancy

- 111 -

RLZ:3/11/87:7001:8

Agreement, dated March 2, 1987, between BWIP and Okuma Machine Tools Inc.

(c)    Notwithstanding    the    provisions    of subsection (a) of this Section 9.04, Borg-Warner shall not be required to defend, indemnify and hold harmless the Buyer, BWIP, their subsidiaries or any Affiliate of Buyer for:

(i)    all of the first $1,000,000; 50% of the next $4,000,000; and 30% of the next $5,000,000 of the amounts that otherwise would be due from Borg-Warner under subsection (a) of this Section 9.04, but for the provisions of this clause (i), provided, however, that this clause (i) shall not apply to any Loss for which Borg-Warner is liable under the provisions of clause (ii)(H) and clause (i)(B) of Section 9.04(a);

(ii)    any claim, action, cause of action or liability that, but for this provision, would involve an indemnification payment by Borg-Warner of less than $10,000, provided, however, that this clause (ii) shall not apply to any Loss for which

RLZ:3/11/87:70C1:8

Borg-Warner is liable under the provisions of clause (ii)(H) and clause (i)(B) of Section 9.04(a); and

(iii)    any claim, action, cause of action or liability arising out of the operation of the Divisions prior to the Effective Date not specifically set out in subsection (a) of this Section 9.04 requiring Borg-Warner to defend, indemnify and hold harmless the Buyer, BWIP and each of their respective subsidiaries; and

(iv)    any claim, action, cause of action, or liability, loss or damage pursuant to subsection (a) of this Section 9.04 which is not submitted to Borg-Warner for defense within five years after the Effective Date except for such claims, action, cause of action, liability, loss or damage covered by the provisions of clauses (ii)B, E, H, J and K and clause (i)(B) of Section 9.04(a);

provided, however, that none of the provisions of this subsection (c) shall apply to Borg-Warner's obligations under clause (I) of subsection (a) of this Section 9.04.

- 113 -

RLZ:3/11/87:7001:8

(d)     Whenever any claim, action, cause of action
or liability (a "Claim") shall be asserted against a party
entitled to be defended and indemnified under this Section
9.04 (the "Indemnified Party"), the Indemnified Party shall
give written notice of the Claim, with reasonable
promptness after such Indemnified Party has actual
knowledge of the Claim, to the party who is required to
provide indemnification and defense with respect to the
Claim (the "Indemnifying Party"); provided, however, that
the failure to give such notice shall not relieve the
Indemnifying Party of its indemnification obligations under
this Agreement except to the extent that the omission
results in a failure of actual notice to the Indemnifying
Party and such Indemnifying Party is injured as a result of
the failure to give such notice. The Indemnifying Party
shall, at its expense, undertake the defense of such Claim
with attorneys of its own choosing reasonably satisfactory
to the Indemnified Party; provided that an Indemnified
Party may participate in such defense, but only at such
Indemnified Party's expense. In the event the Indemnifying
Party, within a reasonable time after receiving notice of
the Claim from the Indemnified Party, fails to defend the
Claim, the Indemnified Party may, at the expense of the
Indemnifying Party and after giving notice to the

RLZ:3/11/87:7001:8

Indemnifying Party of such action, undertake the defense of the Claim and compromise or settle the Claim, all for the account of and at the risk of the Indemnifying Party. No Indemnifying Party, in the defense of any Claim, shall, except with the consent of each Indemnified Party (which consent will not be unreasonably withheld), consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the person or persons asserting such Claim to such Indemnified Party of a release from all liability with respect to such Claim. In each case, the Indemnified Party will cooperate with the Indemnifying Party, so long as the Indemnifying Party is conducting the defense of the Claim, in the preparation for and prosecution of the defense of such Claim, including making available evidence within the control of the Indemnified Party and persons needed as witnesses who are employed by Indemnified Party, in each case as reasonably needed for such defense and at cost, which costs, to the extent reasonably incurred, shall be paid by the Indemnifying Party.

(e)    All product warranty repair or replacement required to be paid for by Borg-Warner under subsection (a) of this Section 9.04 shall be performed at fully allocated cost by the Buyer, through BWIP and its Subsidiaries, at Borg-Warner's request.

- 115 -

RLZ:3/11/87:7001:8

(f)     In any case in which a matter giving rise to a Loss of the type specified in Section 9.04(a)(ii)(G) or a claim under such Section that could result in a Loss requires a hiring or a rehiring or a change in the conduct or practices of BWIP and the Subsidiaries to avoid the Loss or to avoid a continuation of the Loss by bringing such conduct and practice into compliance with the requirements of applicable law, Buyer will cause BWIP and the Subsidiaries at their expense to comply with ordered specific performance or to change their conduct or practices to bring them into compliance with the such requirements.

(g)     In any instance in which each party hereto would be liable for a portion of a particular Loss under the provisions of this Section 9.04 (other than the provisions of clause (i) of subsection (c)), then the portion of the Loss for which each party is responsible under this Section 9.04 shall be determined by an equitable allocation of the Loss between Borg-Warner and the Buyer before applying the sharing provisions in subsection (c) of this Section 9.04.

RLZ:3/11/87:7001:8

ARTICLE X

MISCELLANEOUS PROVISIONS

10.01. <u>Waiver and Amendment</u>.    Any term or pro-
vision of this Agreement and the Collateral Agreements may
be waived at any time by the party which is entitled to the
benefits thereof, but only in a writing signed by such
party, and this Agreement and the Collateral Agreements may
be amended or supplemented at any time, but only by written
agreement of Borg-Warner and the Buyer.    Any such waiver
with respect to a failure to observe any such provision
shall not operate as a waiver of any subsequent failure to
observe such provision unless otherwise expressly provided
in such waiver.

10.02.    <u>Survival of Representations and Warran-
ties</u>.  Each and every representation and warranty given by
Borg-Warner to the Buyer in Article IV of this Agreement or
in the officer's certificate provided pursuant to Section
7.01(a) hereof, except the representations and warranties
in Sections 4.02 and 4.03, which shall survive
indefinitely, and the representations and warranties
contained in Section 4.17, which shall survive until 90
days after all the Tax liabilities of BWIP and the
Subsidiaries for periods commencing prior to the Closing

- 117 -

RLZ:3/11/87:7001:8

have been finally determined or the earlier expiration of
the applicable statute of limitations (including extensions
thereof), and each and every representation and warranty
given by the Buyer to Borg-Warner in Article V of this
Agreement or in the officer's certificate provided pursuant
to Section 7.02(a) hereof, except the representations and
warranties in Section 5.05, which shall survive
indefinitely, shall expire and be deemed terminated and
extinguished one year after the Closing Date.

10.03. <u>Expenses</u>. Except as otherwise provided in
this Agreement or the Collateral Agreements, whether the
purchase and sale of the BWIP Common Stock is or is not
consummated, Borg-Warner and the Buyer shall pay their
respective expenses separately incurred in connection with
this Agreement and the Collateral Agreements and the
transactions contemplated hereby and thereby.

10.04. <u>Entire Agreement</u>. This Agreement and the
additional written agreements called for herein together
contain the entire agreement between Borg-Warner and the
Buyer with respect to the purchase and sale of the BWIP
Common Stock and the related transactions and supersede all
prior arrangements or understandings with respect thereto.

RLZ:3/11/87:7001:8

10.05.  _Descriptive Headings_.  Descriptive headings are for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement or the Collateral Agreements.

10.06.  _Notices_.  All notices, consents, requests, instructions, approvals and other communications provided for herein and in the Employee Assets Agreement and all legal process in regard hereto and thereto shall be validly given, made or served, if in writing and delivered personally or sent by telex (except for legal process) or registered mail, postage prepaid, to:

> BUYER:
>
> BWIP Acquisition Corporation
> c/o The Clayton & Dubilier
> Private Equity Fund II Limited Partnership
> 270 Greenwich Avenue
> Greenwich, Connecticut
> Attention:  Clayton & Dubilier Associates II
>             Limited Partnership
>
> with copies to:
>
> Clayton & Dubilier, Inc.
> 126 East 56th Street
> New York, New York 10022
> Attention: Alberto Cribiore
>
> Debevoise & Plimpton
> 875 Third Avenue
> New York, New York 10022
> Attention: Franci J. Blassberg

- 119 -

RLZ:3/11/87:7001:8

BORG-WARNER:

Borg-Warner Corporation
200 South Michigan Avenue
Chicago, Illinois 60604
Attention:  Clarence E. Johnson, President
Telex No.  25-3450

or to such other address or telex number as any party
hereto may, from time to time, designate in a written
notice given in a like manner. Notice given by telex shall
be deemed delivered on the day the sender receives telex
confirmation that such notice was received at the telex
number of the addressee. Notice given by mail as set out
above shall be deemed delivered three days after the date
the same is postmarked.

10.07. Assignment. This Agreement and the
Collateral Agreements and all of the provisions hereof and
thereof shall be binding upon and inure to the benefit of
the parties hereto and thereto and their respective
successors and permitted assigns, but neither this
Agreement nor the Collateral Agreements, nor any of the
rights, interests or obligations hereunder and thereunder,
shall be assigned by either party hereto or thereto without
the prior written consent of the other party, except that
the Buyer may assign all or any part of its rights herein
or therein to one or more of its wholly-owned subsidiaries

RLZ:3/11/87:7001:8

and as security for such financing as the Buyer considers necessary or desirable in connection with the performance of its obligations hereunder.  Neither this Agreement nor the Collateral Agreements are intended to confer upon any other party, except the parties hereto and thereto, any rights or remedies hereunder or thereunder.

10.08. <u>Acquisition of Rights to Confidentiality</u>. At the Closing, Borg-Warner shall grant and convey to the Buyer all rights of Borg-Warner under all confidentiality agreements between Borg-Warner and person(s) other than the Buyer which have been entered into in connection with or relating to the possible sale of BWIP by Borg-Warner to such other person(s) (collectively, the "Confidentiality Agreements"), including, without limitation, the right to enforce all terms of such Confidentiality Agreements.  At the Closing, Borg-Warner shall deliver to the Buyer the original executed copies of such Confidentiality Agreements.

10.09. <u>Interpretation</u>.

(a) As used in this Agreement, the term "person" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, an unincorporated

RLZ:3/11/87:7001:8

organization or a governmental entity or any department or agency thereof.

(b) As used in this Agreement, the term "Permitted Exceptions" shall mean and include

(i) mortgages, liens, pledges, charges, encumbrances and restrictions which secure debt that is reflected as a liability on the BWIP Balance Sheet or which are otherwise reflected in the BWIP Balance Sheet or disclosed in the notes thereto;

(ii) mortgages, liens, pledges, charges, encumbrances and restrictions incurred in connection with BWIP's purchase of properties and assets after the date of the BWIP Balance Sheet securing all or a portion of the purchase price therefor;

(iii) statutory liens for current taxes or assessments not yet due or delinquent or the validity of which is being contested in good faith by appropriate proceedings;

RLZ:3/11/87:7001:8

(iv) mechanics', carriers', workers', repairers' and other similar liens arising or incurred in the ordinary course of business relating to obligations as to which there is no default on the part of BWIP or any of the Subsidiaries;

(v) zoning, entitlement and other land use and environmental regulations by government authorities; and

(vi) such other liens, imperfections in title, charges, easements, restrictions and encumbrances (A) which do not materially detract from the value of or materially interfere with the present use of any of the Properties subject thereto or affected thereby that is material to the business, operations or financial condition of BWIP and the Subsidiaries taken as a whole or (B) which relate to properties that are not material to BWIP and the Subsidiaries taken as a whole and do not, in the aggregate, materially adversely affect BWIP and the Subsidiaries taken as a whole.

(c) As used in this Agreement, the term "subsidiary" when used in reference to any other person

- 123 -

RLZ:3/11/87:7001:8

shall mean any corporation of which outstanding securities having ordinary voting power to elect a majority of the board of directors of such corporation are owned, directly or indirectly, by such other person.

(d)    As used in this Agreement, the terms "affiliate" and "parent" shall have the meaning set forth in Rule 12b-2 of the General Rules and Regulations under the Securities Exchange Act of 1934 as amended.

(e)    As used in this Agreement, the term "Code" shall mean the Internal Revenue Code of 1986, as amended, and any similar law hereafter enacted, and any reference to any provision of the Code shall be taken to refer to the corresponding provision of such similar law.

(f)    The terms "knowledge" and "best knowledge," and terms of similar import, as used in this Agreement with respect to Borg-Warner, BWIP and the Subsidiaries shall not include what is known solely by hourly workers and not by supervisory or management personnel of such corporations.

10.10.  <u>Model Mini-Trial Agreement</u>.  The parties hereto intend that they will attempt in good faith to resolve any

RLZ:3/11/87:7001:8

controversy or claim between them arising out of or
relating to this Agreement and the Collateral Agreements.
If the parties are unable to resolve such controversy or
claim based on a good faith effort to do so, except as
otherwise provided in this Agreement or the Collateral
Agreements the parties hereby agree to submit such
controversy or claim to a mini-trial procedure as provided
in the CPR Model Mini-Trial Agreement.

10.11. <u>Law Applicable</u>. This Agreement and the
Collateral Agreements shall be governed by and construed
and enforced in accordance with the laws of the State of
Delaware.

IN WITNESS WHEREOF, the Buyer and Borg-Warner have
caused this Agreement to be duly executed in their respec-
tive corporate names by their respective officers, each of
whom is duly and validly authorized and empowered, all on
and as of the day and year first above written.

BWIP ACQUISITION CORPORATION

By: /s/ Alberto Cribiore
    Alberto Cribiore
    President

BORG-WARNER CORPORATION

By: /s/ Donald C. Trauscht
    Donald C. Trauscht
    Vice-President

STOCK PURCHASE AGREEMENT

TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| PARTIES | . . . . . . . . . . . . . . . . . . . | 1 |
| RECITALS | . . . . . . . . . . . . . . . . . | 1 |
| ARTICLE I | STRUCTURE OF BWIP AND CONDITION ON THE CLOSING DATE . . . . . . . . | 3 |
| 1.01 | Financial Statements . . . . . . . | 3 |
| 1.02 | Transfers to BWIP . . . . . . . . . | 5 |
| 1.03 | Change of Name . . . . . . . . . | 9 |
| 1.04 | Names and Trademarks . . . . . . | 10 |
| 1.05 | Reorganization, Income, Sales and Transfer Taxes . . . . . . . . . | 11 |
| ARTICLE II | SALE OF STOCK AND TERMS OF PAYMENT | 11 |
| 2.01 | The Sale . . . . . . . . . . | 11 |
| 2.02 | Consideration . . . . . . . . . | 14 |
| 2.03 | Cash Adjustments During Interim Period. | 15 |
| ARTICLE III | THE CLOSING . . . . . . . . . . | 18 |
| 3.01 | Time and Place of Closing . . . . . . | 18 |
| 3.02 | Deliveries by Borg-Warner . . . . . | 19 |
| 3.03 | Deliveries by the Buyer . . . . . . | 20 |
| 3.04 | Effective Date . . . . . . . . . | 21 |
| ARTICLE IV | REPRESENTATIONS AND WARRANTIES OF BORG-WARNER . . . . . . . . . | 22 |
| 4.01 | Organization; Qualification . . . . . | 22 |
| 4.02 | Capitalization of BWIP . . . . . | 23 |
| 4.03 | Title to Stock . . . . . . . . . | 24 |
| 4.04 | Subsidiaries; Investments . . . . . | 24 |
| 4.05 | Authority Relative to this Agreement | 28 |
| 4.06 | Consents and Approvals; No Violation | 29 |
| 4.07 | Financial Statement Matters; Undisclosed Liabilities . . . . . . | 32 |
| 4.08 | Absence of Certain Changes or Events | 33 |
| 4.09 | Title and Related Matters . . . . . | 36 |
| 4.10 | Patents, Trademarks, Trade Names, Etc.. | 38 |
| 4.11 | Leases . . . . . . . . . . . | 39 |
| 4.12 | Labor Matters . . . . . . . . . | 41 |
| 4.13 | ERISA; Benefit Plans . . . . . . . | 42 |
| 4.14 | Certain Contracts and Arrangements | 46 |
| 4.15 | Legal Proceedings, Etc. . . . . . . | 48 |
| 4.16 | Governmental Authorization and Regulations . . . . . . . . . . | 49 |

(i)

Exhibit A

|  |  |  |  |
|---|---|---|---|
|  | Taxes . . . . . . . . . . . . . . . . . | 50 |
| 4.18 | Transactions with Shareholders, | |
|  | Officers, Directors and Employees . . | 52 |
| 4.19 | Commissions . . . . . . . . . . . . . . | 53 |
| 4.20 | Insurance . . . . . . . . . . . . . . . | 53 |
| 4.21 | Powers of Attorney; Bank Accounts . . . | 53 |
| 4.22 | Disclosure . . . . . . . . . . . . . . . | 54 |
| 4.23 | Environmental Representations and | |
|  | Warranties . . . . . . . . . . . . . . | 54 |
| 4.24 | Acquisition of Subordinated Note . . . | 57 |
| ARTICLE V | REPRESENTATIONS AND WARRANTIES OF | |
|  | THE BUYER . . . . . . . . . . . . . . . | 58 |
| 5.01 | Organization . . . . . . . . . . . . . | 58 |
| 5.02 | Authority Relative to this Agreement . | 59 |
| 5.03 | Consents and Approvals; No Violation . | 60 |
| 5.04 | Commissions . . . . . . . . . . . . . . | 62 |
| 5.05 | Acquisition of Stock for Investment . . | 62 |
| 5.06 | Capitalization of Issuer . . . . . . . | 63 |
| 5.07 | Disclosure . . . . . . . . . . . . . . . | 63 |
| ARTICLE VI | COVENANTS OF THE PARTIES . . . . . . . | 63 |
| 6.01 | Access to Records and Properties | |
|  | Prior to the Closing Date . . . . . . | 63 |
| 6.02 | Operation of the Business of BWIP . . . | 64 |
| 6.03 | Consents . . . . . . . . . . . . . . . | 65 |
| 6.04 | Additional Financial Statements . . . . | 66 |
| 6.05 | Insurance . . . . . . . . . . . . . . . | 66 |
| 6.06 | Tax Agreement . . . . . . . . . . . . . | 67 |
| 6.07 | Employee Assets Agreement . . . . . . . | 67 |
| 6.08 | Filings . . . . . . . . . . . . . . . . | 63 |
| 6.09 | Public Announcements . . . . . . . . . | 6. |
| 6.10 | Commissions . . . . . . . . . . . . . . | 70 |
| 6.11 | Sales and Transfer Taxes . . . . . . . | 70 |
| 6.12 | No Shopping, Etc. . . . . . . . . . . . | 71 |
| 6.13 | Non-Competition . . . . . . . . . . . . | 72 |
| 6.14 | Personal Property Locations . . . . . . | 73 |
| 6.15 | Other Agreements . . . . . . . . . . . | 73 |
| 6.16 | Environmental Matters . . . . . . . . . | 73 |
| 6.17 | Update of Schedule 9.04 . . . . . . . . | 74 |
| ARTICLE VII | CLOSING CONDITIONS . . . . . . . . . . | 75 |
| 7.01 | Conditions to Obligations of | |
|  | the Buyer . . . . . . . . . . . . . . | 75 |
| 7.02 | Conditions to Obligations of | |
|  | Borg-Warner . . . . . . . . . . . . . | 86 |

(ii)

RLZ:3/11/87:7001:8

                                                              PAGE

ARTICLE VIII   TERMINATION   . . . . . . . . . . . . . .   92

    8.01   Termination . . . . . . . . . . . . .   92
    8.02   Procedure and Effect of
           Termination . . . . . . . . . . . .   94
    8.03   Payment of Expenses . . . . . . . . . .   95

ARTICLE IX   POST-CLOSING AGREEMENTS . . . . . . . . .   96

    9.01   Continued Prosecution and Perfecting
           Title to Patents and Similar
           Rights . . . . . . . . . . . . . .   96
    9.02   Stored Records and Access to
           Records Following the Closing Date.   97
    9.03   Further Assurances . . . . . . . . . .   99
    9.04   Indemnification . . . . . . . . . . .   100

ARTICLE X    MISCELLANEOUS PROVISIONS . . . . . . . . .   117

    10.01  Waiver and Amendment . . . . . . . . .   117
    10.02  Survival of Representations and
           Warranties . . . . . . . . . . . .   117
    10.03  Expenses . . . . . . . . . . . . . .   118
    10.04  Entire Agreement . . . . . . . . . . .   118
    10.05  Descriptive Headings . . . . . . . . .   119
    10.06  Notices . . . . . . . . . . . . . . .   119
    10.07  Assignment . . . . . . . . . . . . .   120
    10.08  Acquisition of Rights to
           Confidentiality . . . . . . . . . .   121
    10.09  Interpretation . . . . . . . . . . . .   121
    10.10  Model Mini-Trial Agreement . . . . . .   124
    10.11  Law Applicable . . . . . . . . . . . .   125

RLZ:3/11/87:7001:8

EXHIBITS

| | |
|---|---|
| A-1 | Audited Balance Sheets as of December 31, 1986, and Reviewed Statements of Income and Statements of Changes in Financial Position for the year then ended, of each BWIP division (1.01) |
| A-2 | Unaudited Combined Balance Sheet and Income Statement of BWIP and the Subsidiaries as of December 31, 1985 |
| B | Form of Subordinated Note (2.02) |
| C | Form of Tax Agreement (6.06) |
| D | Form of Employee Assets Agreement (6.07) |

SCHEDULES

| | |
|---|---|
| 1.04 | Trademarks and tradenames |
| 4.01 | Jurisdictions where BWIP is qualified to do business |
| 4.04 | Subsidiaries and investments |
| 4.06 | Conflicts and approvals |
| 4.07 | Unrecorded liabilities |
| 4.08 | Material adverse changes |
| 4.09 | Title exceptions |
| 4.09(a) | Owned real estate |
| 4.10 | Intellectual Property |
| 4.11 | Leases |
| 4.12 | Labor matters |
| 4.13 | Multiemployer plans |
| 4.14 | Certain agreements and obligations |
| 4.15 | Claims and litigation |
| 4.17 | Tax sharing agreements |
| 4.18 | Insider transactions and interest |
| 4.20 | Insurance policies and claims |
| 4.21 | Powers of attorney and bank accounts |
| 4.23 | Environmental matters |
| 7.01(e) | Certain persons |
| 9.04 | Recourse obligations |

(iv)

RLZ:3/11/87:7001:8

## INDEX OF DEFINED TERMS

|  | LOCATION |
|---|---|
|  | (Numbers refer to Sections) |
| ... Person | 8.03(c) |
| ...stment Statement | 2.03 |
| Advance Accounts | 2.03 |
| Affiliate | 1.02(b) |
| Affiliate | 8.03(c) |
| affiliate | 10.03 |
| Affiliated Group | 4.17(a) |
| Agreement | Preamble |
| Associate | 8.03(c) |
| Borg-Warner | Preamble |
| BWIP | Recitals |
| BWIP Balance Sheet | 1.01 |
| BWIP Common Stock | Recitals |
| 1986 BWIP Financial Statements | 1.01 |
| BWIP Historical Financial Statements | 1.01 |
| BWIP and the Subsidiaries | Recitals |
| Buyer | Preamble |
| Cash Amount | 2.02 |
| Change in Control | 8.03(c) |
| Claim | 9.04(d) |
| Closing | 3.01 |
| Closing Date | 3.01 |
| Code | 10.09 |
| Collateral Agreements | 4.05 |
| Common Shares | 8.03(c) |
| Confidentiality Agreements | 10.08 |
| Divisions | Recitals |
| Dutch Assets | 2.01 |
| Effective Date | 3.09 |
| Employee Assets Agreement | 6.04 |
| ERISA | 4.13(c) |
| European Stock | 2.01 |
| HSR Act | 3.01 |
| Indemnified Party | 9.04(d) |
| Indemnifying Party | 9.04(d) |
| Interim Period | 2.03 |
| IRS | 4.13(e) |
| Investments | 4.04(a) |
| Losses | 9.04(a) |
| PMM | 1.01 |
| parent | 10.09 |
| Permitted Exceptions | 10.09 |
| Pension Pla... | 4.13(c) |
| person | 10.09 |
| Plans | 4.13(a) |
| Properties | 4.09 |
| Purchase Price | 2.02 |
| Reorganization | Recitals |
| Specified Liabilities | 9.04(a) |
| Subordinated Note | 2.02 |
| Subsidiary | Recitals |
| subsidiary | 10.09 |
| Tax | 4.17(a) |
| Tax Agreements | 6.06 |